## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **RANDALL WAYNE MAYS** | § | |
| | § | |
| **V.** | § | **NO. 6:11cv135** |
| | § | |
| **RICK THALER,** | § | |
| **DIRECTOR** | § | |

## PETITIONER, RANDALL WAYNE MAYS' PETITION  FOR WRIT OF HABEAS CORPUS

Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail: smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

ATTORNEY FOR RANDALL WAYNE MAYS,
PETITIONER

March 3, 2012

<u>TABLE OF CONTENTS</u>

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      B.   The Prosecution's Case at the Guilt Phase . . . . . . . . . . . . . . . . . . . . 4
      C.   The Defense Case at the Guilt Phase . . . . . . . . . . . . . . . . . . . . . . . . . 7
      D.   The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      E.   The Prosecution's Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . 12
      F.   The Defense's Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      G.   State Post-Conviction Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.   CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

PART 1 – INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS . . . . . . . . . 18

Claim 1

      Trial counsel was constitutionally ineffective in the penalty phase for
      failing to investigate vital mitigating evidence of Mr. Mays' severe
      mental illness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Claim 2

      Trial counsel was constitutionally ineffective for failing to request a
      competency hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Claim 3

      Trial counsel was constitutionally ineffective for failing to investigate
      and present the affirmative defense of insanity . . . . . . . . . . . . . . . . . . . 26

Claim 4

Mr. Mays received ineffective assistance of trial counsel for failing to object to the trial court's omission of the jury instruction that jurors need not agree on what particular evidence supports an affirmative answer to the mitigation question . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

PART 2 – CLAIMS RELATED TO MENTAL DEFICIENCIES . . . . . . . . . . . . 35

Claim 5

Execution of Mr. Mays, as an individual with an intellectual disability, would violate the Eighth Amendment as cruel and unusual punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A. Subaverage Intellectual Functioning . . . . . . . . . . . . . . . . . . . . . . . . 35
B. Adaptive Deficits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
C. Onset Prior to Age 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
D. Ineffectiveness of State Habeas Counsel Constitutes Cause to Excuse any Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Claim 6

The Eighth Amendment's proscription of cruel and unusual punishment prohibits imposition of death penalty on a defendant who is functionally equivalent to an individual with "intellectual disability", but cannot be so diagnosed merely because the onset of this condition occurred after age 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Claim 7

The trial court's restrictions on the jury's consideration of Mr. Mays' mental deficiencies abrogated the State's responsibility to prove a culpable mental state beyond a reasonable doubt in violation of the Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

PART 3 – OTHER CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Claim 8

The underlying offense, as interpreted by the Texas Court of Criminal Appeals, is impermissibly vague and in violation of the Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Claim 9

Mr. Mays' Sixth, Eighth and Fourteenth Amendment rights were violated because the Texas death penalty statute impermissibly placed the burden of proving the mitigation issue on Mr. Mays, rather than requiring the State to prove the absence of mitigating factors beyond a reasonable doubt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

V.  CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

APPENDIX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

COMES NOW, Randall Wayne Mays, currently confined on death row in the Texas Department of Criminal Justice, Institutional Division, who petitions this Honorable Court, pursuant to 28 U.S.C. sec. 2254, *et seq*., to issue a writ of habeas corpus ordering that his sentence of death be vacated.  In support whereof, Mr. Mays would show this Court as follows:

## I.

## INTRODUCTION

At the essence of Mr. Mays' complaints is that he is a severely mentally ill individual, both now, in his youth, and during the occurrence of the shooting.  His trial counsel made an effort to convince the jury that this was mitigating, but fell short of the mark by failing to assure that the evidence was properly investigated, presented, and that the jury was give the proper tools and instructions to give weight to the mitigating evidence.   Further, society's evolving views of executing those with undeveloped or damaged brains, as reflected in *Simmons* and *Atkins*, mandate a finding that execution of a person laboring under such severe mental illness as Mr. Mays is a violation of the Eighth Amendment.

## II.

## PROCEDURAL HISTORY

Mr. Mays was indicted by a Henderson County Grand Jury for the offense of capital murder, alleged to have occurred on May 17, 2007.  Mr. Mays was convicted and sentenced to death almost a year later on May 13, 2008.

An automatic appeal followed, and on April 28, 2010, the the Texas Court of

1

Criminal Appeals affirmed the conviction and death sentence. *Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010). A petition for writ of certiorari was filed with the United States Supreme Court, which was denied on March 7, 2011. *Mays v. Texas*, No. 10-8172 (3-7-11).

State post-conviction proceedings were conducted and relief was denied on March 16, 2011. The opinion of the Texas Court of Criminal Appeals is unpublished, reported as *Ex parte Randall Wayne Mays*, 2011 Tex. Crim. App. Unpub. LEXIS 190 (Tex. Crim. App. March 16, 2011). A petition for writ of certiorari was filed with the United States Supreme Court, which was denied on October 17, 2011. *Mays v. Texas*, No. 10-11097 (10-17-11).

## III.

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a federal court may not grant habeas relief after an adjudication on the merits in a state court proceeding unless the adjudication of the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Supreme Court has "made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quotations omitted).  "In other words, a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Id.* However, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Under § 2254(d)(2), "a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' § 2254(e)(1)." *Id.* at 338–39.

Finally, where the state court did not decide the case on the merits, despite being offered an opportunity to do so, the AEDPA is inapplicable, and a *de novo* standard is appropriate.[1]

---

[1]     28 U.S.C. § 2254(d)*; Reed v. Quarterman*, 555 F.3d 364, 369-70 (5th Cir. 2009): *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006).

<div align="center">

**V.**

**STATEMENT OF FACTS**

</div>

**A.**    **Introduction**

Randall Wayne Mays, a person who had struggled with serious mental illness most of his life, was involved in a standoff with police on May 17, 2007.  On the day of the incident, a neighbor summoned the police to the Mays' residence.  Mr. Mays, who had been arguing with his wife about her claim that she had been sexually assaulted, believed the police were there to help his wife and readily spoke with the officers when they arrived.  However, when one of the police officers started reading Mr. Mays his rights, he snapped.  He ran into his home where he barricaded himself.  During conversations with the officers outside, Mr. Mays incoherently jabbered about being poisoned.  He left the house unarmed at one point, but after an officer tried to come up behind him he ran back inside and ultimately shot three police officers, killing two.  Expert testimony concluded that if not for his mental illness, Mr. Mays would likely have not committed this act.

**B.**    **The Prosecution's Case at the Guilt Phase**

At about 3:30 pm on May 17, 2007, Deputies Billy Jack Valentine, Duane Sanders and Eric Ward of the Henderson County Sheriff's Department responded to a domestic disturbance call at the Mays' residence.  (26:8-9).[2]  On his way there, Deputy Valentine requested a criminal history of Mr. Mays, recalling that he had physically fought Mr. Mays during an off-duty arrest years earlier, an incident for

---

[2]    Numbers in parentheses refer to the transcript of record consisting of 34 volumes, with each volume separately paginated.

<div align="center">

4

</div>

which the charges were ultimately dismissed.  (26:11).  Once they arrived, the officers, climbed the pipe fence separating the property from the road, and approached Mr. Mays and his wife, Candis Mays, who were standing in the front yard outside their home.  (26:10).  Candis angrily told the officers to leave because they had no right to be on the property. (25:232; 26:14).  Mr. Mays explained that he and Candis were fighting over her revelation that three men had sexually assaulted her.  (26:14).

Deputy Valentine, unsure who had called the police, contacted the dispatcher, who said that a neighbor had called 911.  (26:18).  Deputy Valentine sent Deputy Sanders to the neighbor to investigate, and Sanders soon reported that the neighbor wished to press charges.  (26:19, 22-23; 25:238-39).  Deputy Valentine then turned to Mr. Mays and, without explanation, read him his rights.  (26:24).  Mr. Mays ran towards his house.  Deputy Valentine ripped Mr. Mays' shirt in a failed attempt to stop his retreat.  (26:24-25).  A few seconds later, Mr. Mays emerged from the house holding a deer rifle, telling the officers to "back off."  (26:27-28).  Mr. Mays, not firing his rifle, retreated back into the house, with Deputy Valentine warning the other officers present that "he's got a gun."  (25:246; 26:102).  Deputy Valentine then ran to the side of the house, took cover behind a truck and tried to talk Mr. Mays, seated near an open window, into coming back outside.  (26:27-29).

Deputy Sanders, returning from the neighbor's residence, joined Deputies Ward, Ogburn and other officers in a defensive position near the house. (25:241-42). The conversation continued between Mr. Mays and the officers, primarily Deputy

5

Valentine, with the officers pleading for Mr. Mays to come outside and surrender, and Mr. Mays demanding to know why they tried to arrest him if they were there to help his wife.[3]  Meanwhile, Candis was wandering through the yard, pleading with the officers to keep her husband safe, until one officer finally tackled her and dragged her out of harm's way.  (26:32,103-04).  The officers continued to plead with Mr. Mays, who was shouting that they "killed all three of my brothers and want to make it four," that they "jumped my fence, when my wife was needing help," and that his "wife had been raped, so I got mad."  (26:30; SX 65).

Eventually, Mr. Mays left his house and crawled out of his window unarmed to surrender.  (26:35-36).  At that point, Deputy Valentine came up behind him, and Mr. Mays quickly darted head-first through the window back into the house.  Deputy Valentine tried to stop him, but tripped over a garden hose and ended up against a wall to stay out of the line of the fire.  (26:38-39).  Shortly thereafter, an unidentified noise resembling muffled gun fire was heard.  (SX 65 at 16:29).  Two minutes later Mr. Mays shot Deputy Ogburn in the head, then fired at Inspector Habelt.  (27:176-78). The other officers started firing back, and Mr. Mays and Deputy Kevin Harris exchanged gunfire.  Mr. Mays hit Deputy Harris in the leg.  (27:212-14).  Mr. Mays, also hit during that exchange, eventually walked out of the house and surrendered. (27:182-83,189).  In the end, Mr. Mays had shot and killed two deputies.

---

[3]        *See*, State's Exhibit 65 which is a videotape, at 16:12 and 16:24.

### C.    The Defense Case at the Guilt Phase

Mr. Mays' counsel called the instructor for the Intermediate Crisis Intervention class that Deputies Valentine, Sanders and Ward had all attended, which taught a variety of methods for dealing with a mentally distressed individual in a crisis situation, including letting the subject talk himself into a calm state and actively listening to find clues as to how to disarm him or convince him to surrender.  (28:28-29, 31-33).   In these crisis scenarios it is a mistake to surround a suspect, though "every situation is different."  (28:33-34).

During summation, defense counsel told the jury:  "I know what the verdict is going to be, but we just started on this. There's a lot more that you will hear in the next part of this trial."  (28:110).   After about an hour of deliberation, the jury found Mr. Mays guilty of capital murder.  (29:119).

### D.    The Penalty Phase

The State detailed its burden of proving beyond a reasonable doubt the probability of Randall Mays' future dangerousness, and directed the jury to consider all of the evidence in determining whether mitigating circumstances warranted a life sentence.  (30:7-9).   The state then presented victim impact evidence regarding the effects on survivors of the shootings.  (30:10-32).

The defense focused on presenting evidence to persuade the jury to answer "yes" to the issue of whether the mitigating evidence warranted a life sentence, expressly declining to address Mr. Mays' future dangerousness. (31:9).  The defense called psychiatric witnesses.  Dr. Theresa Vail, a state employee, was Mr. Mays'

7

treating psychiatrist at Smith County Jail, five months after his arrest.  She diagnosed Mr. Mays with severe depression and persistent psychotic disorder "not otherwise specified", characterized by paranoid delusions and auditory hallucinations, and prescribed an antidepressant and an antipsychotic medication . (31:19-26).  Dr. Vail testified that a psychotic disorder "not otherwise specified" means that "Mr. Mays doesn't really fit into the schizophrenia box [or] a bipolar disorder box . . . other than he has some delusions and auditory hallucinations."  Dr. Vail described Mr. Mays' mental illnesses as possibly linked to permanent brain damage from his chronic methamphetamine use.

Dr. Gilda Kessner, a forensic psychologist told the jury that, although she had not personally examined Mr. Mays, her preliminary diagnosis was, "That he suffers from a thought disorder, and it can be identified as having a paranoid process, a paranoid ideation."  (29:15).  As she described it:

> [H]e suffers from paranoid personality disorder, which is pervasive and it affects him in all contacts and his relationships and his interactions with people, as well as his internal – with himself, his relationship with himself and that that was active that day.  It's active every day.

(29:25).  Dr. Kessner also explained that Dr. Vail's diagnosis of psychotic disorder "not otherwise specified" means:

> Delusions, hallucinations, disorganized speech, grossly or disorganized or catatonic behavior. . . .  Someone who is hearing things, maybe having visual hallucinations.  It can also include other types of hallucinations, tactile and olfactory.  But that can also be indicative of another disorder.  So speech that's out of contact with reality.

(29:18-19).  Dr. Kessner further testified regarding his mental illness and its affect on him the day of the shooting:

8

"His actions are based on disordered thinking and distorted concept of reality." (29:39). "He was acting under a paranoid ideation. He was not under the same contact with reality that you or I might be under." (29:42). "I don't believe he's in control of his thought processes." (29:45). ". . . I think his mental illness would affect his ability and knowingly do that." (29:46). " . . . [C]haos in his thinking." (29:48)

Dr. David Self, an expert forensic psychiatrist compensated by Henderson County, agreed that Mr. Mays had a severe and chronic mental illness, based on his review of Mr. Mays' records and interviews with friends and family. Dr. Self opined that Mays' mental illness causally contributed to the events of May 17th, 2007. (31:128, 129-133,151). He described how high stress situations could suddenly trigger the symptoms of Mr. Mays' illness. (31:27-28, 138, 156).

The experts described Mr. Mays' fixed false belief that he is being poisoned and his fiercely territorial attitude toward his home as consistent with the diagnosis that he suffers from a severe mental illness. (31:28, 149-51). The consistency of the numerous accounts of Mr. Mays' behavior from friends and family, which closely paralleled the clinical diagnosis of Dr. Vail, confirmed Dr. Self's opinion. (31:149-151).

In addition to the psychiatric testimony, Mr. Mays' family testified to his strange behavior and their belief that he suffers from mental illness. They described Mr. Mays as suddenly getting a look on his face or a "weird look in his eyes," and breaking off conversation without any explanation or making statements wholly unrelated to prior conversation. (31:92, 119, 168). Mr. Mays' sisters testified that he

would suddenly and inexplicably become distrustful and suspicious of them.  (31:91-92, 120-21).

Christina White and Lynn Forbus, Mays' stepdaughter and daughter respectively recounted specific incidents where Mays acted abnormally, describing his habit of hanging up in the middle of phone conversations and sudden mood changes without any apparent trigger. (31:60, 174).  Ms. Forbus stated her belief that Mr. Mays has a mental illness, preventing him from having "the strength to hold the impulses back."  (31:174, 177).  Mr. Mays' older sister, Sherry Ross, described him as "peculiar" (31:72), and Ms. White found him strange upon first meeting him. (31:56).

Sherry Ross further described Mays' traumatic upbringing in Texas.  After their parents divorced, the children, Noble, Ray, Sherry, Randall, Linda, and Kenny, lived in California with their mother.  Soon their father brought the children back to Texas, denying their mother contact for several years.  (31:82-84, 162).  The children were unsupervised most of the time, with Ms. Ross, although just a "kid" herself, charged with caring for her younger siblings.  (31:84-85, 112-113).  Noble, the eldest boy, was "mean"; under his influence, the children huffed gas fumes from junked cars in their backyard  (31:112) and Mr. Mays began drinking alcohol at age seven.  (31:32).  In his teens, Mr. Mays started using drugs and alcohol heavily. (31:32).

Mr. Mays' chronic methamphetamine abuse began around the year that his favorite brother, Ray, from whom he was inseparable, was murdered. (31:114,135)  In 1977, they were at a gas station when Ray was shot in the head in a drive-by

10

shooting, bleeding to death in Mr. Mays' lap. (31:80, 114). Mr. Mays' sisters testified that he was "never the same" and "messed up in the head" after this incident. (31:114). Subsequent drug abuse resulted in Mr. Mays' commitment to Terrell State Hospital for involuntary treatment in 1983 and 1985. (31:87, 116). Despite these hospitalizations Mr. Mays was not treated for his mental illness. (28:130). In the following years, Mr. Mays' youngest brother Kenny died of a drug overdose and his eldest brother Noble was executed by the state of Texas. (31:80-81).

Mr. Mays independently stopped using methamphetamine in 1991, when he bought his property in Payne County. (31:99, 116). Around the same time, he married Candis, who also suffers from mental problems. (31: 52, 54). Christina White described him as a "great grandfather" to her children and her mother's primary caretaker. (31:56-62). His family described Mr. Mays as a generous, hardworking loving husband, father, uncle and grandfather, devoted to his home, even while exhibiting symptoms of serious mental illness. (31:59-60, 173-177). Finally, Christina White described the role Mr. Mays played in her mother's life. Candis Mays had always relied on others, particularly Christina, to help her function, as she was never able to work or drive. (31:53). After Candis met Mr. Mays, Christina "didn't have to worry anymore," as her mother was happy and being taken care of by Mr. Mays. (31:55-56).

### E.    The Prosecution's Closing Arguments

Two prosecutors presented arguments at the penalty phase.  Both  claimed that there was a risk of violence when Mr. Mays found himself surrounded by uniformed officials, and that would be the case for the rest of his life. (32:23, 66-67).  Mr. Mau added, "if you believe he's paranoid…then clearly there's a risk of violence." (32:23).

Regarding mitigation, Mr. Mau focused on Mr. Mays' mental illness. He began by noting that "you can't commit capital murder if you are a well-adjusted, socially conscious individual," suggesting that if "having some sort of screw loose" were enough to mitigate capital murder, no one would receive the death penalty.  (32:27-28).  He added that the mitigation inquiry "is not asking you simply to decide there are – there is something mentally wrong with this person, and therefore, he can't receive the death penalty." (32:28).  Mr. Mau also argued that Mr. May's actions were not the result of mental illness, but rational responses to the circumstances.  (32:29).

Noting that several witnesses also testified that Mr. Mays was a nice, trusting and friendly man, Mr. Mau argued that the defense "can't have it both ways. You can't just throw all the defenses against the wall and see what sticks. . . . [t]here has to be a theory here."  (32:32).  He stated that the jury could not choose to believe only some of the evidence: "You consider all the evidence. You don't just pick out the half of the evidence that you want. But that's what the Defense is asking you to do." (32:32).  And, "if you're going to find that there's a mitigating circumstance to justify that the defendant doesn't receive the just punishment he deserves, then, surely, the evidence should all show you that." (32:32).

This argument was re-iterated by Ms. Bennett:

And you heard Mr. Mims get up here and talk about – let's see, this is a sad story. And if it's a sad story for the defendant doesn't work for you, his family upbringing…

And I that doesn't work for you, he's got some mental illness…

And if that doesn't work for you, he took some drugs about 20 years ago…

And if that doesn't work for you, the police came and invaded his castle.

And if that doesn't work for you, he's poor.

And I that doesn't work for you, he's pathetic.

And if that doesn't work for you, his attorney is begging for his life.

All of those things are issues that he's throwing up there hoping that one of those, you're going to grasp a hold of and determine that that's some sort of mitigation evidence . . .

The problem is, you have to look at all the evidence."

(32:58-59).

## F.   <u>The Defense's Closing Argument</u>

Counsel began by arguing that the events of May 17, 2007 did not have to happen, explaining that the consequences of the standoff could have been prevented. (32:38-41).  He argued that the officers were familiar with Mr. Mays, and that "the first time they met Mays, they knew he had some kind of problem." (32:41-42).  Some of the officers underwent Crisis Intervention Training for this sort of incident, and even Tony Ogburn's widow agreed that the incident "could have been handled differently."  (32:43-44).  Counsel discussed his abusive childhood, his brothers'

13

deaths, his family life, and evidence of odd behavior long before the incident. (32:45-47).

G.   **State Post-Conviction Hearing**

At a hearing on the state application for a writ habeas corpus, Bobby Mims, the principal defense attorney, testified regarding the claim of ineffective assistance of counsel at trial.   Mr. Mims's testimony in large part concerned Mays's apparent mental health while Mims represented him.   Mr. Mims identified that it was "particularly challenging" to gain Mr. Mays' trust, and that Mr. Mays would go into "episodes" between cooperation and non-cooperation with his attorneys. (HV 2:54, 59).[4]   He attributed his difficulties with Mr. Mays to mental illness. (HV 2:53).   He stated that Mr. Mays would episodically become suspicious of his counsel in a way that hindered Mr. Mims's ability to help him.  (HV 2:23-24).

Mr. Mims recalled that at some point during the trial, he became aware that Mays had been diagnosed with an organic brain injury.  (HV 2:30).   During jury selection, the defense received medical records that indicated that Mr. Mays was diagnosed with either "organic brain damage" or "organic brain syndrome."  (HV 2:30; *See* Petitioner's Exhibit 1 submitted herewith).   The record itself was made almost a year earlier, shortly after Mr. Mays' arrest, in June of 2007.  (HV 2:57). Mr. Mims stated that upon receiving the medical records containing the diagnosis of organic brain injury, he was disturbed that he had missed something and desired to take remedial action.  (HV 2:31).  He testified: "[W]e didn't discover that.  That's one

---

[4]        Numbers preceded by HV refer to the transcript of the hearing on the writ of habeas corpus consisting of five volumes, with each volume paginated separately.

thing we were negligent in." (HV 2:30).  Mr. Mims quickly sought funds from the court in order to retain Dr. Paul Andrews, a psychologist. (HV2:31).  According to Mr. Mims, Dr. Andrews visited Mays two or three times at the jail in an attempt to investigate the possibility of organic brain damage. (HV 2:31).  However, Mr. Mays refused to sign a release in order to be tested, and could not be persuaded to submit to testing by Dr. Andrews or Gerald Byington, a member of the defense team. (HV2:32; See also the report of Dr. Andrews, submitted as Petitioner's Exhibit 2 herewith).  Mr. Mims did not recall if he had visited Mays in jail in order to impress upon his client the importance of signing the release and submitting to testing. (HV.2, p.32).  Mr. Mims also testified that John Wright, another member of the defense team, expressed that there might be a need to give Mr. Mays a neuropsychological evaluation because of Mr. Mays's past abuse of methamphetamines. (HV2:33).  Mr. Mims did not discuss neuropsychological testing with Mr. Mays since Mr. Mays would not cooperate with Dr. Andrews, and Mr. Mims did not believe that he would cooperate with having "to put electrodes on his head and that sort of stuff." (HV 2:33).

Mr. Mims also testified that he failed to object to the Court's omission of the "*Mills v. Maryland*" language in the jury charge. (HV.2, p.36).  Mr. Mims stated that it was possible that he requested such language to be included in the jury charge, but he did not have a memory of making a request. (HV 2:37).  Mr. Mims stated, however, that he believed that he had filed an objection to charge that covered the omitted language. (HV 2:37).

15

At the same hearing, Dr. Joan Mayfield, a Ph.D. in psychology with special training in neuropsychology, testified regarding her neuropsychological evaluation of Mr. Mays. A copy of her report is submitted herewith as Petitioner's Exhibit 3. The tests that Dr. Mayfield conducted on October 9, 2009 concerned intelligence, academic achievement, and executive functioning, which comprises memory, language and motor function. (HV 3:10). Dr. Mayfield also tested Mr. Mays' attention, which encompassed his ability to inhibit responses, his problem-solving ability, and his ability to generate strategies or figure out plans. Dr. Mayfield found that Mr. Mays was able to perform tasks at an appropriate level when it is simple and concrete, but as distractions increase, he gets overwhelmed and is unable to process simple information. (HV 3:13-18).

With respect to his intelligence, Dr. Mayfield found that Mr. Mays "did really poorly. His scores were in the significantly-impaired range in both verbal and non-verbal functioning." (HV 3:10). She acknowledged that the testing she did would indicate the existence of a brain injury, but now how the injury occurred. (HV 3:26). She further testified, "If I had some collaborative history to support this, it would look like he's functioning at a mild mental retardation range." (HV 3:10-11). Although she was aware from reports from Mr. Mays that he had been in special education, she had no other information of "adaptive functioning delay, that would be necessary for a diagnosis of mental retardation." (HV 3:11). Accordingly, she did not make a diagnosis of mental retardation. (HV 3:11).

16

Dr. Mayfield concluded that the cognitive deficits she observed were the result of Mays's prior methamphetamine usage "[b]ecause I couldn't find any other excuse for it." (HV 3:26). She determined that the drug use had caused organic brain damage. (HV 3:24-25). There was no indication that Mays had any developmental disability that would account for his cognitive functioning, nor was there any indication from his record that he had sustained any kind of head injury or stroke. (HV 3:26). On these bases, Dr. Mayfield diagnosed Mays with dementia not otherwise specified secondary to the chronic use of drugs. (HV 3:27).

Dr. Mayfield elaborated on her diagnosis at the hearing. Persons with dementia can perform well with concrete or structured tasks, and are able to do things well that they encounter on a normal basis. But dementia creates problems when the individual encounters a novel, complex, difficult, or stressful situation. In these situations, the individual would face more difficulty and the signs of dementia would become more pronounced. (HV 3:29). Dr. Mayfield also commented on the facts of the offense that resulted in a capital conviction for Mr. Mays. She opined that it was a stressful situation and that Mays would not have adapted as well to that situation as someone who does not have dementia. (HV 3:30-31).

# VI

## PART 1

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

The Sixth Amendment guarantees a criminal defendant a right to counsel.  The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).

An ineffective assistance claim has two well-known components:  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668 at 687 (1984).  To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  *Id.*, at 688.  The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Wiggins v. Smith*, 539 U.S. 510 (2003).

A showing of prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is a trial whose result is reliable.  *Strickland*, 466 U.S. at 687.  Prejudice is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings.  *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.  *Strickland*, 466 U.S. at 694.

18

## Claim 1

**Trial counsel was constitutionally ineffective in the penalty phase for failing to investigate vital mitigating evidence of Mr. Mays' severe mental illness**.

Mr. Mays' counsel failed to order a neuropsychological examination to present as mitigating evidence.  Subsequently, state habeas counsel was able to do what trial counsel apparently could not – obtain a Neuropsychological Evaluation of Mr. Mays, Petitioner's Exhibit 3.  Exhibit 3 and the testimony of Dr. Mayfield demonstrated objectively through testing that he suffered, at a minimum, dementia, and did on the day of the shooting.  Because of trial counsel's error, crucial mitigating evidence that could have outweighed the State's case for the death penalty was not investigated or at least was not investigated in a timely manner to be of any use to Mr. Mays.  Mr. Mays was deprived of his Sixth Amendment right to effective assistance of counsel.

Trial counsel did not request, and therefore did not have access to the June 6, 2007, jail record reflecting Mr. Mays had "organic brain damage, Petitioner's Exhibit 1, until April of 2008, after the trial had already started.  (HV 2:57).  Jury selection commenced on March 26,  2008.  When testifying at the state post-conviction hearing, lead trial counsel admitted: "But when I say that, we didn't discover [the jail record].  That's one them that we were negligent in."  (HV 2:30).  When Dr. Andrews tried to get Mr. Mays' last-minute consent to testing, he balked.  Given the nature of his mental illness and his chronic paranoia, this should have come as little surprise.  During these ten months it is quite likely that counsel and the investigator who had

19

rapport with Mr. Mays, could have convinced him to cooperate with Dr. Andrews. However, that time was lost by the start of trial.

Even without the telling jail record, counsel knew that he had a client with mental issues.   Although he did not have the June 6, 2007, jail record, counsel admitted that at that time he was having difficulties with Mr. Mays that he thought "might have to do with mental illness."  (HV 2:53).  Because of his mental illness, counsel even told the jury:

> But I have to tell you, I'd never been around mentally ill people.  I never have.  I thought I have.  I'd never – I'd never been around a mentally ill person 'til I met that guy right there, Randall Mays. . . .  I can't talk to this guy.   I don't – I met with him several ties.   We couldn't communicate. . . .  He wouldn't have anything to do with us.  It was almost like he had nothing. . . . . [H]e could even cooperate with his own lawyers in his own defense.

(32:50-53).  Counsel advised the trial court that he started representing Mr. Mays on March 18th or 19th of 2007, and "Mr. Mays, obviously from the first time I met him, I believe suffered from some sort of mental illness."  (29:68-69).  Why then, did the trial team fail to secure a neuropsychological examination?  There could be no strategical reason for not having Mr. Mays examined.

By neglecting to obtain a neuropsychological examination, despite awareness of Mr. Mays' organic brain damage, trial counsel failed to investigate vital mitigation evidence, and therefore, rendered ineffective assistance.  *See, Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003)(when evidence known to counsel suggests problematic areas, counsel has a duty to investigate further).  Of course, the Sixth Amendment guarantees each criminal defendant the assistance of competent counsel.   If counsel's

performance was deficient, and the defendant suffered prejudice because of that deficient performance, then the resulting death sentence is unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Courts throughout the country have, under similar circumstances, determined that failure to secure such examination renders counsel's performance deficient. *Frierson v. Woodard*, 463 F.3d 982 (9th Cir. 2006) (failure to investigate neurological damage from a head injury rose to the level of ineffective assistance); *Parker v. State*, 3 So.3d 974, 983 (Fla. 2009) (ineffective assistance found as a result of trial counsel's failure to present an expert on defendant's neuropsychological impairment in executive functioning); *Bell v. True*, 413 F.Supp.2d 657 (W.D. Va 2006) (ineffective assistance found based on failure to offer evidence of neurological impairment and cognitive defects); *United States ex rel. Madej v. Schomig*, 223 F.Supp.2d 968 (N.D. Ill. 2002), *affd*, 370 F.3d 665 (7th Cir. 2004) (same).

It is a widely accepted view that obtaining a neuropsychological exam of a defendant suffering from mental illness is critically important.  Trial counsel's failure to obtain a neuropsychological exam, his awareness of Mr. Mays' mental illness if not his organic brain damage, and his difficulty communicating with Mr. Mays demonstrate deficient performance, especially given defense counsel's testimony that strategically speaking, demonstrating diminished capacity was a primary goal and this case "especially" was "defend[ed]…at the mitigation level." (HV 3:28-9).

Indeed, it cannot be seriously disputed that trial counsel knew and even presented some limited evidence of Mr. Mays' psychological impairment.  Three

doctors testified, and told the jury that Mr. Mays suffered from mental illness, but none to the depth and with the objective criteria found by Dr. Mayfield.   Even though the State brought forth no experts to undermine the claim of mental illness, it argued in punishment that Mr. Mays was not mentally ill.

One who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.   *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993). As shown by Dr. Mayfield's report, Mr. Mays has suffered organic brain damage which does and did affect his cognitive ability to think and make decisions.   This was clearly available to trial counsel, especially had they used the year between offense and verdict to secure such an evaluation.   Even though Mr. Mays delusionally refused to participate in last-minute testing, the fact that state habeas counsel was able to secure an evaluation demonstrates that trial counsel could have done so as well, had they been diligent and attentive to the need.

Evidence of the severity of Mr. Mays' brain damage and resulting mental illness and its relevance to his ability to cope in high stress situations would have been invaluable at the penalty phase of his capital trial.   Despite extensive mitigation at the penalty phase, evidence of his severe dementia and mild retardation (due to brain damage) directly implicates his moral culpability for his crime, and the addition of this compelling evidence may well have influenced the jury's appraisal of Mr. Mays' mitigation case.   The nature of this mitigating evidence is such that there is a reasonable probability that its presentation at the penalty phase would have changed

the outcome of that proceeding. *Strickland v. Washington*, 466 U.S. at 694. Of course, the prejudice from failure to present this critical mitigating evidence was exacerbated by the omission of the mitigating evidence instruction required by Supreme Court precedent and Texas statute. *See*, Claim 4.

## Claim 2

### Trial counsel was constitutionally ineffective for failing to request a competency hearing.

Despite arguing to the jury in the punishment phase that Mr. Mays was mentally ill and non-communicative, Mr. Mays' counsel failed request a competency hearing. It is apparent from the record and from the testimonies of Dr. Vail, Dr. Self and Dr. Kessner that Mr. Mays is severely mentally ill. (31:28). Psychiatrist, Dr. David Self testified: "Well, I believe, with reasonable psychiatric certainty, that Mr. Mays has a chronic and severe psychiatric illness." (31:129). Psychiatrist, Dr. Teresa Vail testified that, when she first visited with Mr. Mays he was polite but very delusional (31:31), and that her initial diagnosis was depression and psychotic disorder not otherwise specified. (31:19-20). She testified:

> Also, there are strange thoughts that people have, called delusions, which are fixed false beliefs. Those thoughts, no matter what you tell them, how you tell them that they are not true, they still hang on to them with tenacity.

(31:21). In fact, Dr. Teresa Vail told the jury that the defense mitigation expert, Gerald Byington:

> He was under the belief that Mr. Mays was suffering from a depression and also some sort of delusional disorder. He did not believe that he was at that time able to actually help with his defense.

23

(31:19)  Counsel admitted that all three doctors testified that Mr. Mays had severe mental illness.  (HR 1:51-52)  Certainly, all the indicators of incompetency were present and well known to counsel, as reflected by the arguments:

> "I've never been around a mentally ill person 'til I met that guy right there Randall Mays."  (32:50)

> "I can't talk to this guy.  I don't – I met with him several other times.  We couldn't communicate."  (32:51)

> "[H]e wouldn't have anything to do with us.  It was almost like he had nothing."  (32:52)

> "[H]e couldn't even cooperate with his lawyers in his own defense.  He needed to have mediation."  (32:53)[5]

It is axiomatic that a criminal defendant must be mentally competent to stand trial. *Drope v. Missouri*, 420 U.S. 162 (1975).  Article 46B.003 of the Texas Code of Criminal Procedure states that a person is incompetent to stand trial if that person does not have:

> (1)   sufficient present ability to consult with persons with a reasonable degree of rational understanding; or

> (2)   a rational as well as factual understanding of the proceedings against the person.

Pursuant to TEX. CODE. CRIM. P. 46B.004, either party or the trial court on its own may suggest that a defendant is incompetent to stand trial.

---

[5]   These comments stand in stark contrast to the findings of the state habeas court that this attorney "believed that at the time of trial [Mr. Mays] was not incompetent, and that [Mr. Mays] was able to assist counsel in his defense . . .."  See, the state habeas court's finding of fact number 1 relating to writ issue no. 2, on page 4 of the Findings of Fact and Conclusions of Law on Applicant's Writ of Habeas Corpus, filed on December 3, 2010.  That finding is unreasonable determination of the facts by the State court.  28 U.S.C. § 2254(d).

24

Trial counsel's failure to request a competency hearing violated Mr. May's rights to due process of law and allowed an incompetent defendant to be sentenced to death.   Counsel's failure prejudiced the rights of the defendant to have his incompetency fairly and fully adjudicated. *Hull v. Kyler*, 190 F.3d 88 (3rd Cir. 1999); *Burt v. Uchtman*, 422 F.3d 557 (7th Cir. 2005).

The obligation to seek a competency hearing can arise more than once during a trial.   Counsel should be alert to any deterioration of the defendant's mental condition between the time of a competency determination and the end of the trial, so as to decide if another competency hearing should be requested.   *See Felde v. Blackburn*, 795 F.2d 400, 403 n.2 (5th Cir. 1986).

Mr. Mays' trial while incompetent is patently ineffective because his attorneys had access to additional information suggesting he was incompetent than did the trial court.   Moreover, there is not any conceivable tactical reason for counsel's decision not to request a competency hearing.   If during the trial on the merits or, prior to trial, evidence which raises a bona fide doubt of the defendant's competency is brought to the attention of the trial court, the court is constitutionally required to conduct a separate hearing out of the jury's presence to determine whether the defendant is competent to stand trial. *Pate v. Robinson*, 383 U.S. 375, 376–387 (1966); *Townsend v. State*, 427 S.W.2d 55, 57–63 (Tex. Crim. App. 1968).

The state habeas court found that trial counsel felt that by submitting evidence at a competency hearing, it would result in the Court ordering Mr. Mays to submit to cross-examination by the state's experts, and would give the state certain advantages,

25

and further found that imcompetent excuse to be a plausible basis for foregoing a competency trial.[6]   These findings confirm that trial counsel was unaware that a competency examination could not be used for other purposes, given the reluctance to allow a competency examination.  TEX. CODE CRIM. PROC., art. 46B.007 expressly prohibits the admissibility during any criminal proceedings (other than at a competency trial or where Defendant opens the door) any statement made by a defendant during an examination or trial on the defendant's incompetency.  It is inconceivable that a person with Mr. May's disabilities would not have been examined for competency.  It was patently ineffective not to have requested a competency hearing.

### Claim 3

**Trial counsel was constitutionally ineffective for failing to investigate and present the affirmative defense of insanity.**

Section 8.01 of the Texas Penal Code provides:

(a)    It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

(b)    The term mental disease or defect does not include an abnormality manifest only by repeated criminal or otherwise anti-social conduct.

The prosecutor in Texas is not required to negate the existence of an affirmative defense.  TEX. PEN. CODE § 2.04.  If the existence of an affirmative defense such as insanity is submitted to the jury, meaning that evidence was submitted supporting the

---

[6]    See, the state habeas court's finding of fact number 2, 3 and 5 relating to writ issue no. 2, on page 4 of the Findings of Fact and Conclusions of Law on Applicant's Writ of Habeas Corpus, filed on December 3, 2010.

defense, the defendant must prove the affirmative defense by a preponderance of the evidence. *Id*. A defendant intending to raise the insanity defense is further required to give advance notice of that intent to raise the issue of insanity. TEX. CODE CRIM. P. art. 46C.051.

The issue of the sanity, *vel non*, of Mr. Mays was not raised and no notice of insanity was given. As set forth above, it was the unanimous opinion of Drs. Vail, Self and Kessner that Mr. Mays was seriously ill. In addition, Dr. Kessner's testimony raised the issue that Mr. Mays claimed he was acting in response to a perceived threat:

> He was acting under a paranoid ideation. He was not under the same contact with reality that you or I might be under.
>
> . . . I don't believe he's in control of his thought processes.
>
> Yes. I think his mental illness could affect his inability to intentionally and knowingly [commit the shootings].

(29:42, 45, 46). Her testimony was that Mr. Mays acted under a delusion of imminent attack. (29:47). Despite these clear markers, well known in advance of trial, Mr. Mays was never seen by a psychiatrist or psychologist to determine whether he was sane at the time of the shootings.

It is obvious that trial counsel were aware of the mental illness of their client, but equally obvious that they did not investigate the matter further or adequately. In determining whether counsel made serious errors, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690. "However, a failure to investigate,

27

especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91.

Pursuant to section 8.01(b) of the Texas Penal Code, intoxication does not constitute a mental disease or defect. Had counsel investigated this case fully, they might have learned that Mr. Mays' learning deficits, and his organic brain damage existed at his youth, well prior to his march down the path of substance abuse. It is not consequential in any event, as while drug addiction in an of itself cannot be mental disease, organic brain pathology or psychosis caused by drugs may be mental disease or defect. *See, United States v. Lyons*, 731 F.2d 243, 246–247 (5th Cir. 1984).

### Claim 4

**Mr. Mays received ineffective assistance of trial counsel for failing to object to the trial court's omission of the jury instruction that jurors need not agree on what particular evidence supports an affirmative answer to the mitigation question.**

This was raised as the seventh issue in Mr. Mays' state application for writ of habeas corpus. With respect to the mitigation issue, the court instructed the jury:

> The jury shall consider mitigating evidence to be evidence that a jury might regard as reducing the Defendant's moral blameworthiness. . . .

28

[T]he jury may not answer [the mitigation issue] "Yes" unless ten or more jurors agree.[7]

It is not disputed that the trial court clearly omitted the statutorily mandated instruction advising the jurors that they did not need to agree on what particular evidence supports a finding on the mitigation issue.[8]  It is likewise not disputed that counsel did not object to the omission of this instruction.[9]

In connection with the mitigation issue, the Texas Code of Criminal Procedure, article 37.071(2)F)(3) states:

> The court shall charge the jury that in answering [the mitigation issue], the jury need not agree on what particular evidence supports an affirmative finding on the issue.

This the instruction was required not only by Texas statute, but more importantly by Supreme Court precedent.  *See Mills v. Maryland*, 486 U.S. 367 (1988)(vacating death sentence because the jury instructions gave rise to a "substantial probability that reasonable jurors . . . may have thought they were precluded from

---

[7]     *See*, the Court's Charge on Punishment, at page 3, a copy of which is submitted herewith as Petitioner's Exhibit 4.

[8]     See, the state habeas court's finding of fact number 1 relating to writ issue no. 7, on page 13 of the Findings of Fact and Conclusions of Law on Applicant's Writ of Habeas Corpus, filed on December 3, 2010.

[9]     *Id.*, at finding 2.  This was also raised on direct appeal, but because it was not the subject of a proper objection at trial, it was therefore subjected to a higher, near impossible level of review:

> [A]ppellant complains that the trial court omitted statutorily required language from the mitigation-issue instructions. He is correct. The trial judge erred by failing to instruct the jurors that they need not agree on what particular evidence supports a finding on the mitigation special issue. However, appellant failed to notice or object to this omission, and thus he may obtain a reversal of his sentence only if he shows that this error caused "egregious harm" with respect to sentencing, that is, that the defendant was deprived of a fair sentencing trial.

*Mays v. State*, 318 S.W.3d 368, 394 (Tex. Crim. App. – 2010).

29

considering any mitigating evidence" not found unanimously); *McKoy v. North Carolina*, 494 U.S. 433, 439-40 (1990)(unanimity requirement as to mitigating circumstances prevents jurors from giving effect to evidence that they believe calls for a sentence less than death – even if all jurors agree that some mitigating circumstances exist – unless they unanimously find the existence of the same mitigating circumstance). An essential holding in *Mills* is that the jury may not refuse to consider *or be precluded from considering* any relevant mitigating evidence, *Mills*, 486 U.S., at 374-375, yet that is precisely what occurred here. As the Supreme Court has described the problem:

> If, for example, the defense presents evidence of three potentially mitigating considerations, some jurors may believe that only the first is mitigating, some only the second, and some only the third. But if even *one* of the jurors believes that one of the three mitigating considerations exists, but that he is barred from considering it because the other jurors disagree, the Court held, the Constitution forbids imposition of the death penalty.

*Smith v. Spisak*, 130 S. Ct. 676, 682 (2010).

Several federal circuit courts have determined that failure to object to erroneous or unconstitutional jury instructions can constitute deficient performance. In *Bloomer v. United States*, 162 F.3d 187 (2d Cir. 1998), the Second Circuit determined that counsel's failure to object to jury instructions relaying an improper reasonable doubt standard fell short of professionally competent assistance, even though higher courts had not ruled specifically on the deficiency of the exact instruction given by the court. Similarly, the Fifth Circuit has held that counsel's failure to object to or appeal constitutionally defective jury instructions that added a different legal theory to that

charged in the indictment constituted ineffective assistance of counsel.  *Ricalday v. Procunier*, 736 F.2d 203, 207 (5th Cir. 1984).  *See also Gray v. Lynn*, 6 F.3d 265, 269 (5th Cir. 1993)(trial counsel's failure to object to an "erroneous jury instruction" regarding the intent required for conviction could not be "considered within the 'wide range of professionally competent assistance'" and was therefore deficient).

Without the non-agreement charge, it is highly likely that jurors would understand the instructions to preclude the consideration of mitigation evidence supporting a "yes" answer to this special issue unless the jurors agreed on the existence of that evidence.  Moreover, the possibility that jurors were precluded from considering relevant mitigating evidence was increased by other portions of the jury instruction as well as statements made by the prosecution. *See Cupp v. Naughten*, 414 U.S. 141, 146-147 (1973)(jury instruction may not be judged in artificial isolation, but must be viewed in context, citing *Boyd v. United States*, 271 U.S. 104 (1926)).  The jury here had been instructed that they need not agree on what particular evidence supports a "no" answer to special issue one, future dangerousness.  By specifically telling the jury that they need not agree on what particular facts support an answer to special issue one, and then failing to give them this same instruction for special issue two, the judge at best created confusion and at worst affirmed an erroneous understanding by the jury.  This possibility of error in a death penalty case is one that this Court has determined it "dare not risk." *Mills*, 486 U.S. at 384.

As in *Mills*, the instructions here created the strong probability that one holdout juror could have prevented the others from giving effect to evidence that they believed

called for a sentence less than death.  Moreover, even if all twelve jurors agreed that there were some mitigating circumstances, the instruction prevented them from giving effect to evidence supporting any of those circumstances in their deliberations unless they unanimously found the existence of the same "particular evidence."  *Id*.  As discussed above, the instruction failed to state that unanimity was not required concerning "what particular evidence" supported the finding of a mitigating circumstance, while informing the jurors they need not agree "what particular evidence" could negate a finding on the first issue.  Thus this is not an isolated misstatement, but an omission which tipped the scales against Mr. Mays.

There was ample evidence in the record which might have served in mitigation of sentence.  Most obvious is his mental illness.  Additionally, there was evidence of his struggle with methamphetamine addiction, his abuse and neglect as a child, and the provocations and intrusions made by the officers on himself, his home and his spouse. Clearly, at least two of the jurors did not think Mr. Mays was a continuing threat.[10]  As on juror stated,  "I don't see him really hurting a fly. . . .  Like I said, I think that it was just a fluke that it happened."   Exhibit 9.

Furthermore, the likelihood of an erroneous understanding by the jury was even greater given the prosecution's repeated, and unrebutted, suggestions in closing argument that the defense was required to submit and the jury should accept a single mitigation theory.  The prosecution asserted that the defense could not "just throw all the defenses against the wall and see what sticks . . . *[t]here has to be a theory here*."

---

[10]     See, excerpts of juror interviews of jurors Denson and Anderson, submitted herewith as Exhibits 9 and 10 respectively.

32

"If you're going to find that there's a mitigating circumstance to justify that the defendant doesn't receive the just punishment he deserves, then, surely, the evidence should *all* show you that." (32:32) (emphasis added). The state went on to list the different mitigation theories presented by the defense, and then asserted that, "All of those things are issues that he's just throwing up there, hoping that *one of those*, you're going to grasp a hold of and determine that that's some sort of mitigation evidence." (32:58)(emphasis added). These statements improperly implied that the jurors had to agree in finding a particular mitigating factor, increasing the likelihood that a reasonable juror would have been impermissibly inhibited from considering all mitigating evidence. Nothing was said in the arguments of defense counsel that in any way corrected the false impression of the law created for the jury by the erroneous instructions in this case. The defense said nothing about there being no need for unanimity.

The state habeas judge's finding of fact that the omission of the instruction had "no conceivable impact" on the jury's verdict[11] nullifies the purpose of the *Mills* requirement. This finding is clearly contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and as such qualifies for relief under 28 U.S.C. § 2254(d). The omission of the instruction inserted risk into the jury deliberations that individual jurors would mistakenly preclude consideration of mitigating evidence simply because

---

[11]     See, the state habeas court's finding of fact number 4 relating to writ issue no. 7, on page 13 of the Findings of Fact and Conclusions of Law on Applicant's Writ of Habeas Corpus, filed on December 3, 2010.

they did not all agree upon it.  This is precisely the risk that the *Mills* majority found to be abhorrent to the imposition of the death penalty.

In order to meet the requirements of the Eighth Amendment, a capital sentencing system must allow the sentencing authority to consider mitigating circumstances. *Jurek v. Texas*, 428 U.S. 262, 271 (1976).  Further, under the *Penry* decisions,[12] the jury must be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." *Penry I*, 492 U.S. at 319.  Only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," *id.* at 328, can there be any confidence that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Id.* at 319 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)).

Without the proper jury instructions, the jury's death penalty determination cannot be considered reliable. Therefore, Mr. Mays was denied his Sixth Amendment right to effective assistance of counsel.

---

[12]     *Penry v. Lynaugh (Penry I)*, 492 U.S. 302, and *Penry v. Johnson (Penry II)*, 532 U.S 782, 797 (2001).

## PART 2

## CLAIMS RELATED TO MENTAL DEFICIENCIES

### Claim 5

**Execution of Mr. Mays, as an individual with an intellectual disability, would violate the Eighth Amendment as cruel and unusual punishment.**

Since the 2002 decision of *Atkins v. Virginia*, 536 U.S. 304 (2002) any effort to execute a mentally retarded individual violates the Eighth Amendment.  The terminology has since changed, and this disability is now termed "intellectual disability."  The American Association of Intellectual and Developmental Disabilities defines an "intellectual disability" as:

> [A] disability characterized by significant limitations both in intellectual functioning and in adaptive behavior, which covers many everyday social and practical skills. This disability originates before the age of 18.

Intellectual Disability: Definition, Classification, and Systems of Supports (Eleventh edition 2010).   *Atkins* specifically reserved to the states the adoption of procedures to implement its new constitutional rule.  In Texas, "intellectual disability" is defined by: (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Ex parte Briseno, 135 S.W. 3d 1, 7 n.26 (Tex. Crim. App. 2004)*; *Ex Parte Hearn*, 310 S.W.3d 424 (Tex. Crim. App. 2010).

### A.    Subaverage Intellectual Functioning

Dr. Joan Mayfield, a Ph.D. in psychology with special training in neuropsychology, performed a neuropsychological evaluation of Mr. Mays in connection with the state habeas proceedings.  A copy of her report is submitted

35

herewith as Petitioner's Exhibit 3.  With respect to his intelligence, Dr. Mayfield found that Mr. Mays "did really poorly.  His scores, which were in the 60's, were in the significantly-impaired range in both verbal and non-verbal functioning."  (HV 3:10).  She further testified, "If I had some collaborative history to support this, it would look like he's functioning at a mild mental retardation range."  (HV 3:10-11).

### B.   **Adaptive Deficits**

Undeveloped by trial or state habeas counsel were the school records for Mr. Mays, which demonstrate extremely poor grades, with relatively appropriate attendance.  See, Petitioner's Exhibit 5 and 6.  Moreover, his standardized test scores demonstrate that he was functioning several grades below his stated age.  Thus, while he was attending school, he was not achieving.

### C.   **Onset Prior to Age 18**

There can be little squabble that Mr. Mays demonstrated mental illness at a very young age.  In 1983, at age twenty-two, he was civilly committed due to delusion, hallucinations and active psychosis. It was reported that Mr. Mays was pacing, talking to himself, not communicating with others, and experiencing hallucinations.  See, Petitioner's Exhibit 7 and 8 submitted herewith.  In 1983, he was also committed to the Terrell State Hospital where the staff psychiatrist reported that Mr. Mays admitted to both auditory and visual hallucinations, that his memory was impaired for both recent and remote events, that retention and recall were both impaired, and that his judgment and insight were both impaired.  Two years later, during a second admission

36

to the Terrell State Hospital, it was reported that Mr. Mays had no salable employment skills.

Again, Dr. Mayfield acknowledged that the testing she did would indicate the existence of a brain injury, but now how the injury occurred.  (HV 3:26).  Nor would it indicate when.  What she was not provided with was the transcript of the testimony of Mr. Mays' sister Sherrie Ross, who testified that Mr. Mays and his siblings children huffed gas fumes from junked cars in their backyard  (31:112);  Mr. Mays began drinking alcohol at age seven (31:32); and that in his teens, Mr. Mays started using drugs and alcohol heavily (31:32).   Ms. Ross stated that in 1977, Mr. Mays and his brother were at a gas station when his brother was shot in the head in a drive-by shooting, bleeding to death in Mr. Mays' lap. (31:80, 114). Mr. Mays' sisters testified that he was "never the same" and "messed up in the head" after this incident.

### D.    Ineffectiveness of State Habeas Counsel Constitutes Cause to Excuse any Procedural Default.

This matter has not been presented to the state court.  It should have been asserted by state habeas counsel as an issue of ineffectiveness of trial counsel in failing to investigate and assert an *Atkins* issue with the trial court.  With ease it can be predicted that the Director's will assert that there is no constitutional right to effective assistance of counsel in state habeas proceedings, a position first articulated in Texas in *Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002).  But this issue was the subject of a grant of certiorari by the Supreme Court in *Martinez v. Ryan* on

37

June 6, 2011.[13]  Though no one can predict precisely what the decision will be in these two cases, the premise that there is no constitutional right to the effective assistance of counsel in state habeas proceedings is now likely questioned by at least four Justices of the Supreme Court.

If the Director's position is correct, Mr. Mays has a very strong claim of ineffective assistance of state habeas counsel in wholly failing to assert the ineffectiveness of trial counsel to investigate and present the issue of intellectual disability to the trial court.   The forthcoming decision in *Martinez* could require that his *Atkins* claim be heard.

The ultimate question presented would be whether Mr. Mays has "cause" for failure to present in state court his *Atkins* claim (i.e, the ineffectiveness of trial counsel to investigate and develop an *Atkins* claim), where post-conviction proceedings provided him the first opportunity to present such claims, the State appointed counsel to represent him, but State-appointed counsel then failed to raise viable issues which would have led to relief.  If there is a right to effective state habeas counsel in those instances where habeas is the only forum for relief for constitutional violations, then the answer is "yes."

---

[13]     The precise question presented in *Martinez v. Ryan* is as follows:

Whether a defendant in a state criminal case who is prohibited by state law from raising on direct appeal any claim of ineffectiveness of trial counsel, but who has a state-law right to raise such a claim in a first post-conviction proceeding, has a federal constitutional right to effective assistance of first post-conviction counsel specifically with respect to his ineffective-assistance-of-trial-counsel claim.

The Supreme Court granted certiorari in *Martinez v. Ryan*, No. 10-1001 on June 6, 2011.[14] *Martinez* (a non-capital case) presents the question of whether a criminal defendant has a constitutional right to the assistance of counsel with respect to claims that only can be raised for the first time in state habeas proceedings.[15]

If *Martinez* recognizes a right to effective assistance of state habeas counsel, at least in those jurisdictions such as Texas where it is likely the only forum in which ineffectiveness of trial and appellate counsel can be raised, this Court should allow Mr. Mays sufficient opportunity to investigate and present his *Atkins* claim despite the Director's expected position that the claim is unexhausted. In *Martinez* the Supreme Court could open the door to merits consideration of claims that were previously defaulted due to lack of exhaustion, either because they were not raised or raised inadequately. Moreover, if these cases establish such a right, it could, at a minimum, require that the Texas Court of Criminal Appeals revisit *Ex parte Graves*.

---

[14]       The decision below is *Martinez v. Schriro*, 623 F.3d 781 (9th Cir. 2010).

[15]       In *Martinez*, the question presented is:

Whether a defendant in a state criminal case who is prohibited by state law from raising on direct appeal any claim of ineffective assistance of trial counsel, but who has a state-law right to raise such a claim in a first postconviction proceeding, has a federal constitutional right to effective assistance of first post-conviction counsel specifically with respect to his ineffective-assistance-of trial-counsel claim.

## Claim 6

**The Eighth Amendment's proscription of cruel and unusual punishment prohibits imposition of death penalty on a defendant who is functionally equivalent to an individual with "intellectual disability", but cannot be so diagnosed merely because the onset of this condition occurred after age 18.**

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that a mentally-retarded defendant may not be executed.   Consistent with the Eighth Amendment, may defendant who is functionally equivalent to an individual with "intellectual disability" nonetheless be executed merely because the onset of this condition occurred after age 18?  There is no meaningful distinction.

Mr. Mays also raised this as his second and third issues on direct appeal.  The Texas Court of Criminal Appeals declined to extend a categorical exemption from execution for the mentally ill.  *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010).  When he again raised the issue in his state habeas proceedings, with the additional benefit of Dr. Mayfield's report, the Texas Court of Criminal Appeals, without discussion held that this claim was procedurally barred.  *Ex parte Randall Wayne Mays*, 2011 Tex. Crim. App. Unpub. LEXIS 190 (Tex. Crim. App. March 16, 2011).  Since aspects of Mr. Mays' mental illness were raised at a hearing on his habeas petition to the district court that were not presented on direct review, the Texas Court of Criminal Appeals improperly determined that Mays' claim arising from his mental illness was decided on direct appeal and thus procedurally barred.  While generally claims that were introduced and rejected on direct appeal are considered on habeas corpus review, an exception is made "…where (1) direct appeal cannot be

expected to provide an adequate record to evaluate the claim in question, and (2) the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding." *Ex parte Nailor*, 149 S.W.3d 125, 131 (Tex. Crim App. 2004), *quoting Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (permitting review of ineffective assistance of counsel claim on habeas when new evidence is presented); *see also Ex parte Brown*, 205 S.W.3d 538, 547 & n.26 (Tex. Crim. App. 2006) (permitting habeas review of actual innocence claim upon presentation of new evidence; claim rejected on the merits).

On direct appeal, the Texas Court of Criminal Appeals rejected Mays' claim that the United States Supreme Court's decisions in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), categorically bar his execution under the Eighth and Fourteenth Amendments as he suffers from severe mental illness and that Mays had failed to show that his mental illness was severe enough to diminish his moral culpability his crimes. *See Mays v. State*, 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010). On direct appeal, however, the court was presented only with the testimony of the experts from Mays' trial, who testified that Mays suffered from "severe depression and a persistent psychotic disorder not otherwise specified," and from a "cronic and severe psychiatric illness." *Id.* at 376. On the basis of this evidence, the Court concluded that "appellant has failed to show that, if he did suffer from some mental impairment at the time of these murders, that impairment was so severe that he is necessarily and categorically less morally culpable than those who are not mentally ill." *Id.* at 380.

41

At the habeas hearing held a few months later, Dr. Mayfield pointed out a more specific source of Mays' psychotic delusions, testifying that Mays suffered from organic brain damage potentially caused by past methamphetamine use.  Because this newly obtained neuropsychological evidence was not available to the Court on direct appeal, Mays' claim arising from his mental illness took on a different shape and was reviewable by the habeas court.  In denying Mr. Mays' first writ issue, the court simply asserted that "Neither the Texas Constitution nor the United States Constitution renders unconstitutional the execution of the mentally ill."  Although the court cited the opinion on direct appeal, it did not rely on a procedural bar in rendering this opinion.  Thus, not only was new evidence presented on habeas review that was not before the Court on direct appeal, but the specific issue of whether Mays' mental illness was of such severity as to make him categorically exempt from execution was adjudicated on the merits by the habeas court and is therefore appropriately considered by this Court.

The presence of this new evidence regarding Mays' organic brain damage puts into doubt the Court of Criminal Appeals' assumption that his argument that the Eighth and Fourteenth Amendment categorically bar his execution was decided on direct appeal.  *Ex parte Santana*, 227 S.W.3d 700 (Tex. Crim. App. 2007); *Ex parte Rich*, 194 S.W.3d 508, 512–13 & n. 9 (Tex. Crim. App. 2006).

The Supreme Court's death penalty jurisprudence has consistently required that death is reserved for the worst offenders. The Supreme Court has categorically restricted this category to exclude those whose culpability is diminished for various

42

reasons.  *See, Atkins v. Virginia*, 536 U.S. 304 (2002) (mentally retarded categorically excluded from death penalty); *Roper v. Simmons*, 543 U.S. 551 (2005) (juveniles categorically excluded).  If the penological purposes of retribution and deterrence are not served by imposing the death penalty on a class of offenders, the death penalty is not proportionate.

The nature of certain kinds of mental illness reduces an offender's culpability in the same manner that the *Atkins* Court held that mental retardation reduced culpability.  Reduced culpability requires a proportionate reduction in punishment. The retributive purpose of the death penalty is not justified when an offender is mentally retarded or mentally ill, because only the most culpable offenders deserve a death sentence. Additionally, the attributes that reduce culpability frustrate the deterrent purpose of the death penalty. Individuals consistently unable to control impulses or learn from mistakes are unable to account for the consequences of criminal activity in their decision-making process. *Atkins*, 536 U.S. at 319.  The offender whose mental illness is characterized by profound cognitive functioning impairments, is similarly immune to the deterrent effects of the death penalty.

Subsequent to *Atkins v. Virginia*, 536 U.S. 304 (2002) a number of courts and commentators have found that its rationale should apply with equal force to those individuals who suffer from a severe mental illness. See *State v. Ketterer* (2006),111 Ohio St.3d 70, 855 N.E.2d 48 (Lundberg Stratton , J., concurring) ("Deterrence is of little value as a rationale for executing offenders with severe mental illness when they have diminished impulse control and planning abilities."); *People v. Danks* (2004), 32

43

Cal.4th 269, 322, 82 P.3d 1249 (Kennard, J. concurring and dissenting)("The same mental capacities are impaired in a person suffering from paranoid schizophrenia, and the impairment may be equally grave."); *Bryan v. Mullin*, 335 F.3d 1207(10th Cir. 2003) (Henry, J. concurring and dissenting)(Imposition of the death penalty on mentally ill defendant contributes nothing to the stated goals of capital punishment, retribution and deterrence.); *State v. Nelson*, 173 N.J. 417, 493, 803 A.2d 1 (2002), (Zazzali, J. concurring)("The State's legitimate penological interests that purportedly are served by the death penalty are unconstitutionally diminished if the State executes such a mentally ill and psychologically disturbed person."); *Corcoran v. State*, 774 N.E.2d 495, 502–503 (2002)(Rucker, J. dissenting)(underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill).

Scholars have argued that "there may not be any plausible reasons for differentiating between the execution of people with mental illness and execution of people with mental retardation or juveniles"  Christopher Slobogin, What Atkins Could Mean For People With Mental Illness, 33 N.M.L. Review 293, 293 (2003). "[I]f anything, the delusions, command hallucinations, and disoriented thought process[es] of those who are mentally ill represent greater dysfunction than that experienced by most 'mildly' retarded individuals (the only retarded people likely to commit crime)".  Christopher Slobogin, Mental Illness and the Death Penalty, 1 Cal. Crim. L. Rev.3 (2000). [16]

---

[16]      Available at http://www.boalt.org/CCLR/v1/v1sloboginfr.htm

Today there is considerable objective support for the notion that evolving standards of decency prohibit the execution of the severely mentally ill.  The American Bar Association, American Psychiatric Association, American Psychological Association and the National Alliance on Mental Illness (NAMI) have issued almost identical policies calling for exemptions to the death penalty for the severely mentally ill.  The resolutions urge jurisdictions that impose capital punishment to implement policies that would prohibit imposition of the death penalty on those who are severely mentally ill if such persons are unable to appreciate the nature, consequences or wrongfulness of their conduct, are unable to exercise rational judgment in relation to conduct, or are unable to conform their conduct to the requirements of the law.[17]

The Supreme Court's rationales for banning the death penalty for the mentally retarded and for juveniles provide substantial support for a ban on the execution of the severely mentally ill.

Mr. Mays falls within a narrow class of offenders whose severe impairments in cognitive functioning, not resulting from a developmental abnormality, makes them

---

[17]     The American Bar Association version states, "Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law.  A disorder manifested primarily by repeated criminal conduct or attributable solely to the acute effects of voluntary use of alcohol or other drugs does not, standing alone, constitute a mental disorder or disability for purposes of this provision." Recommendations of the American Bar Association Section of Individual Rights & Responsibilities Task Force on Mental Disability and the Death Penalty (2005), 54 Cath.U.L.Rev. 1115.

categorically less culpable and therefore ineligible to be sentenced to death. Experts at trial testified that he suffered from depression, persistent psychotic disorder characterized by paranoid and persecutory delusions and auditory hallucinations, and delusional thinking. (31:19-26, 36-8). Further testimony at the habeas hearing specified that he suffered from dementia not otherwise specified, as a result of organic brain damage due to chronic drug use. (HV 3:27). These diagnoses are not inconsistent and demonstrate the extent to which Mays' mental capacity was diminished at the time of his crime.

Mr. Mays' experts elaborated that his multiple diagnoses are due to his past methamphetamine abuse. (31:135; HV 3:26). Mr. Mays' organic brain injury causes multiple cognitive deficits. But for the age of onset, which went largely undeveloped by his state appointed lawyers, he would classified as intellectually disabled, with an IQ in the 60s, severe impairments in problem solving and planning and diminished ability to pay attention, inhibit responses, and switch between contemporaneous and unrelated tasks. (HV 3:14-20). The impact of diminished cognitive functioning on routine, simple and concrete tasks is limited, but as situations grow more complex and multi-faceted, Mr. Mays' ability to cope normally decreases rapidly. (HV 3:30). Additionally, increases in stress simultaneously trigger psychotic symptoms. (31:36-8). The substantial decline in his global cognitive functioning in combination with the paranoia and hallucinations which characterize his severe mental illness are directly relevant to his perception, processing, and reasoning abilities in high stress situations.

Mr. Mays, and offenders similarly afflicted, should be excluded from the death penalty due to their categorically lesser culpability for capital crimes.

Severe mental illness of the kind suffered by Mr. Mays necessarily reduces an offender's culpability.   "The Eighth Amendment succinctly prohibits '[e]xcessive' sanctions." *Atkins* supra. at 311.   Under the Eighth Amendment, death can only be imposed on offenders with proportionate culpability.   Obviously, this Court cannot create a categorical exception, but the issue needs to be preserved for subsequent review by the Supreme Court in the event this petition is not otherwise granted.

### Claim 7

**The trial court's restrictions on the jury's consideration of Mr. Mays' mental deficiencies abrogated the State's responsibility to prove a culpable mental state beyond a reasonable doubt in violation of the Sixth, Eighth and Fourteenth Amendments.**

This was raised by Mr. Mays as part of his fifth issue on direct appeal.   The Texas Court of Criminal Appeals ruled against the state law components of this claim, but did not adjudicate the federal constitutional elements of this claim.   *Mays*, 318 S.W.3d at 380-382.[18]

A Texas capital defendant has the  right to an acquittal of capital murder charges where the evidence of an intentional or knowing mental state is insufficient in the minds of the jurors.   By submitting conflicting and confusing limiting instructions to the jury, the trial court denied Mr. Mays an adequate process to

---

[18]    Mr. Mays raised his complaints about the way the trial judge instructed the jury regarding the culpable mental states and the use of evidence bearing on his mental health, invoking the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. CR 1204-1213.  Each objection was denied by the trial court.  (29:76).

vindicate this right as required by the Constitution of the United States.  The circular language in the charge giving rise to these issues is as follows:

> You are further instructed that you may consider any mental condition, if any, of the Defendant, that he did or did not act intentionally or knowingly in committing the alleged offense, but you cannot consider any mental condition, if any, that the Defendant lacked the capacity to act intentionally or knowingly.

(CR 1221).   By this instruction, the trial court essentially removed the mental condition of Mr. Mays from the jury's consideration.

The trial court's overly broad prohibition on the use of capacity evidence to rebut intent offended our federal constitution.  The authority of a state to define rules for the exclusion of evidence and to apply those rules to criminal defendants, has constitutional limits.   "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U. S. 319 (2006)(quoting *Crane v. Kentucky*, 476 U. S. 683, 690 (1986), in turn quoting *California v. Trombetta*, 467 U. S. 479, 485 (1984) ).

While naturally it is normally "within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as

48

fundamental."[19]   The charge here allowed the jurors to consider the condition of Mr.

Mays' mind, but somehow they were not to consider his *capacity* in deciding whether

or not he acted intentionally or knowingly.   This part of the charge offends the

constitutional principles that underlay *Boyde v. California*, 494 U.S. 370 (1990).   In

*Boyde*, the Supreme Court, drawing on *Francis v. Franklin*, 471 U. S. 307 (1985) and

*Sandstrom v. Montana*, 442 U. S. 510, 442 U. S. 516-517 (1979), set the legal

standard for reviewing jury instructions claimed to restrict impermissibly a jury's

consideration of relevant evidence: Whether there is a reasonable likelihood that the

jury has applied the challenged instruction in a way that prevents the consideration of

constitutionally relevant evidence.[20]

Applying *Boyde*, the subject instruction offends federal constitutional principles

by its ambiguity.   A reasonable juror might well have been inhibited from

consideration of the Vail and Kessner expert mental health opinions by the prohibition

on consideration of Mr. Mays' capacity to form the culpable mental state.   The trial

court's initial grant of permission to consider Appellant's mental condition does not

save this charge.   The second part effectively nullifies the first part.   At best, its

instruction is circular, assuming any rational juror could somehow segregate a

defendant's "capacity" to act from his acts themselves.   A reviewing court simply

---

[19]     *Patterson v. New York*, 432 U. S. 197, 202 (1977); *Speiser v. Randall*, 357 U. S. 513, 523 (1958); *Leland v. Oregon*, 343 U. S. 790, 798 (1952); *Snyder v. Massachusetts*, 291 U. S. 97, 105 (1934).
[20]     *Boyde* does not require a defendant to establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, nor is  a capital sentencing proceeding inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition.

cannot know which part the jury followed, and which part was not.  Meaningful appellate review is thus defeated.  This is not permissible under the constitutional principles set down in *Penry v. Johnson,* 532 U.S. 782 (2001), citing *Roberts v. Louisiana*, 428 U.S. 325, 335 (1976) (plurality opinion).

## PART 3

## OTHER CLAIMS

### Claim 8

**The underlying offense, as interpreted by the Texas Court of Criminal Appeals, is impermissibly vague and in violation of the Sixth, Eighth and Fourteenth Amendments.**

This was raised as the Eleventh Issue on direct appeal by Mr. Mays and was denied on state law grounds, but not adjudicated on federal constitutional grounds.[21]  Mays, 318 S.W.3d 388-389.

The guilt phase aggravator that elevated the charge from murder to capital murder was taken from Texas Penal Code 19.03(a)(1).  As submitted to the jury, the charge read as follows: "...and the said Tony Ogburn was then and there a peace officer who was acting in the lawful discharge of an official duty, to-wit: attempting to arrest or detain the Defendant, and the Defendant knew Tony Ogburn was a peace officer, then you will find the Defendant guilty of the offense of Capital Murder as charged in the indictment, and so say by your verdict."  CR 1220-1221

Aggravating factors must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant

---

[21]     Mr. Mays timely raised his complaints about this guilt phase aggravator, in his oral motion for a directed verdict and by a series of charge objections.  (27:238-239; CR 1204-1205).

compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). On their face, and as applied, aggravating circumstances must permit the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); see also *Richmond v. Lewis*, 506 U.S. 40, 46 (1992)("a statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty"); *Clemons v. Mississippi*, 494 U.S. 738, 758 (1990)("invalid aggravating circumstance provided "no principled way to distinguish the case in which the death penalty is imposed, from the many cases in which it was not "); *Maynard v. Cartwright*, 486 U.S. 356 (1988) ("[t]he construction or application of an aggravating circumstance is unconstitutionally broad or vague if it does not channel or limit the sentencer's discretion in imposing the death penalty").

In *Maynard v. Cartwright*, supra, the Supreme Court unanimously set out the legal principles which control vagueness claims directed at an aggravator.  In addressing the validity of a death sentence based solely on the statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," the *Maynard* court reasoned that an Eighth Amendment vagueness challenge to an aggravating factor in a capital case may not be analyzed under the "as-applied" approach used in vagueness challenges to criminal statutes under the Due Process Clause.  486 U.S. at 361.

An Eighth Amendment challenge requires that reviewing court to conduct its review in several steps.  First, the reviewing court must evaluate the challenged aggravating circumstance on its face, entirely apart from the facts of the particular case in which it was applied.  An over broad aggravating circumstance vests in sentencing courts the "open-ended discretion" to impose the death penalty which the Supreme Court condemned in *Furman v.*

51

*Georgia*, 408 U. S. 238 (1972).  Where a death sentence is imposed under a system that permits unbridled discretion, the state may not save the sentence by demonstrating that the outcome would have been the same even if the sentencer's discretion had been properly narrowed and guided.  *Maynard*, 486 U.S. at 361-363.

Secondly, even if the text of a statutory aggravating circumstance does not provide meaningful guidance to a capital sentencing jury, such an aggravating circumstance can nevertheless support a death sentence if  the state courts have narrowed its scope to a constitutionally sufficient degree.  Finally, the reviewing court must determine whether such a narrowing construction actually guided the sentencing jury in the case under review. *Godfrey v. Georgia*, 446 U.S. 420 (1980); see also *Walton v. Arizona*, 497 U.S. 639 (1990)(recognizing the authority of a state reviewing court to supply a limiting definition of a facially over broad or vague aggravating circumstance).[22]

The decisions in *Maynard* and *Zant* assume that a state reviewing court will interpret an arguably vague aggravator so as to clarify its meaning and narrow its scope in such a way that the statutory scheme will meet the demands of the Supreme Court's Eighth Amendment jurisprudence.  What has occurred here is beyond what was contemplated in these two Supreme Court cases.  In Texas, in practice, the modifier "lawful" has been judicially removed as an element of the offense that the state must prove.  *Montoya v. State*, 744 S.W.2d 15 (Tex.Crim. .App.1987)(" ... as long as the officer was acting within his capacity as a peace officer, he was acting within the lawful discharge of his official duties ... ");

---

[22]     The Supreme Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness."  *Zant v. Stephens*, 462 U.S. at 885, citing *Miller v. Florida*, 373 So.2d 882, 885-886 (Fla.1979). If the aggravating circumstance at issue is invalid for reasons such as these, due process of law would require that the jury's decision to impose death be set aside. *Id*.

*Guerra v. State*, 771 S.W.2d 453 (Tex.Crim.App.1988); *Hughes v. State*, 897 S.W.2d 285 (Tex.Crim.App.,1994).

In *Montoya, Guerra* and *Hughes*, the Court of Criminal Appeals has refused to define and narrow the quoted statutory language. Instead, by judicial fiat, deleting the word "lawful," that court has enlarged the breadth of this aggravator broader and rendered it more vague than did the legislature. The effect of this interpretation of Texas Penal Code 19.03 Section (a)(1) is that no amount of abuse of office, departure from accepted professional norms, recklessness, negligence, or outright criminality on the part of a peace officer will serve to prevent the state from seeking and obtaining a death verdict in a Texas capital trial for the murder of an officer.

Texas Penal Code 19.03(a)(1), as interpreted by the Texas Court of Criminal Appeals, is facially unconstitutional for failure to limit the scope of the aggravator to the ordinary and commonly accepted core meaning of "lawful." Further, a rational juror might well have deemed the officer's decision and efforts to arrest and detain Mr. Mays reckless or negligent rather than "lawful" under the facts and circumstances of this case, such that this subsection of the Texas Penal Code 19.03, if not facially invalid, was unconstitutional as it was applied.

Put simply, this subsection, as interpreted by this court, exposes the killer of a rogue cop engaging in the very worst on-the-job conduct imaginable to the death penalty, whereas the killer of the very best performing and most ethical  soldier, cab driver, journalist, paramedic, nurse, doctor, teacher, engineer or accountant cannot receive death as a penalty by reason of the status of his victim. Without a requirement that the peace officer act within the core meaning of the word "lawfully", it is simply irrational to afford a just anyone working as a peace officer whatever extra protection is afforded by extending the death penalty to his or her killer.

53

Applying the *Maynard/Zant* analysis to this subsection, as interpreted and applied by the Texas courts, there is an impermissibly vague and therefore harmful statutory aggravator. The use of the  word "lawful" in this context begs for explanation.  Unlawful could mean anything from the tiniest infraction in the rules of engagement with a suspect to the murder, rape, robbery or kidnap of the suspect.   That is too broad and too controversial a concept to use in an effort that is supposed to reduce arbitrariness to a constitutional minimum.

The Supreme Court decision in *County of Sacramento v. Lewis*,  523 U.S. 833 (1998) demonstrates how broad is the meaning of the word lawful as it applies to police conduct. In finding that a police officer did not violate the Fourteenth Amendment standards of reckless or deliberate indifference in the context of injuries to a third party resulting from a high speed chase, the court deferred to the judgment of the officer who was required to make split second decisions that could make the difference between life and death.  The *Lewis* court rejected the notion that Lewis's death resulted from an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment. Cf. *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) (noting that the Due Process Clause was intended to prevent government officials " 'from abusing [their] power, or employing it as an instrument of oppression' ") (quoting *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 196 (1989) (quoting *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)).

The *Lewis* court reviewed its precedents that decline to impose federal civil liability on police officers found guilty of ordinary negligence, and turned to the closer question of culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence. In this middle range of cases, where the facts demonstrate extended opportunities to do better combined

with protracted failure even to care, indifference may be deemed truly shocking and therefore actionable. *Lewis*, supra.

The *Lewis* decision demonstrates that the notion of lawfulness as regards police conduct  has such a broad connotational range that it renders the aggravator at issue here unconstitutional.

The Texas rule permits a very broad range of police misconduct  to serve as an aggravator in capital cases.  This Texas rule afforded the prosecution a great and unfair advantage at Mays' trial.  The prosecutor argued with all the force and prestige of his office and position, that misconduct by the police does not matter, no matter how provocative or how far at variance with the prevailing professional norms of the officers involved.  (29:102)

When applying the second *Maynard* step, an examination of the state court's efforts to save the aggravator with a narrowing interpretation of it, there is none.  The Texas courts decline to clarify or narrow the meaning of "lawful" as used in this subsection, in a way that will reduce arbitrariness in the imposition of death as a penalty. The mere status of a murder victim as a peace officer on duty, without more, cannot serve to elevate the crime to a capital offense.

A claim for facial invalidity of this aggravator requires no evidentiary support.   The claim that this aggravator is vague and improper as it was applied to him requires only some evidence that might persuade a reasonable juror that there is a reasonable doubt that the officers acted recklessly or negligently as opposed to lawfully.  However, the question is begged, "Were the actions of law enforcement on the Mays' property 'lawful'?"

The officers' conduct was at variance from the lawfully established protocols in the moments leading up to the shooting, and thus unlawful. Experienced and ranking Texas peace officers are required to know the rules of engagement in crisis situations.  By statute,

they are required  to take Crisis Intervention Training.  TEX. OCCUP. CODE 1701.253.  The state agency responsible for providing peace officer training is the Texas Commission on Law Enforcement Officer Standards and Education. The training material for Texas Crisis Intervention Training, Course 3841, was admitted into evidence as Defendant's Exhibits 1 and 2.  Through cross examination, counsel for Mr. Mays informed the jury that one of the regular officers abruptly and inexplicably abandoned his state-mandated crisis intervention training at the very moment that a highly trained standoff negotiator was about to make it work.  In the words of defense counsel, "This did not have to happen."  (32:38).  Perhaps well intended, the behavior of the responding peace officers was, at critical times, grossly deficient in light of the gravity of their official duties.  This deficient behavior contributed mightily to this terrible tragedy.

The training material, Defendant's Exhibit 1, served to inform the jurors of the prevailing professional norms with respect to "stand off" situations such as the one here.  It was the textbook for this scenario, and it was ignored.  In light of the high standards Texas has set for officers confronting crisis situations, and the gravity of the situation at hand, a reasonable juror, properly instructed, might well conclude that just a little more caution, patience, understanding, respect, honesty, and sincerity was required in this tragic crisis situation, and that the conduct of the officers was reckless or negligent, rather than lawful.

## Claim 9

**Mr. Mays' Sixth, Eighth and Fourteenth Amendment rights were violated because the Texas death penalty statute impermissibly placed the burden of proving the mitigation issue on Mr. Mays, rather than requiring the State to prove the absence of mitigating factors beyond a reasonable doubt.**[23]

Mr. Mays preserved and raised this issue at trial on direct appeal.[24]  The trial court overruled the claims, and the Texas Court of Criminal Appeals found the argument foreclosed by precedent.  *Mays*, 318 S.W.3d at 397.

The primary thrust of the mitigation case was that Mr. Mays was mentally ill, delusional, and suffered paranoid ideations.  Mr. Mays also presented evidence of his abused upbringing, his struggle with substance abuse and methamphetamine addiction.  Further, he presented friends and family that described his good demeanor through the years.  Naturally, the State disputed the existence and severity of his mental illness.

Supreme Court jurisprudence holds that the right to present mitigating evidence and to rebut aggravating evidence can only be vindicated with a rational process, one that will permit a reasoned moral response to the body of evidence before the jury. See *Simmons v. South Carolina*, 512 U.S. 154 (1994)(right to inform the sentencing jury that the capital defendant will never parole.)  The Supreme Court has continually

---

[23]     This claim has been foreclosed by circuit precedent.  It is presented here in the event that the Supreme Court changes existing law and applies the changes retroactively.

[24]     See, the objections numbered 13, 22 and 27 to the trial court's refusal to  assign to the state the burden of proof and persuasion with respect to the ultimate mitigation issue in the punishment charge and the facts adverse to Appellant's mitigation case.  CR 001241, 001246, 001248.  Mr. Mays invoked provisions of the federal constitution.  CR 001253.  The trial court overruled Appellant's charge objections before reading the charge to the jury.  CR 001254.

sought to verify that States' capital procedures provide a "rational basis" for predictably determining which defendants shall be sentenced to death. *Furman. v Georgia*, 428 U.S. 153, 294 (1976)(Brennan, J., concurring). See also *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *Barclay v. Florida*, 463 U.S. 939, 960 (1983) (Stevens, J., concurring in judgment)("A constant theme of our cases . . . has been emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner"); *McCleskey v. Kemp*, 481 U. S. 279, 323 !987)(Brennan, J., dissenting) ("[C]oncern for arbitrariness focuses on the rationality of the system as a whole, and . . . a system that features a significant probability that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational").  States may satisfy *Furman*'s demands – providing objective standards to ensure that the sentencer's discretion is "guided and channeled by . . . examination of specific factors." *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

The assignment of the burden of proof and persuasion is at the very foundation of our traditional adversarial system of justice that informs our understanding of the very meaning of due process, yet Texas refuses to do that.  Assignment to the State of the burden of proof and persuasion of the facts that must be established in order for the State to achieve its objectives is one of the hallmarks of our criminal justice system. Texas refuses to do that.   The Texas system simply is not a rational one; it cannot stand constitutional muster.

This proceeding without rules permits the jury members to assign the burden of proof and persuasion, in the jury room, in secret, if they wish, after the presentation of evidence, and the argument of counsel.  Some jurors may assign the burden of proof of the sufficiency of mitigating circumstances to the capital defendant, then take another look at the bloody crime scene photos, the autopsy photos, or the pictures of the victims during life, and set the burden of persuasion at beyond all doubt. Conversely, law abiding and conscientious jurors may assign to the state the burden of  persuasion as to facts adverse to the capital defendant at a level of one per cent certainty.

The "no burden of proof" system invites arbitrariness**.**  Mr. Mays offered credible mitigating evidence relevant to  the mitigation special issue.  Completely within their oaths to render a true verdict according to the law given them by the judge, the jurors could have required that he prove his mitigating circumstances beyond all doubt, beyond a reasonable doubt, by clear and convincing evidence, or according to some standard unknown to our law.

The State should bear the burden of proof with respect to the mitigation special issue to establish the lack of a sufficient mitigating circumstance beyond a reasonable doubt.  Because of the heightened reliability requirement in capital sentencing, only the reasonable doubt standard can adequately impress upon the jury the significance and solemnity of their decision between life and death.  "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our

59

society thinks he [or she] should have in the correctness of the factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)).   The beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship,* 397 at 364 (internal quotation marks and citation omitted).   As Justice Harlan wrote in *Winship*:

> In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.   It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation.

Id. at 372 (Harlan, J., concurring) (footnote omitted).

Furthermore, the lack of a standard of proof and an assignment of the burden with respect to the mitigation special issue raises the problem of unfettered and open-ended jury discretion with respect to capital sentencing.   *See Furman v. Georgia*, 408 U.S. 238 (1972). As such, a jury may require the State to prove that the mitigation special issue should be answered no beyond a reasonable doubt just as easily as it might require the defendant to prove beyond all possible doubt that mitigating circumstances exist.   The latter scenario, though entirely possible under the current framework, would offend most sensibilities and notions of fair play and would likely

be found unconstitutional. The level of capriciousness and arbitrariness possible under the current system violates the Eighth Amendment.

Mr. Mays requests the Court to take up and reconsider this issue  so as to restore the traditional adversarial process to Texas' capital mitigation hearings by making a clear and proper assignment to the parties  burdens of proof and persuasion in the manner suggested above. He does, however, recognize that the Fifth Circuit has held that "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). *See also, Druery v. Thaler*, 647 F.3d at 546.

## CONCLUSION AND PRAYER

Mr. Mays submits that his case should be reversed as to punishment; and prays that this Honorable Court afford him an evidentiary hearing; and, that upon such consideration that the Court issue a writ of habeas corpus vacating his unlawfully obtained sentence of death; allow him a constitutionally sufficient period within which to file such amendments to this Petition as may be necessary to bring all proper matters before this Court and avoid unnecessary piecemeal litigation of his challenges to the legality of his conviction and sentence; grant him full and complete discovery pending such evidentiary hearing; and for such other and further relief as may be just and proper.

Respectfully submitted,

*/s/    Thomas Scott Smith*

By:_____

Thomas Scott Smith
State Bar Number 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
e-mail: smithlaw@airmail.net
Facsimile (903) 870-1446
Telephone (903) 868-8686

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of this Petition for Writ of Habeas Corpus upon counsel for Office of the Attorney General of Texas, P.O Box 12548, Austin, Texas  78711-2548, by placing electronic delivery, to the above address, this March 3, 2012.

*/s/    Thomas Scott Smith*

_____
Thomas Scott Smith

62

## APPENDIX OF EXHIBITS

1.    Smith County Jail Records Relating Organic Brain Injury

2.    Report of Paul Andrews, Ph.D.

3.    Report of Joan Mayfield, Ph.D.

4.    Court's Charge on Punishment

5.    Kemp I.S.D. School Records

6.    Eustace I.S.D. School Records

7.    1983 Civil Commitment

8.    Terrell State Hospital Records

9.    Excerpts from Juror Interview Denson

10.   Excerpts from Juror Interview Anderson