IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| RANDALL WAYNE MAYS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 6:11-cv-135-MAC |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | **DEATH PENALTY CASE** |
| | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER TO PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

A Texas jury lawfully convicted and sentenced Petitioner Randall Wayne Mays to death for the capital murder of on-duty peace officer, Deputy Sheriff Tony Ogburn. In the same transaction, Mays also murdered Sheriff's Investigator Paul Habelt and badly wounded Deputy Sheriff Kevin Harris. The state courts having rejected his direct and collateral appeals, Mays now seeks federal habeas corpus relief in this Court pursuant to 28 U.S.C. § 2254. For the reasons fully briefed below, the Court should deny such relief, dismiss Mays's petition with prejudice, and deny him a certificate of appealability.

## MAYS'S ALLEGATIONS

Mays raises the following grounds for federal habeas corpus relief:

1.    Trial counsel rendered ineffective assistance at the punishment phase of trial because counsel did not investigate mitigating evidence of Mays's severe mental illness, Pet. 19–23, ECF No. 10 (Claim 1);

2.    Trial counsel rendered ineffective assistance because counsel did not request a competency hearing, *id.* at 23–26 (Claim 2);

3.      Trial counsel rendered ineffective assistance because counsel did not investigate and present an insanity defense, *id.* at 26–28 (Claim 3);

4.      Trial counsel rendered ineffective assistance at the punishment phase because counsel did not object to the trial court's omission of a jury instruction stating that jurors need not agree on what particular evidence supported an affirmative answer to the mitigation special question, *id.* at 23–34 (Claim 4);

5.      Executing Mays, a mentally retarded individual, would violate the Eighth Amendment's prohibition against cruel and unusual punishment, as set forth in *Atkins v. Virginia*,[1] *id.* at 35–39 (Claim 5);

6.      The Eighth Amendment's proscription against cruel and unusual punishment prohibits imposition of the death penalty on a defendant who is functionally equivalent to an individual with mental retardation but cannot be so diagnosed because the onset of the condition occurred after age eighteen, *id.* at 40–47 (Claim 6);

7.      The trial court's restrictions on the jury's consideration of Mays's mental deficiencies abrogated the State's responsibility to prove a culpable mental state beyond a reasonable doubt, in violation of the Sixth, Eighth, and Fourteenth Amendments, *id.* at 47–50 (Claim 7);

8.      The underlying offense, as interpreted by the Texas Court of Criminal Appeals (CCA), is impermissibly vague under the Sixth, Eighth, and Fourteenth Amendments, *id.* at 50–56 (Claim 8); and

9.      Texas's death penalty statute impermissibly placed the burden of proving the mitigation issue on Mays rather than requiring the State to prove the absence of mitigating evidence beyond a reasonable doubt and thereby violated the Sixth, Eighth, and Fourteenth Amendments, *id.* at 57–61 (Claim 9).

Mays concedes that Claim 5, his allegation that he is mentally retarded and therefore may not be executed, is unexhausted. Pet. 37. However, Mays prospectively invokes the

---

[1]      *Atkins v. Virginia*, 536 U.S. 304 (2002).

Supreme Court's holding in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).[2] Pet. 37–38. He argues that *Martinez*'s holding may establish a constitutional right to effective assistance of counsel in state habeas proceedings and therefore require the CCA to revisit its precedent finding the issue noncognizable on state habeas corpus review. Pet. 38–39. But recent Fifth Circuit precedent puts to rest the notion that *Martinez* has any application to Mays's unexhausted, procedurally barred, and meritless *Atkins* claim. *Ibarra v. Thaler*, No. 11-70031, __ F.3d __, __, 2012 U.S. App. LEXIS 13777, *2, 6–7, 12 (5th Cir. June 28, 2012).

Fifth Circuit precedent also precludes relief concerning Claim 6, Mays's alternative theory that *Atkins* bars his execution because he is the functional equivalent of a mentally retarded individual due to mental illness. *See Shisinday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville*, 440 F.3d 220, 221(5th Cir. 2006). Further, Mays concedes that *Teague*[3] nonretroactivity principles prohibit the Court from granting relief concerning this allegation. Pet. 47.

The Court may not consider the merits of Claim 8, Mays's allegation that the aggravating element that elevated his crime to capital murder—the intentional killing of

---

[2]     Mays filed his federal habeas petition on March 3, 2012, while *Martinez* was pending before the Supreme Court. The Supreme Court subsequently released *Martinez* on March 20, 2012. 132 S. Ct. at 1309. Mays has not sought to amend his petition following *Martinez*'s release, presumably because its actual holding does not establish a constitutional right to effective state habeas counsel or provide Mays with a means of overcoming the procedural bar to a federal merits review of his unexhausted and procedurally defaulted *Atkins* claim.

[3]     *Teague v. Lane*, 489 U.S. 288, 310 (1989).

a peace officer "who is acting in the lawful discharge of an official duty"—is unconstitutionally vague. The claim is procedurally barred from federal review because Mays failed to raise a contemporaneous objection at trial. *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005).

In Claim 9, Mays alleges that Texas's death penalty statute is unconstitutional because it places the burden of proving the mitigation issue on the defendant rather than requiring the State to proving the absence of mitigating evidence beyond a reasonable doubt. But Mays concedes that Fifth Circuit precedent precludes a grant of federal habeas relief . Pet. 57 n.23, 61. And as with all of Mays's claims, the allegation lacks merit.

For these reasons, the Court should deny Mays relief as to all things, including a certificate of appealability, and dismiss his petition with prejudice.

## STATEMENT OF THE CASE

### I.    Facts of the Crime

In its opinion on direct appeal, the CCA accurately recounted the evidence that the State presented to support Mays's capital murder conviction:

> The evidence showed that at about 3:00 p.m. on May 17, 2007, Fran Nicholson called the Henderson County 911 dispatcher and said that [Mays], her neighbor, was shooting a handgun at his wife, who was close to the road. Mrs. Nicholson was worried because the school bus was about to drop off her granddaughter near where [Mays] was shooting. After the first shot, Mrs. Nicholson heard one or two more, and she saw [Mays's] wife, Candis, walking down the easement. Candis and [Mays] were screaming at each other.

Deputies Billy Jack Valentine, Duane Sanders, and Eric Ward responded to the "domestic violence-gunshot" dispatch call.[4] All three were in uniform, wearing badges, and driving marked patrol cars or trucks. [Mays's] two-acre property was surrounded by pipe fencing,[5] so Deputies Valentine and Sanders hopped over the fence to talk to the couple who were still standing near the road.[6] Candis, who was described as being "slow," walked "right up directly in [Deputy Sanders's] face." She was angry and said he had no business being on their property. "We're just having a spat." [Mays], however, was calm, polite, and friendly. He explained that Candis had been sexually assaulted and he was mad about it.

[Mays] told Deputy Valentine that he did not know who had called the police, but he "guessed" that Candis had. Valentine assured [Mays] that he was just trying to do his job and figure out what was going on, so he called dispatch to find out who had made the 911 call. When the dispatcher said that the call came from the neighbor, Fran Nicholson, Valentine sent Deputy Sanders over to the Nicholsons' house to find out why she had called. Just as he was leaving, Sanders saw Deputy Tony Ogburn arrive in his patrol car. Deputy Ogburn was wearing his police uniform and hat.

In the meantime, Valentine asked [Mays] if he had a gun on him and whether he had been shooting. [Mays] said that he had been "target practicing," and that the gun was in his house. Valentine also calmed Candis down, and [Mays] joked about how he "was wanting to get some loving from her and that's what started this." Throughout, [Mays] "was very nice, courteous"; he was "super-calm." However, Valentine also stated that [Mays] was well known to the local deputies because "[h]e shoots a lot out there."

---

[4]     [Court's footnote, renumbered here:] Deputy Valentine testified that he had just returned to the sheriff's office after attending a peace officers' memorial service for fallen officers when he received the dispatch.

[5]     [Court's footnote, renumbered here:] [Mays] was a welder. His property contained a residence, several sheds, considerable welding equipment, and some farm machinery, as well as a variety of farm animals.

[6]     [Court's footnote, renumbered here:] Valentine had turned on his patrol-car videotape and body microphone as he pulled up to [Mays's] property. Virtually everything that was said by the officers, [Mays], and Candis during the stand-off was on the audio tape, but the fixed-position video recorder did not capture much of the action. The tape is almost five hours long, although the stand-off itself lasted less than an hour.

Sanders radioed back that the Nicholsons wanted to press charges against [Mays] for deadly conduct, so Valentine called dispatch to see if [Mays] had any felony convictions or arrests. He did; "the most recent [arrest] was a 7/1/99 assault on a public servant." Valentine said, "That was me, that was on me."[7] He then approached [Mays] to arrest him and said, "Before you talk to me any more, OK, listen to me. Now don't make this no harder than it's gonna be, OK? You have the right to remain silent-" At that moment, [Mays's] face changed, and he started backing up.

According to Fran Nicholson, who was watching from her front porch, [Mays] "broke to run for the house." Valentine reached out to grab the back of [Mays's] T-shirt to stop him from getting to the house where [Mays] had said he had weapons. [Mays's] T-shirt ripped, and he pulled a knife and ran in the front door with Valentine close behind. [Mays] emerged a few seconds later "with the barrel of the rifle coming out." It was a 30.06 deer rifle with a scope. Valentine was about two and a half feet away, but [Mays] did not shoot; instead, he yelled, "Back off, back off!" [Mays] disappeared back inside the house as Valentine screamed, "He's got a gun!" to warn the other officers. Valentine ran back around the side of the house, took cover behind a truck, and kept talking to [Mays] to calm him down, get him to put down the rifle, and come back outside. Valentine testified that [Mays] pulled a chair up to a window, sat down, and kept talking to him. "We just kept going back and forth, just different things." Even during the middle of the stand-off, [Mays] "seemed to be fine mentally."

Deputy Sanders had returned from the Nicholsons, and he took cover along with Deputies Ward and Ogburn. More officers kept arriving and they, too, took up defensive positions behind cars, trucks, and sheds. [Mays] and Valentine intermittently yelled and talked back and forth for more than fifteen minutes.[8]  Meanwhile, Candis was wandering in the open yard

---

[7]      [Court's footnote, renumbered here:] Later testimony showed that [Mays] almost drove into the back of Valentine's pick-up truck as Valentine was backing out of his driveway one day. The deputy was off-duty, in plain clothes, and with his wife, but when he saw [Mays] continue to swerve down the road, he followed the car until it pulled into a driveway. When Valentine walked up to the driver's door and asked the driver to step out, [Mays] got out and hit the deputy in the head with his fist. Valentine thought that [Mays] was intoxicated. Although [Mays] was arrested, the charge was later dismissed.

[8]      [Court's footnote, renumbered here:] All of this conversation was captured on Valentine's recorder. Valentine repeatedly promised not to hurt [Mays], but [Mays]

between the deputies and [Mays], getting in the line of possible fire, saying that the officers were not going to shoot her husband and he wouldn't shoot them. A deputy finally tackled her and pulled her off behind a shed where he handcuffed her to keep her safe. Other officers, including Deputy Ogburn, took turns talking to [Mays].

After about twenty minutes, [Mays] climbed out of a window without his rifle and started forward toward the officers. As one deputy talked to [Mays], keeping him calm, Valentine tried to "slowly ease" between [Mays] and the open window to ensure that [Mays] could not run back into the house where the guns were. [Mays] saw him, turned, and bolted back toward the window. Valentine ran to intercept him, but he tripped over a garden hose and fell as [Mays] dived head-first through the window. Valentine got up, but he was then trapped against the side of the house as [Mays] could shoot through either of two windows beside Valentine, and he was in the direct line of fire from his fellow deputies.

Three minutes later, [Mays] shot.[9] Deputy Sanders heard the blast and saw Deputy Ogburn's hat fly in the air and saw part of his head explode. [Mays] then yelled, "Where's the other one? I'll take him out, where is he?" [Investigator] Paul Habelt ran toward Sanders, waving his arms. [Mays] shot Habelt in the head, killing him also. The officers then started shooting back. Sanders saw Deputy Kevin Harris run past a nearby shed, "[a]nd as he got to the end, I saw him jump, exchange the gunfire, and I saw his leg explode from impact." But [Mays] was also wounded during this exchange. He screamed, "I give up. I've been hit. I give up. I've been hit." He finally walked out of the house and surrendered. [Mays] later told news reporters that he had killed the two deputies because "I felt I was being mistreated."

---

yelled that he feared they would kill him and said that "Ya'll killed all three of my brothers." [According to later witnesses, [Mays] did have three brothers who were all dead: one executed by the state; one shot to death; and one who died of a drug over-dose.] [Mays] yelled, "You've got a gun and I've got one." When Valentine asked [Mays] to admit that Valentine had been honest with him, [Mays] responded, "You tried to take me to jail!" [Mays] expressed confusion about why he was "the bad guy" when the officers had originally come to help his wife. He was mad that Deputy Valentine tore his T-shirt when grabbing for him. He said, "I'm sick, I'm feeling real sick, I'm about to die, anyway, I was poisoned." Later, he said that he was "a military man." [Later witnesses said that [Mays] joined the Army when he was young.]

[9]     [Court's footnote, renumbered here:] All of the witnesses, including the Nicholsons' daughter, testified that this was the first shot fired.

*Mays v. State,* 318 S.W.3d 368, 372–75 (Tex. Crim. App. 2010). The CCA also accurately

described the evidence that Mays's counsel presented during Mays's guilt-innocence case-

in-chief:

> During his case-in-chief, [Mays] called Ron Shields, the instructor for an Intermediate Crisis Intervention class that Deputies Valentine, Sanders, and Ward had attended just ten days before the stand-off. He testified that all three deputies had scored an "excellent" after their training. Shields noted that the course had covered techniques for dealing with mentally ill or distressed people, but he explained, "Whenever weapons [are] involved, this training pretty well goes out the window." He also said that, once a suspect is separated from his weapon, "you use all means necessary to keep him separated from that weapon" regardless of his mental instability or distress.
>
> Defense counsel called Dr. Gilda Kessner, a psychologist who had never talked with [Mays], to testify to her opinion that [Mays] suffered from a "thought disorder with a paranoid ideation." Paranoia, she explained, is characterized by "suspiciousness, distrust, fearfulness." She stated that paranoia is exaggerated in a crisis and "involves a deep mistrust and suspiciousness and expectation that individuals have a malevolent, deceitful motive when they deal with you." Paranoia does not prevent someone from acting intentionally or knowingly, but such a person is "influenced by the disordered thoughts."
>
> Dr. Kessner agreed that [Mays] showed no signs of paranoia until Valentine began to read him his Miranda rights. She did not find any indications that [Mays] experienced any auditory or visual hallucinations. She said that [Mays] was not insane and that he could "intentionally or knowingly do anything, shoot in this case. I mean, that's apparent."
>
> The defense also offered the written transcript of testimony by Dr. Theresa Vail that had been taken outside the presence of the jury. Dr. Vail was [Mays's] treating psychiatrist in jail. But because she had never discussed the crime with [Mays], she had formed no conclusions about whether he might have been experiencing delusions at the time of the murders. She said that [Mays] was capable of forming the intent to commit his actions and able to understand their consequences. Dr. Vail also noted that, while [Mays's] belief

that he was being poisoned[10] was false, the stomachaches that he described as being the basis for this belief are common in anxious people such as [Mays].

*Id.* at 375. After deliberating for one hour, the jury found Mays guilty of capital murder.

*Id.*

## II.   Facts Relating to Punishment

The CCA likewise accurately summarized the evidence presented by the parties at

the punishment phase of Mays's trial:

During the punishment phase, the jury heard brief victim-impact testimony from Deputy Ogburn's widow[11] and son. Deputy Harris testified that his injured leg continued to affect him and that Deputy Ogburn's wisdom had helped him during his own father's terminal illness. Deputy Valentine testified that Deputy Ogburn had been a mentor to him during his law-enforcement career and that the events during the stand-off had adversely affected him.

During the defense case-in-chief at punishment, Dr. Vail testified in person. She diagnosed [Mays] with depression and "a psychotic disorder not otherwise specified," a condition that would make a person more dangerous.[12] She did not know if [Mays] was mentally ill on the day of the stand-off, and she did not have any indication that he had previously been treated for a

---

[10]    [Court's footnote, renumbered here:] *See supra* note [8].

[11]    [Court's footnote, renumbered here:] Mrs. Ogburn, who testified from her wheelchair, said that she suffered a stroke in 1996, and ever since then her husband had taken care of all of her needs. After his death, she had to move and now lives with her sister in The Colony, TX.

[12]    [Court's footnote, renumbered here:] She stated that a person with the type of psychosis that [Mays] had might suddenly "go off" when he felt threatened. Dr. Vail said that [Mays] had already had problems with a fellow inmate, and he thought that the jailers were poisoning his food.

mental illness. Dr. Vail did not begin treating him until four months after the stand-off, and she never asked him anything about that day.

Several family members testified that [Mays] was good with children and took care of his family.[13] [Mays's] sister, Sherry Ross, testified that [Mays's] older brother had been executed for murder sometime around 1999. [Mays] saw a second brother shot and killed in 1977. A third brother died of a drug overdose. Ms. Ross testified that [Mays] had been committed twice for drug use, but that he had stopped using drugs around 1991 when he bought his rural property. Another sister, Linda Ross, testified that [Mays] sometimes had mental "spells" when his eyes would get wide and he would act suspicious and distrustful of her. [Mays's] mother also testified that, a couple of times, she had seen [Mays] get a "weird look" in his eyes, but he was "a good man . . . a loving father. He loved children. He always played with the nieces and nephews. He'd give anybody the shirt off his back, if somebody walked up to him and asked him." Various friends testified that [Mays] was gentle, honest, even-tempered, and never out of control.

Dr. David Self, a psychiatrist, testified that he had reviewed various records, but, because he had never examined [Mays], he could not make a formal diagnosis. Nonetheless, he opined that [Mays] had a "chronic and severe psychiatric illness" that was "centrally involved in the causality of this offense."[14] He thought that the evidence of the crime showed that [Mays] was experiencing delusional thinking. Nonetheless, [Mays] understood that his actions during the stand-off were wrong and illegal. Dr. Self also thought that [Mays's] heavy methamphetamine use fifteen years earlier might have contributed to his psychosis because this drug destroys brain nerves and tissue.

After deliberating less than three hours, the jury answered "yes" to the future dangerousness issue and "no" to the mitigation question. The trial judge then sentenced [Mays] to death.

---

[13]     [Court's footnote, renumbered here:] Candis's daughter, Christina White, testified that she was relieved when [Mays] married her mother, who was mentally unable to take care of herself. Ms. White noticed that a couple of times [Mays] suddenly changed moods without any warning.

[14]     [Court's footnote, renumbered here:] Based on listening to the tape recording of the stand-off, Dr. Self opined that [Mays's] statements and actions throughout were consistent with someone who was coming in and out of a delusional state.

*Id.* at 375–76.

## III.    Direct Appeal and Postconviction Proceedings

A jury sitting in the 173rd Judicial District of Henderson County, Texas,  convicted Mays of on-duty peace officer Tony Ogburn's capital murder. 9 CR 1226; 29 RR 118–19.[15] Pursuant to the jury's answers to the statutory  special questions, the trial court, the Honorable Carter Tarrance presiding, sentenced Mays to death. 9 CR 1233–34, 1268–72; 32 RR 74–78, 83–84. Mays's court-appointed direct appeal counsel filed a motion for new trial, 1 CR Supp. 1–45, which the trial court denied, 2 SHCR 256.[16] The CCA unanimously affirmed Mays's conviction and sentence on direct appeal and denied rehearing. *Mays v. State,* 318 S.W.3d at 374–75. The Supreme Court denied Mays's petition for a writ of certiorari. *Mays v. Texas*, 131 S. Ct. 1606 (2011).

Mays's court-appointed state writ counsel filed an application for state habeas corpus relief, raising nine grounds of error. 1 SHCR 1–109. After holding a live evidentiary hearing, Judge Tarrance entered findings of fact and conclusions of law recommending that the CCA deny relief. SHCR 203–18. The CCA adopted the state habeas court's findings of fact and

---

[15]    "CR" refers to the Clerk's Record of all pleading, motions, and other documents filed in the trial court under cause number B-15,717. "RR" refers to the Reporter's Record of all transcribed proceedings in the same cause. The volume number precedes citations to the Clerk's Record and Reporter's Record; page numbers follow.

[16]    "SHCR" refers to the State Habeas Clerk's Record of all pleadings, motions, and other documents filed in Mays's state habeas proceedings. "SHRR" refers to the State Habeas Reporter's Record. The volume number precedes citations to the State Habeas Clerk's Record and State Habeas Reporter's Record; page numbers follow.

conclusions of law in their entirety and additionally concluded that Mays's first claim[17] was procedurally barred. *Ex parte Mays*, No. 75,105-01, slip op. at *2 (Tex. Crim. App. Mar. 16, 2011). Based on the trial court's findings and conclusions and its own review of the record, the CCA denied relief. *Id.* The Supreme Court denied Mays's petition for writ of certiorari. *Mays v. Texas*, 132 S. Ct. 453 (Oct. 17, 2011).

## III.   Federal Habeas Proceedings

After the convicting court set Mays's execution for August 23, 2011, Mays's federal writ counsel filed an unopposed motion in this Court to stay Mays's execution, pending the resolution of his federal habeas corpus proceedings. Pet'r's Mot. Stay Execution, ECF No. 7. The Court granted the motion. Order Granting Mot. Stay Execution, ECF No. 8. Mays subsequently filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pet. *passim*. The Director's Answer follows.

## THE DIRECTOR'S ANSWER, WITH BRIEF IN SUPPORT

Mays, confined pursuant to a state-court judgment, is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where claims were exhausted in state court, under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim

---

[17]    In his first state habeas claim, Mays alleged that the execution of a mentally ill person would violate the "evolving standards of decency provision of the Sixth, Eighth[,] and Fourteenth Amendments of the United States Constitution." 1 SHCR 12.

by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)); *see* 28 U.S.C. §2254(d). The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *(Terry) Williams*, 529 U.S. at 405–06.

A "run-of-the-mill" state-court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,* 537 U.S. 19, 27 (2002) (emphasizing that federal habeas relief is merited only where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado,* 541 U.S. at 664; *Renico v. Lett,* 130 S. Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."). This is particularly true when reviewing a state court's application of *Strickland v. Washington,* 466 U.S. 668 (1984), which when analyzed in conjunction with §2254(d), creates a difficult-to-surmount, "doubly" deferential assumption in favor of the state court's denial of relief. *Richter,* 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas

> corpus is a "guard against *extreme malfunctions* in the state criminal justice systems," *not a substitute for ordinary error correction through appeal.*

*Id.* (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). Indeed, state courts are presumed to know and follow the law. *Visciotti*, 537 U.S. at 24. And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Richter*, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *(Terry) Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. at 786–87 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests the proposed rule is not clearly established. *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).[18] A reviewing court accords deference to determinations of credibility made by the factfinder; this deference also extends to findings based on "physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574 (1985).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state-court fact finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state-court fact finding based upon

---

[18]     Federal courts review questions of law and mixed questions of law and fact under (d)(1) and review questions of fact under (d)(2). *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).

evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2). "It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo. . . . It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Pinholster*, 131 S. Ct. at 1399.

Moreover, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. *(Michael) Williams v. Taylor,* 529 U.S. 420, 436 (2000). But even if the petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark v. Johnson,* 227 F.3d 273, 284–85 (5th Cir. 2000).

Finally, AEDPA did not cast aside prior precedent that forecloses relief if a claim is (1) defaulted as a consequence of a failure to comply with state law procedural rules, *Coleman v Thompson*, 501 U.S. 722, 750 (1991); (2) barred by the doctrine of nonretroactivity, *Teague,*

489 U.S. at 310;[19] or (3) based on trial error that did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## I.   Trial Counsel Adequately Investigated Mitigating Evidence Of Mays's Mental Illness. (Claim 1).

In Claim 1, Mays alleges that trial counsel rendered ineffective assistance because counsel did not request Mays's jail records until April 2008, after voir dire had started. Pet. 19. The jail record entry for June 6, 2007, contained a single notation querying whether Mays possibly suffered from organic brain syndrome.[20] *Id.*; 2 SHCR 209.[21] Mays argues that if trial counsel had ordered his jail records closer in time to June 6, 2007, counsel would have had more time and would in fact have been able to persuade him to consent to neuropsychological testing.[22] Pet. 19–20. And although Mays acknowledges that trial counsel mounted "extensive mitigation" evidence at the punishment phase—including similar evidence that Mays

---

[19]    For purposes of *Teague*, Mays's conviction became final on March 7, 2011, when the Supreme Court denied certiorari off the CCA's denial of relief on direct review. *Mays v. Texas*, 131 S. Ct. 1606; *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994).

[20]    Mays incorrectly asserts that the jail record showed that he had organic brain damage. Pet. 19. Rather, the jail record contained only the notation, "IMP: organic brain syndrome," suggesting that the clinician thought it was *possible* that Mays suffered from organic brain syndrome. *See* 2 SHRR 30; 4 SHRR 21 (SX 1).

[21]    Mays provides the specific page from Mays's jail records as the first exhibit to his Petition. The Director cites to Mays's federal habeas exhibits as "PX," followed by the exhibit number (i.e., -1, -2, etc.).

[22]    As discussed below, after receiving the jail records, trial counsel attempted to have Mays evaluated for organic brain damage by a psychologist, but Mays refused to cooperate.

suffered from mental illness—that did not persuade the jury to spare his life, he nevertheless contends there is a reasonable probability that the double-edged evidence yielded by a neuropsychological examination would have produced a different punishment verdict. *Id.* at 26.

The CCA reached the merits of this claim and thus, the doubly deferential standard that AEDPA extends to *Strickland* claims governs this Court's review. As demonstrated below, because Mays's instant ineffective assistance claim has no merit, he has not established that the CCA unreasonably rejected it. The Court should therefore deny federal habeas corpus relief.

### A.   The state habeas court's factual findings are entitled to deference.

After a live evidentiary hearing at which both of Mays's trial counsel testified, *see* 2 SHRR 16–61, 63–65 (testimony of Bobby Mims), 65–72 (testimony of Steve Green), the state habeas court entered extensive factual findings, summarized below. Because Mays has not rebutted these factual findings with clear and convincing evidence to the contrary, they are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1).

The state habeas court found that Mims and Green, two experienced attorneys, represented Mays at his capital murder trial. 2 SHCR 204. Both attorneys possessed significant criminal defense experience, including experience representing capital murder defendants. *Id.* at 204–05. Mims, who acted as Mays's lead counsel, in particular possessed significant experience trying capital murder cases to a verdict. *Id.* at 204. Other members of the defense team at trial included Gerald Byington, a mitigation specialist; Dr. David Self,

a psychiatrist; Melinda Carroll, a paralegal; Dr. Gilda Kessner, a psychologist; Mike Ward, a private investigator; John E. Wright, an appellate attorney; Larry Fitzgerald, a prison classification expert; Dr. Susan Stone, an expert in crisis intervention; and Sonny Monteugudo, another private investigator. *Id.* at 205. Dr. Teresa Vail, Mays's treating psychiatrist at the Smith County Jail, also assisted the defense. *Id.*

Before or possibly during jury selection, trial counsel discovered a single note in Mays's medical file that Mays possibly suffered from organic brain syndrome.[23]  *Id.* at 209. As a result, Mims hired Dr. Paul Andrews, a psychologist, to evaluate Mays for organic brain syndrome. *Id.* Dr. Andrews made at least three attempts to test Mays for organic brain syndrome, none of which were successful because Mays refused to cooperate. *Id.* On at least one occasion, Dr. Andrews and defense investigator Byington talked to Mays for two hours, attempting to obtain his compliance with testing. *Id.* Mims and paralegal Melinda Carroll also attempted to convince Mays to cooperate with Dr. Andrews, but were unsuccessful. *Id.* Due to Mays's refusal to cooperate, Dr. Andrews was unable to reach any conclusions regarding whether Mays suffered from organic brain syndrome. *Id.* Mims reasonably concluded that Mays would refuse to cooperate with any attempt to conduct more extensive testing than that which Dr. Andrews had attempted to conduct. *Id.* At Mays's trial, counsel

---

[23]    At the state habeas evidentiary hearing, Mims agreed with state habeas counsel's characterization of "organic brain syndrome" as "an obsolete nonspecific term referring to syndromes arising from brain disease" and an [o]bsolete term for delirium or acute confusional state." 2 SHRR 59.

presented the testimony of Dr. Vail, Dr. Kessner, and Dr. Self. *Id.* at 206. Each mental health professional opined that Mays suffered from mental illness.  *Id.*

The state habeas court made the following findings regarding the evidentiary hearing testimony of Dr. Joan Mayfield, a neuropsychologist hired by state habeas counsel. Dr. Mayfield reviewed Mays's medical records and certain testimony from his trial, but did not recall reviewing Dr. Self's trial testimony. *Id.* at 210. She personally interviewed Mays and administered a variety of written and oral tests to him in prison on October 9, 2009. *Id.* at 209–10. Dr. Mayfield's testing was not capable of showing the brain's physical structures or any physical damage. *Id.* at 210. Rather, Dr. Mayfield's testing consisted entirely of Mays performing tasks or answering questions and required his cooperation. *Id.* Dr. Mayfield would not have been able to provide her opinion without Mays's cooperation because she relied upon the interview and test results to reach her conclusions. *Id.*

Dr. Mayfield said that her testing indicated that Mays's IQ level was in the 60s, but concluded that his history ruled out mental retardation.[24] *Id.* She reported that Mays performed well on a few tests but his results generally fell in the low to significantly impaired range. *Id.* Dr. Mayfield opined that Mays's test results would have been similar if had he been tested nearer the time of the offense. Dr. Mayfield stated that drug abuse can affect the brain in the same way as a brain injury. She noted that Mays had a history of methamphetamine

---

[24]     The Director discusses state habeas counsel's direct examination of Dr. Mayfield on the subject of mental retardation and her responsive testimony in detail concerning Claim 5, Mays's unexhausted and procedurally defaulted claim that he is mentally retarded and thus, *Atkins* prohibits his execution.

abuse and could find no explanation for Mays's performance on her tests other than his methamphetamine abuse. *Id.* Dr. Mayfield diagnosed Mays with dementia, not otherwise specified, secondary to the chronic use of drugs. *Id.* She opined that Mays would not be able to adapt to circumstances like the ones surrounding his offense as well as someone without his problems. *Id.* at 211.

The state habeas court found that trial counsel took reasonable steps to investigate Mays's mental health. *Id.* The court further found that counsel reasonably decided not to have his mental health experts personally interview Mays because counsel did not want the State's experts to have similar personal access. *Id.* at 212.

The court also determined that Dr. Mayfield's testimony was largely cumulative of evidence adduced at trial and added little or no weight to the trial testimony of Mays's mental health experts, particularly the testimony of Dr. Self. *Id.* at 212. The court noted that, before testifying, Dr. Self reviewed all the same material that Dr. Mayfield reviewed, except for those materials not yet in existence. *Id.* at 211. And unlike Dr. Mayfield, who only reviewed records which may or may not have included testimony by Mays's family members, Dr. Self interviewed multiple family members before testifying. *Id.* Dr. Self opined that Mays suffered from a "chronic and severe psychiatric illness" that was "centrally involved in the causality of this offense." *Id.* Dr. Self testified that he was been told that Mays previously had reported believing he was being poisoned based on relatively innocuous circumstances, such as a water company's warning about water quality and becoming sick to his stomach after eating in a restaurant. *Id.* Dr. Self also testified that methamphetamine abuse had been shown to

damage nerve cells and cause persisting psychosis. *Id.* Dr. Self likewise testified that studies have shown that an MRI can reveal such damage but Mays had not had an MRI. *Id.* Dr. Mayfield testified that she did not conduct an MRI and never orders such testing. *Id.* To the extent Dr. Mayfield's testimony did add to the evidence presented at trial, the state habeas court found that her testimony (or similar testimony from another neuropsychologist) was unavailable at trial due to Mays's persistent refusal to cooperate with medical personnel, whether those personnel were employed by the jail or by defense counsel. *Id.* at 212.

Based on these findings, the state habeas court concluded that Mays had not shown by a preponderance of the evidence that trial counsel performed deficiently or that Mays suffered prejudice as a result of the allegedly deficient actions or omissions. *Id.* at 217. The CCA adopted the state habeas court's factual findings and legal conclusions in their entirety and denied relief. *Ex parte Mays*, No. 75,105-01 (Tex. Crim. App. Mar. 16, 2011).

The record fully supports the state habeas court's findings. Lead counsel Mims testified at the evidentiary hearing that Mays's mental health was an issue in the case "from the start." 2 SHRR 23. Mims testified that he had already hired a fact investigator, a mitigation specialist, and two mental health experts, Dr. Self (a psychiatrist) and Dr. Kessner (a psychologist) to assist the defense team with its punishment case. *Id.* at 19–20. Mims testified that he had also enlisted the assistance of a second psychiatrist, Dr. Vail, who treated Mays while he was incarcerated at the Smith County Jail awaiting trial. *Id.* at 21. There is no evidence that Dr. Vail or Dr. Self or Dr. Kessner ever suggested that Mays should undergo testing for organic brain damage or neuropsychological deficits. *See* 28 RR 124–39 (voir dire

testimony of Dr. Vail); 28 RR 139–68 (voir dire testimony of Dr. Kessner), 29 RR 6–53 (testimony of Dr. Kessner before the jury); 31 RR 16–46 (testimony of Dr. Vail before the jury); 31 RR 122–59 (testimony of Dr. Self before the jury).

Mims testified that while reviewing Mays's medical records from the Smith County Jail, investigator Byington noticed an entry that read either "IMP: organic brain damage" or "IMP: organic brain syndrome" and which was not in Dr. Vail's handwriting. 2 SHRR 30. Mims testified that he thereafter retained Dr. Paul Andrews, a psychologist, to evaluate Mays for organic brain damage. *Id.* at 31. But Mays refused to cooperate, despite three attempts by Dr. Andrews to conduct the testing and efforts by Andrews, investigator Byington, defense counsel, and paralegal Carroll to obtain Mays's compliance. *Id.* at 32–33. Steve Green, Mays's second-chair counsel, at trial, also testified at the evidentiary hearing and confirmed the various efforts the defense team made to gain Mays's compliance with testing. *Id.* at 69–70.

Mims testified that, at his request, the trial court appointed John E. Wright, an appellate attorney, to help the defense team preserve any error at Mays's trial. Mims stated that Wright was the one who suggested that a neuropsychological test might be useful, given Mays's past methamphetamine abuse. *Id.* at 33. But Mims also testified that after the unsuccessful attempt to have Dr. Andrews test Mays for organic brain damage, he judged that it would be futile to attempt to obtain Mays's cooperation for a neuropsychological examination. *Id.*

**B. Mays has not met *Strickland*'s demanding standard for establishing ineffective assistance, let alone his burden under the doubly deferential standard of review that AEDPA affords such allegations.**

Mays has not established that trial counsel performed deficiently or that prejudice resulted, even if this Court were to apply a de novo standard of review to his ineffective assistance claim. Because Mays cannot meet his burden under the extremely deferential standard afforded *Strickland* claims even on de novo review, it follows that he certainly cannot meet the doubly deferential standard that AEDPA extends to ineffective assistance allegations. *See Richter*, 131 S. Ct. at 786 (stating that AEDPA creates a difficult-to-surmount, "doubly" deferential assumption in favor of the state court denial when reviewing a state court's application of *Strickland* in conjunction with §2254(d)); *Druery v. Thaler*, 647 F.3d 535, 539–40 (5th Cir. 2011) (stating that the court's review of *Strickland* claims is doubly deferential when AEDPA governs because the question then is whether the state court's application of the *Strickland* standard was unreasonable; "[i]mportantly, 'this is different from asking whether defense counsel's performance fell below *Strickland*'s standard' because the 'state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.'") (quoting *Richter*, 131 S. Ct. at 135; internal alterations omitted).

"Surmounting *Strickland*'s high bar is never an easy task. . . . Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 131 S. Ct. at 787–88 (internal citations and quotations omitted). To prevail under *Strickland*,

a petitioner must establish both that counsel's performance was constitutionally deficient and that the deficiency prejudiced his defense. *Id.* at 787.

When assessing *Strickland*'s deficient performance prong de novo, the reviewing court "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Richter*, 131 S. Ct. at 787 (internal citations and quotations omitted).

To establish on de novo review that he has sustained prejudice, the challenger "must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* (internal quotations and citations omitted). "It is not enough to show that the errors had some conceivable effect on the outcome." *Id.* Rather, "[c]ounsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 787–88 (internal quotations and citations omitted), and the challenger must "affirmatively prove prejudice," *Strickland*, 466 U.S. at 693. Thus, "a mere allegation of prejudice is not sufficient to satisfy the prejudice prong of the *Strickland* test." *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994). Because a convicted defendant must satisfy both prongs of *Strickland*'s test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Strickland,* 466 U.S. at 697; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

### 1. The CCA reasonably determined that Mays had not established deficient performance.

While Mays is correct that counsel has a duty to make reasonable investigations or to make a reasonable decision that renders particular investigations unnecessary, *see Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003) (quoting *Strickland*, 466 U.S. at 690–91), *Strickland* does not support Mays's attempt to micromanage trial counsel's representation down to the exact timing of counsel's investigation. *Strickland* accords counsel wide latitude in the realm of reasonable investigation, even when counsel decides *not* to investigate further. *Wiggins*, 539 U.S. at 522–23. Logically, *Strickland*'s extreme deference must apply with equal or even greater weight when, as here, counsel did investigate, but not at a time—in hindsight—to petitioner's liking. *Id.* (quoting *Strickland*, 466 U.S. at 690–91, for the proposition that, " '[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' "). In asking the Court to find the timing of trial counsel's request for his jail records deficient, Mays asks this Court to apply precisely the type of retrospective evaluation of trial counsel's actions that *Strickland* forbids. 466 U.S. at 689.

Indeed, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ." *Id.* That includes the distorting effect of counsel's own hindsight, where counsel's complained of actions or omissions, as here, were not objectively unreasonable.

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better,

> and, in the course of that reflection, to magnify their own responsibility for an
> unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective
> reasonableness of counsel's performance, not counsel's subjective state of mind.

*Richter*, 131 S. Ct. at 790; *see Druery*, 647 F.3d at 540 (emphasizing that *Strickland*'s

standard for deficient performance is "objective reasonableness" and holding that counsel's

performance was not deficient where his overall strategy was objectively reasonable, even

though motivated in part by a mistaken understanding of law). Thus, to the extent Mims

testified at the state habeas evidentiary hearing that "we were negligent" in not sooner

discovering the lone, cryptic notation in Mays's jail records regarding the possible organic

brain syndrome, 2 SHRR 30, Mims's retrospective, subjective assessment of his own

performance was not relevant to the CCA's *Strickland* analysis, *see Richter*, 131 S. Ct. at 790;

*Druery*, 647 F.3d at 540.

Mays's effort to establish deficient performance is further hampered by the fact that

it was his own refusal to cooperate that short-circuited trial counsel's attempt to have Mays

tested for neurological deficits. As the state habeas court found—and Mays has not

rebutted—counsel did in fact make this effort, hiring Dr. Andrews to perform testing on Mays

to determine whether he suffered from organic brain syndrome. 2 SHCR 209. Counsel and

various members of the defense team then diligently attempted to persuade Mays to

cooperate when he refused to permit Andrews to proceed. *Id.* Mays's cooperation was patently

necessary for the administration of tests, including neuropsychological tests, to determine

whether he suffered from organic brain damage. *Id.* at 210.

Counsel cannot be deemed deficient for failing to investigate when (1) counsel did investigate the isolated reference to possible brain damage contained in Mays's jail records and (2) Mays's own recalcitrance was responsible for counsel's inability to effectuate further investigation, including the administration of neuropsychological testing. *Strickland* unequivocally tempers the scope of counsel's duty in situations such as this, where the client actively obstructs counsel's efforts to investigate and thereby denies counsel the opportunity to present the uninvestigated evidence at issue. *See* 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statement's or actions."); *see also Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("[A]lthough a defendant's obstreperousness will not justify a complete failure by appointed counsel to investigate and present mitigating evidence in all cases . . . the scope of the attorney's duty to investigate may be limited by a defendant's lack of cooperation.") (internal quotations and citations omitted).

The Supreme Court reaffirmed this principle in *Rompilla v. Beard*, 545 U.S. 374 (2005). Although in *Rompilla*, the Court ultimately granted the petitioner relief on his ineffective assistance claim alleging a failure to investigate mitigating evidence, the Court noted that Rompilla's case was not one in which defense counsel

> simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family [including Rompilla's former wife, two brothers, a sister-in-law, and his son], and examinations of reports by three mental health experts who gave opinions at the guilt phase. Nine of these sources proved particularly helpful.

> Rompilla's own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them that he was "bored being here listening" and returned to his cell. To questions about childhood and schooling, his answers indicated that they had been normal, save for quitting school in ninth grade. *There were times when Rompilla was even actively obstructive* by sending counsel off on false leads.

*Id.* at 381 (internal citations omitted; emphasis added). Significantly, the Court did not find that Rompilla's attorneys performed deficiently based on counsel's investigative efforts described above, hindered as they were by Rompilla's lack of cooperation and active obstruction:

> The Commonwealth argues that the information trial counsel gathered from Rompilla and the other sources gave them sound reason to think that it would have been pointless to spend time and money on the additional investigation espoused by postconviction counsel, and *we can say that there is room for debate about counsel's obligation to follow at least some of those potential lines of inquiry.*

*Id.* at 383 (emphasis added). Rather, the *Rompilla* Court solely held that the deficiency in counsel's investigation lay in their failure to examine a file turned over to them by the prosecution, before trial, with the prosecution's express advisement that it would rely on the information inside to prove the aggravating factors necessary under Pennsylvania law to obtain a death sentence. *Id.* at 383–84.

Here, where counsel actively attempted to investigate whether Mays suffered from organic brain damage but was thwarted by Mays's refusal to cooperate in the personal interview and testing necessary to allow a neuropsychological expert to offer an opinion at trial, counsel's performance simply cannot be said to have been deficient. *See id.* at 383;

*Strickland*, 466 U.S. at 691; *Carty*, 583 at 263. Nor could such determination by the CCA be said to be unreasonable. *See Rompilla*, 545 U.S.  at 383 ("We can say that there is room for debate about counsel's obligation to follow at least some of those potential lines of inquiry."); *see also Brown v. Thaler*, No. 11-70012, __ F.3d __, __, 2012 U.S. App. LEXIS 11908, at *16 (5th Cir. June 12, 2012) (stating that, as to Brown's allegation of ineffective assistance for failure to investigate,  "[t]he state habeas court was 'required not simply to give [Brown's] attorneys the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [Brown's] counsel may have had for proceeding as they did.'") (quoting *Pinholster*, 131 S. Ct. at 1407).

Counsel's decision not to pursue neuropsychological testing was further consistent with counsel's reasonable professional judgment that a personal interview of Mays by a defense mental health expert could have opened the door to a personal examination by the State's mental health experts, with damaging results that would outweigh any potential benefit. 2 SHRR 26–28; *Richter*, 131 S. Ct. at 789–90 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."); *Brown*, __ F.3d at __, 2012 U.S. App. LEXIS 11908, at *16 (stating that, regarding counsel's duty to investigate, "counsel were 'entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.'") (quoting *Richter*, 131 S. Ct. at 789).

      2.    **The CCA reasonably concluded that Mays did not establish prejudice.**

Initially, Mays's present contention, that he could have been persuaded to cooperate with neuropsychological testing if only trial counsel had initiated testing efforts earlier, is speculative, self-serving, and exactly the kind of "mere allegation" that is insufficient to prove prejudice under *Strickland*. 466 U.S. at 693 (requiring that the petitioner must "affirmatively prove prejudice."); *Armstead*, 37 F.3d at 206 (noting that, under *Strickland*, a "mere allegation" of prejudice is inadequate to establish ineffective assistance). Mays's argument—that state writ counsel's later success in convincing him to cooperate with Dr. Mayfield regarding neuropsychological testing is proof that trial counsel could have persuaded Mays to cooperate, if only counsel had tried longer—again urges a retrospective evaluation of trial counsel's representation that *Strickland* prohibits. 466 U.S. at 689.

Further, no prejudice can result under *Strickland* where, as here, the defendant interferes with counsel's efforts to investigate mitigating evidence uniquely within the defendant's control and thereby interferes with counsel's ability to present that mitigating evidence. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (holding that it was not objectively unreasonable for the state court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence). The state habeas court found that Mays would have refused to submit to the personal interview and neuropsychological testing that would have been necessary to allow Dr. Mayfield—or any neuropsychologist—to testify and render an opinion concerning his neuropsychological functioning. Thus, Mays refused to allow counsel to take the actions which might have

yielded the mitigating evidence at issue. By doing so, like the defendant in *Schriro*, Mays effectively refused to allow counsel to present this mitigating evidence. No prejudice can result under these circumstances. *Id.*

No prejudice ensued for other reasons, as well. As the state habeas court properly determined, Dr. Mayfield's testimony at the evidentiary hearing was largely cumulative of Dr. Self's punishment phase testimony. *See* 31 RR 122–59. Given that the jury had already heard of Mays's methamphetamine abuse and the detrimental toll such abuse can take on an individual's cognitive and psychological state, there is no reasonable likelihood that the outcome of the punishment phase would have been different, but for the presentation of Dr. Mayfield's testimony or similar testimony by another neuropsychologist. *See United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) (concluding that counsel's decision to omit a witness's testimony did not deprive the petitioner of effective assistance where it would have been merely cumulative of other witnesses' testimony).

Moreover, Mays has not demonstrated that he suffered prejudice from trial counsel's alleged deficiencies, given the double-edged nature of the evidence in question. Presenting evidence that suggested Mays suffered from permanent organic brain damage[25]—as opposed to a potentially persistent but also potentially treatable mental illness—would have dangerously undermined the defense's attempt to save Mays from the death penalty because

---

[25]    At the state habeas evidentiary hearing, Dr. Mayfield, Mays's own witness, testified that the brain damage she diagnosed in Mays had no other ascertainable cause than his methamphetamine abuse and that brain damage caused by methamphetamine abuse is permanent. 3 SHRR 31.

such evidence would have had a direct, adverse bearing on the jury's assessment of Mays's future dangerousness. Under these circumstances, Mays has not established that a reasonably competent attorney would have presented such double-edged evidence or that but for the absence of this evidence, there is a reasonable probability that the jury would have spared Mays from the death penalty. *See Wong v. Belmontes,* 130 S. Ct. 383, 386 (2009) (per curiam) ("[*Strickland*'s prejudice] showing requires [the petitioner] to establish 'a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,' and 'that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'") (quoting *Wiggins*, 539 U.S. at 535–36); *see Brown*, __ F.3d at __, 2012 U.S. App. LEXIS 11908, at *40 (discussing the double-edged evidence the petitioner claimed his trial counsel should have presented in mitigation and concluding it was uncertain that reasonable counsel would have used the evidence even if it had been available); *see also Cockrum v. Johnson*, 119 F.3d 297, 304–05 (5th Cir. 1997) (collecting cases, in all of which the courts rejected ineffective assistance claims because the alleged failures to investigate double-edged mitigating evidence did not prejudice the defendant).

In short, Mays has not demonstrated either deficient performance by his trial counsel or prejudice resulting from it under *Strickland* regarding Claim 1. He therefore also has not established, as AEDPA requires, that the state courts unreasonably rejected his claim for relief. The Court should deny Claim 1 with prejudice.

## II.   Trial Counsel Did Not Render Ineffective Assistance By Foregoing A Competency Hearing. (Claim 2).

Mays next contends that trial counsel rendered ineffective assistance because he did not request a competency hearing. Pet. 23. The state courts rejected this claim on the merits. Thus, the doubly deferential standard AEDPA affords *Strickland* claims, described in Part I(B), *supra*, governs the Court's review. *Richter*, 131 S. Ct. at 135. Because Mays fails to show that the state courts unreasonably rejected his *Strickland* claim, he has not established a right to federal habeas corpus relief concerning Claim 2.

### A.   The state habeas court's findings of fact are entitled to deference.

After a live evidentiary hearing at which the state habeas court had a unique opportunity to observe trial counsel's credibility and demeanor, the court found that Mims did not believe that Mays was incompetent. 2 SHCR 206. To the contrary, Mims believed that Mays was able to assist in his own defense and understood the proceedings against him. *Id.* Mims thought that seeking a competency hearing under these circumstances would not advance Mays's interests and might actually damage his defense. *Id.* Mims knew that he would have to secure the services of a mental health expert witness to personally examine Mays if Mims pursued a competency hearing. *Id.* Mims also expected to lose any such competency determination. *Id.* Mims feared that if he sought to have his expert personally examine Mays for competence, then the trial court would order Mays to submit to a personal examination by the State's mental health experts. *Id.* Mims believed that the State would obtain an advantage if its mental health experts gained access to Mays. *Id.*

The state habeas court found that Mims' concern over the adverse consequences that might result from securing a competency hearing constituted a plausible basis for foregoing such a hearing. *Id.* at 207. The court additionally found that no medical expert, including Mays's state postconviction expert, Dr. Mayfield, had ever determined that he was incompetent to stand trial. *Id.* at 206. The court concluded that Mays had failed to demonstrate by a preponderance of the evidence that, at trial, he lacked the ability to consult with counsel with a reasonable degree of rational understanding or that he lacked a rational as well as factual understanding of the proceedings against him. *Id.* at 207.

To the extent Mays challenges the reasonableness of the court's factual finding that Mims believed Mays was competent to stand trial, *see* Pet. 24, he has not rebutted the finding's presumptive correctness. 28 U.S.C. § 2254(e)(1). It is clear that Mays cannot do so, because the record amply supports this finding as well as the remainder of the court's factual findings.

At the evidentiary hearing, on direct examination by state habeas counsel, Mims agreed that Mays's mental health was "an issue" from the beginning of counsel's preparation for trial, in that Mays would appear to trust the defense team on certain occasions but then appear to become suspicious. 2 SHRR 23–24. But concerning Mays's "actual competence," Mims testified that

> I didn't question at least for the times we were in trial preparations that he did not understand what a normal person that would be in his circumstances would [have] understood. I think he understood we were trying to help him. I do think that at some point in there his mental health issue would sort of invade our ability to help him, but it wasn't consistent. It was episodic.

*Id.* at 24. In subsequent direct questioning, Mims expanded:

> It's like I said earlier, we didn't feel like as far as the competence goes, we didn't feel like he was incompetent to the extent he could [not] assist his attorneys. It's like I said, he would become noncooperative at points in the representation but at other points in time he was very clear, [and] courteous[.] I suppose he had some—this mental illness that I believe he has and persists would become problematic for us in preparation, but it wasn't overwhelming. That's why we didn't open it up.

2 SHRR 28. On cross-examination, Mims agreed that despite some problems he had with Mays as far as cooperation and trust, Mays understood what he was charged with; the possible consequences for the charged offense; and the roles his lawyers, the prosecutors, and the trial judge played in the proceedings—in other words, "the sorts of things that in order to be competent a person must at least understand." *Id.* at 55. The state habeas court found Mims's testimony credible, as evidenced by its factual findings.

Mays's challenge focuses on certain statements Mims made during his punishment phase closing argument. Pet. 24. Mays asserts that the statements are inconsistent with Mims's evidentiary hearing testimony and suggests that the court's finding is therefore not worthy of deference. *Id.*

The Court should reject Mays's argument. Initially, counsel's arguments are not evidence under state law, *see Hutch v. State*, 922 S.W.2d 166, 173 (Tex. Crim. App. 1996), and therefore Mims's statements during jury argument could not have constituted proof of anything in state habeas proceedings. Further, the excerpts Mays emphasizes are either taken out of context or do not stand for the proposition he advances, or both. Lastly, state habeas counsel questioned Mims about these same statements during the state evidentiary

hearing. The state habeas court believed Mims's explanation. The state court's assessment of witness credibility would be entitled to deference even on de novo review, and "'the respect paid such finding[] in a habeas proceeding certainly should be no less.'" *Wainwright v. Witt*, 469 U.S. 412, 428 (1985) (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)); *cf. Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("We have recognized that . . . determinations of [witness] credibility and demeanor lie peculiarly within a trial judge's province and we have stated that in the absence of exceptional circumstances, we would defer to [the trial court].") (internal quotations and citation omitted); *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000) ("We cannot second guess the district court's decision to believe one witness'[s] testimony over another's or to discount a witness'[s] testimony.").

The first statement to which Mays refers is, "I've never been around a mentally ill person 'til I met that guy right there[,] Randall Mays." Pet. 24; 32 RR 50. But Mays conflates mental illness with legal competency to stand trial. A defendant may suffer from mental illness and yet be legally competent to stand trial under state law if he has the "sufficient *present* ability" to consult with his lawyer with a reasonable degree of rational understanding or a rational as well as factual understanding of the proceedings against him. Tex. Code Crim Proc. art. 46B.003. Thus, Mims's assertion that Mays was the first mentally ill person Mims had ever encountered is not equivalent to an assertion that Mays was incompetent to stand trial.

Moreover, Mays has removed the remaining statements from their context. When read in context, the statements acquire an entirely distinct character than Mays represents.[26]

> [Mays] was chained up to a bed, they had IVs all in him, and he was handcuffed, and he had sacks on his hands, and he made no sense at all. I said, "Well that's just the morphine and the drugs that's doing it. *I can't talk to this guy.*" I don't—*I met with him several other times. We couldn't communicate.* This is still in the hospital.

32 RR 51.

> We tried to meet with him in the jail. *He wouldn't have anything to do with us. It was almost like he had nothing—*

32 RR 52.

> *[Mays] couldn't even cooperate with his lawyers in his own defense. He needed to have medication.*
> Now, since that time, he has done fairly well in jail over there. We've been able to prepare this case and get it together, but it's been very difficult. It's been very difficult because he is mentally ill.

32 RR 53. The surrounding transcript on its face indicates that Mims is referring to his early encounters with Mays. Mims's argument suggests that, early in the course of his representation, he found it difficult to communicate with Mays, especially when Mays was hospitalized and medicated for the injuries he received during the shootout.[27] But "[s]ince

---

[26]     The portions of Mims's argument that Mays emphasizes are italicized.

[27]     Mays was wounded in the left arm during the shootout; after he surrendered, he was transported by helicopter to a local hospital for treatment. 25 RR 168, 189; 26 RR 154–56; 27 RR 75–76.

that time,"Mims went on to explain, Mays "ha[d] done fairly well," and the defense was "able to prepare this case and get it together."[28]

The omitted portions of Mims's statements are additionally significant because, as discussed previously, to establish incompetency to stand trial, Texas law emphasizes the defendant's mental state *at trial*. Read in context, rather than as selectively quoted by Mays, nothing in Mims's argument supports a finding that Mims believed Mays to be incompetent or that Mays was actually incompetent to stand trial at the time of trial.

Further, at the state habeas evidentiary hearing, Mims credibly explained the statements from his closing argument:

> [MR. HAAS[29]]:      During your closing argument, Mr. Mims, you told the jury basically, I can't talk to this guy. I don't—I met with him several times. We couldn't communicate. He wouldn't have anything to do with us. It was almost like he had nothing—he couldn't even cooperate with his lawyers in his own defense. He needed to have medication.
>
>                      Now, what do you mean by that?
>
> [MR. MIMS]:          Well, obviously, it was final argument . . . . [W]e felt like we had to address those mental issues and how it affected us with respect to him, and it was argument. We were trying to

---

[28]      At the state habeas evidentiary hearing, Mims testified that, as far as the last excerpted statement (i.e., the assertion that Mays wouldn't cooperate with counsel), he was not specifically referring to the period in which Mays was hospitalized. 2 SHRR 54. But Mims explained that his assertion regarding Mays's noncooperativeness was exaggerated: "There were times when he certainly wouldn't cooperate with us. There were other times that, yes, he would. Again, it was my argument." *Id.* Mims moreover testified that his statement that he was able to prepare the case was true. 2 SHRR 55.

[29]      Jeff L. Haas represented Mays in state habeas proceedings.

> get the jury at least to consider that [Mays] had a diminished
> mental capacity during the incident . . . .[30]

2 SHRR 25. In other words, Mims explained that he was using his opportunity to sway the

jury to full advantage and vigorously advocating an interpretation of the evidence that would

most strongly favor Mays. The state habeas court found Mims's testimony credible, as

evidenced by its factual findings. Because Mays has not rebutted the presumptive correctness

of the state habeas court's factual findings, this Court must accept those findings as correct.

28 U.S.C. §2254(e)(1).

### B.   The CCA Reasonably Rejected Mays's Ineffective Assistance Allegation.

A petitioner seeking relief under *Strickland* must meet both of its prongs to obtain

relief. Mays has not carried his burden regarding either prong and therefore cannot establish

that the CCA unreasonably rejected his *Strickland* claim.

### 1.   The CCA reasonably determined that Mays failed to demonstrate deficient performance.

The state habeas court found that Mims did not believe Mays to be incompetent;

believed that Mays understood the proceedings against him and was able to assist in his own

defense; and further, judged that a competency determination would go against Mays. 2

SHCR 206. An attorney does not perform deficiently under *Strickland* when he declines to

pursue a course of litigation that he reasonably considers futile or meritless. *Green v.

Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (stating that failure to make frivolous objection

---

[30]    The charge conference at the guilt-innocence phase supports Mims's
account of their strategy. *See* 28 RR 175–83; 29 RR 4–6.

does not cause counsel's performance to fall below an objective level of reasonableness); *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) (noting that counsel cannot be deficient for failing to press a frivolous point); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) (explaining that "failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (stating that "counsel is not required to make futile motions or objections.").

Further, trial counsel may rely upon the objectively reasonable evaluations and opinions of experts without worrying that a reviewing court will substitute its own judgment and rule that his performance was deficient for doing so. *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002) (abrogated on other grounds by *Tennard v. Dretke*, 542 U.S. 274 (2004)). Where counsel recognizes the need for expert assistance and employs and relies upon that assistance, counsel's actions are objectively reasonable. *See Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) (stating that counsel performed appropriately by recognizing a mental health issue, by recognizing a need for expert aid, and by employing an expert); *see also Easley v. Dretke*, 122 F. App'x 124, 128–30 (5th Cir. 2005) (unpublished) (stating that where an expert, after examining a defendant, finds no evidence of post-traumatic stress disorder, counsel's actions in not pursuing such a defense is not deficient); *United States v. Roane*, 378 F.3d 382, 409 (4th Cir. 2004) (stating that where counsel was presented with a mental health report about the defendant, counsel had no mandate to second-guess the report); *Campbell v. Coyle*, 260 F.3d 531, 555–56 (6th Cir. 2001) (concluding that counsel's actions were objectively reasonable where he relied upon an expert's diagnosis; counsel's

failure to independently diagnose the defendant's condition was not unreasonable); *Pruett v. Thompson*, 996 F.3d 1560, 1574 (4th Cir. 1993) (stating that counsel is not required to be an expert in psychiatry; counsel acts reasonably by firing and relying upon an expert).

There was no evidence before the state habeas court (nor is there any before this Court) that any of the mental health experts Mims hired ever suggested that Mays was not competent to stand trial. Further, Mims himself—a very experienced capital trial attorney who interacted closely with Mays over a lengthy period—reasonably believed that Mays was not incompetent and thus, it would be fruitless to pursue a competency hearing. Moreover, Dr. Mayfield, Mays's mental health expert during state habeas proceedings—like Mays's mental health experts at trial—never suggested that he had been incompetent to stand trial. Under these circumstances, the state habeas court reasonably concluded that Mays had not established deficiency under *Strickland*. *Green*, 160 F.3d at 1037 *Sones*, 61 F.3d at 415 n.5; *Clark*, 19 F.3d at 966 *Koch*, 907 F.2d at 527.

The state habeas court also credited Mims's testimony that he declined to pursue a competency hearing for a second reason—his belief that, under *Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997), a competency hearing would result in State's mental health experts being allowed to personally interview Mays, with possible negative consequences to Mays's defense if the competency determination went against him. Mays asserts that Mims's belief was based on a mistaken understanding of *Lagrone* and therefore could not have been a professionally reasonable basis for declining to pursue a competency determination. Pet. 25–26.

But even assuming that Mims misjudged *Lagrone*'s impact in the context of competency examinations, Mays's concomitant proposition—that the CCA therefore unreasonably rejected his *Strickland* claim—is misplaced. "*Strickland* directs courts to consider the conduct of defense counsel based on the *objective* standard of a reasonable attorney. That [Mims] may have been mistaken in part of his legal reasoning does not constitute ineffectiveness where the ultimate strategic choice was reasonable." *Druery*, 647 F.3d at 540 (internal citation omitted; emphasis added); *see also Richter*, 131 S. Ct. at 790 (emphasizing the objectivity of *Strickland*'s deficiency inquiriy).

In addition, as discussed below, the CCA reasonably rejected Mays's *Strickland* claim because he did not establish prejudice.

## 2. The CCA reasonably concluded that Mays had not demonstrated prejudice.

Mays cites generally to two out-of-circuit cases to support his assertion that Mims's decision not to pursue a competency hearing "prejudiced the rights of [Mays] to have his incompetency fairly and fully adjudicated." Pet. 25. Initially, to the extent Mays argues that this represents the proper prejudice inquiry under *Strickland*, he is mistaken.[31] The Fifth

---

[31] Indeed, neither case that Mays cites supports his position. The Seventh Circuit opinion he cites expressly states that, under circuit precedent, the proper prejudice inquiry is whether there is a reasonable probability that the defendant would have been found unfit had a hearing been held. *Burt v. Uchtman*, 422 F.3d 557,567 (7th Cir. 2005) (citing *Eddmond v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996)). Although it concerns a distinct set of facts and legal theory of ineffective assistance, the Third Circuit opinion to which Mays cites espouses a similar standard. *See Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (stating that where the petitioner has once been found incompetent and alleges that counsel performed deficiently during a subsequent competency proceeding by failing to produce evidence or cross-examine the State's sole

Circuit has held that the question for purposes of establishing prejudice in these circumstances is whether there is a reasonable probability that, but for Mims's decision not to seek a competency hearing, Mays would have been found incompetent to stand trial. *Felde v. Butler*, 817 F.2d 281, 282–83 (5th Cir. 1987); *see also Burt*, 422 F.3d at 567 (stating the same prejudice inquiry); *Hull*, 190 F.3d at 110 (requiring the petitioner to establish that there was a reasonable probability that he was actually incompetent). For the same reasons discussed above—the complete lack of evidence that Mays was actually incompetent to stand trial—the CCA reasonably concluded that he did not establish prejudice under *Strickland*. The Court should deny federal habeas corpus relief concerning Claim 2.

## III.   Trial Counsel Did Not Render Ineffective Assistance By Declining To Raise An Insanity Defense. (Claim 3).

In Claim 3, Mays contends that trial counsel rendered ineffective assistance because counsel did not investigate and raise an insanity defense pursuant to Texas Penal Code § 8.01. Pet. 26. That section provides that it is "an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect,[32] did not know that his conduct was wrong."   The CCA adjudicated this claim on the merits. Therefore, Mays must surmount the doubly deferential standard of review that AEDPA requires the Court to apply to claims of *Strickland* error. *Richter*, 131 S. Ct. at 135. But Mays

---

witness, to establish prejudice under *Strickland*, the petitioner must show that there was a reasonable probability that he was actually incompetent).

[32]   "Mental disease or defect," as used in § 8.01(a), "does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." Tex. Penal Code § 8.01(b).

cannot carry his burden because, as demonstrated below, the claim has no merit under the *Strickland* standard set forth in Part I(B), *supra*. Accordingly, the CCA reasonably rejected it and the Court should deny Claim 3 with prejudice.

### A.   The state habeas court's factual findings are entitled to deference.

The state habeas court entered factual findings on this claim following a live evidentiary hearing. 2 SHCR 204. The court found that Mims made a professional and thorough attempt to evaluate Mays's mental state at the time of the offense, *id.* at 207, and based on that investigation, made a reasonable decision to seek an acquittal or life sentence on the basis of evidence that Mays was mentally ill rather than to plead insanity, *id.* at 208. Dr. Self told counsel that he could not testify that Mays was insane when he committed the offense. *Id.* Neither Mims nor his second-chair, Steve Green, had any reasonable expectation that an insanity plea would be successful. *Id.* at 207. Further, Mims believed that a failed insanity plea would likely result in a loss of credibility which would damage Mays's punishment case. *Id.*

The state court also found that Mays was not insane under Texas law when he murdered Deputy Ogburn, and that no reasonable juror would have found him so, even if Mays had entered such a plea. *Id.* The court noted that no medical expert had ever found that Mays was insane at the time of the offense, including Mays's own postconviction mental health expert, Dr. Mayfield, and no credible evidence supported a conclusion that Mays was insane. *Id.* at 208.

Because Mays has not rebutted these factual findings by clear and convincing evidence, they are entitled to deference. 28 U.S.C. § 2254(e)(1). Indeed, Mays cannot make the required showing where, as here, the record entirely supports the trial court's findings. On direct examination during the state habeas evidentiary hearing, state habeas counsel asked Mims whether the defense considered raising the affirmative defense of insanity. 2 SHRR 28. Mims responded:

> It was discussed but, once again, you get into the area of credibility. If you don't win that issue, you're not going to win the diminished capacity [argument],[33] in my opinion. You're [also] not going to maintain your credibility with the jury on the punishment side of the case. We defend these cases almost every time, especially in this case, at the mitigation level. If you don't maintain your credibility as a defense team, I think you lose the mitigation issue. That's the main reason we did not [raise an insanity defense].

2 SHCR 29. Mims testified that he did not ask for a defense expert to personally examine Mays to ascertain whether Mays was sane when he committed Ogburn's murder, for the same reason he declined to do so regarding Mays's competency to stand trial. *Id.* Mims had earlier explained his understanding that, under *Lagrone*, 942 S.W.2d at 611, if Mims submitted Mays to a psychiatric examination and subsequently attempted to use any evidence garnered as a result at trial,

> that would open [Mays] up for an examination by the State's psychiatrist. So that's one of the reasons we didn't [seek a competency determination or raise an insanity defense]. I was very . . . worried that if I opened him up to that sort of

---

[33]       Mims agreed earlier in the evidentiary hearing that, based on the physical evidence in the case, including videotapes, it was not seriously disputed that Mays shot Deputy Obgurn and the other victims. Mims testified that he tried to defend Mays against the capital murder charge by arguing that he was guilty of some lesser-included offense such as murder, based on diminished capacity. 2 SHRR 26.

> examination  . . . we would face substantial adverse testimony with respect to certainly future dangerousness.

2 SHRR 26–27. On cross-examination, Mims elaborated on his assessment of the dangers of raising an insanity defense:

> [T]he insanity defense is a tough defense. I believe the public does not like the insanity defense in the sense that not guilty by reason of insanity, NGRI—I think the public believes you just walk out of the courtroom, you are not guilty, you go off for treatment, I suppose. But . . . I didn't have any reasonable expectation that the insanity defense would work. What we were really interested in was making sure as best we could [that] he did not get the death penalty. That the obviously overriding goal in all of this. If you have the challenge of presenting insanity in any kind of trial, I believe if you don't make it [at guilt/innocence, then] you lose the rest of it. . . .
>
> You have to win it. If you don't win it, I believe the jury then doesn't listen to you. You've fired all your ammo.

*Id.* at 56–57. Mims further testified that he did not raise an insanity defense because he did not believe that Mays was insane. *Id.* at 56. Second-chair counsel Green testified at the hearing and confirmed that he and Mims discussed the insanity defense several times. *Id.* at 68. Green testified that he agreed with Mims's legal opinion that there was not a case to be made for insanity. *Id.* at 69. Green also recalled that while counsel were reviewing the in-car video of the incident with Dr. Self in preparation for trial, Self commented "that he couldn't say that [Mays] was insane at the time of the incident." *Id.*

To the extent Mays asserts that the trial testimony of Drs. Vail, Self, and particularly, Kessner, undermines the state habeas court's findings regarding the reasonableness of counsel's investigation and decision regarding the insanity defense, Pet. 27, his argument is unavailing. Insofar as Mays asserts that Drs. Vail, Self, and Kessner unanimously opined

that he was "seriously [mentally] ill," *id.*, Mays confuses unanimity on the issue of mental illness with an opinion on legal insanity—under Texas law, the inability to distinguish right from wrong when he committed the offense. Tex. Penal Code § 8.01. But these concepts are not identical.

Further, Mays has not rebutted the state habeas's court's finding that Dr. Self told trial counsel that Mays was not insane at the time of the offense. 2 SHCR 208. Indeed, Mays cannot rebut this finding when Dr. Self testified at the punishment phase that he "[did] not think the wrongfulness or legal context [of the offense] escaped [Mays]. I think he understood that." 31 RR 156. Moreover, although Mays particularly emphasizes Dr. Kessner's trial testimony that Mays was mentally ill, he ignores the fact that Dr. Kessner also expressly testified that Mays was *not* insane at the time of the crime. 29 RR 52. As to Dr. Vail, she first encountered Mays after he had already been in jail for several months following Deputy Ogburn's murder. 31 RR 34. Although Dr. Vail diagnosed Mays as then suffering from a mental illness, she could not say that Mays suffered from a mental illness of any severity at the time of the offense. 31 RR 28. Further, Dr. Vail testified that she did not discuss the offense with Mays, 31 RR 45, and offered no opinion on his sanity when he killed Deputy Ogburn.

In sum, Mays has failed to rebut the state habeas court's findings with clear and convincing evidence to the contrary. The Court must accordingly accept those findings as true. 28 U.S.C. § 2254(e)(1).

## B.   The CCA reasonably rejected Mays's *Strickland* claim.

### 1.   Mays failed to establish deficient performance.

Mims reasonably believed that Mays was sane when he committed the crime. Mims further reasonably believed that an insanity defense would fail at the guilt-innocence stage. Mims moreover reasonably judged that the failure would cause an irreparable loss of credibility that would carry over to the punishment phase and eviscerate his attempt to keep Mays from receiving the death penalty. In such circumstances, Mays has not established that Mims performed deficiently. *Richter*, 131 S. Ct. at 789–90 (stating that counsel need not pursue investigations that would be fruitless, especially those that might harm the defense.); *Brown*, __ F.3d at __, 2012 U.S. App. LEXIS 11908, at *16 (stating that, regarding counsel's duty to investigate, "counsel were 'entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.'") (quoting *Richter*, 131 S. Ct. at 789); *see, e.g.*, *Dowthitt v. Johnson*, 230 F.3d at 748 (counsel reasonably relies on expert opinion); *Roane*, 378 F.3d at 409 (same); *Campbell*, 260 F.3d at 555–56 (same). Given Mays's failure to establish that counsel's representation fell outside the wide range of reasonable professional assistance, the CCA reasonably rejected the allegation represented by Claim 3.

### 2.   Mays failed to establish prejudice.

To establish prejudice, Mays must demonstrate that but for counsel's decision not to raise an insanity offense, there is a reasonable likelihood that a jury would have found that he was insane when killed Deputy Ogburn. *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009). There was no evidence in the trial record or the state habeas record that Mays was actually

insane. In fact, the evidence was just the opposite; two of Mays's own mental health experts

opined that was sane when he committed the crime. 29 RR 52; 31 RR 156; 2 SHCR 208.

Under these circumstances, Mays cannot carry his burden regarding *Strickland*'s prejudice

prong. Accordingly, the CCA reasonably denied Mays relief. For these reasons, the Court

should also deny him relief.

## IV.   Trial Counsel Did Not Render Ineffective Assistance By Not Objecting To The Omission Of A Juror Non-Unanimity Instruction. (Claim 4).

Mays contends that he received ineffective assistance at the punishment phase because

counsel did not object to the trial court's omission of an instruction advising the jury that, in

answering the second special question, it need not agree concerning what particular evidence

was mitigating. Pet. 28; *see* Tex. Code. Crim. Proc. art. 37.07, § 2(f)(3). Mays also asserts that

improper comments by the State during its punishment-phase closing argument magnified

the adverse effect of counsel's putative error. Pet. 32–33.

Mays raised the underlying issue as a freestanding claim on direct appeal. He asserted

that the trial court violated Texas law and—pursuant to *Mills v. Maryland*, 486 U.S. 367,

383–84 (1988)—the Eighth Amendment when, at the punishment phase, it omitted the

instruction that the jurors need not agree on what particular evidence supports an

affirmative finding on the mitigation special question. Appellant's Br. 42–49; *see* Tex. Code.

Crim. Proc. art. 37.07, § 2(f)(3). As part of that claim, Mays asserted that the State

exacerbated the trial court's error by arguing to the jury that it must accept a single

mitigation theme in order to answer "yes" to the mitigation special question. Appellant's Br. 42, 46–47.

The CCA rejected the claim on the merits. First, the CCA concluded that the trial judge erred by failing to instruct the jurors that they need not agree on what particular evidence supported a finding on the mitigation special issue. *Mays*, 318 S.W.3d at 394. But the Court noted that Mays did not object to the omission and thus, could only obtain reversal of his sentence if he demonstrated that "the error caused 'egregious harm' with respect to sentencing, that is, that [Mays] was deprived of a fair sentencing trial." *Id.*; *see also Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (explaining that when a defendant does not object at trial to an alleged error, to obtain relief on direct appeal he must establish that error occurred and that the error caused him egregious harm).

The CCA then concluded that Mays could not obtain relief due to the court's earlier holding in *Young v. State*, 283 S.W.3d 854 (Tex. Crim. App. 2009). The CCA explained that in *Young*, it held that the Constitution does not require the non-unanimity instruction and that the trial court's omission of the statutory non-unanimity instruction was harmless error under *Almanza*'s "egregious harm" standard. The CCA further rejected Mays's attempts to distinguish *Young* from his own case on the grounds that the prosecutor  repeatedly suggested that the defense must submit a single mitigation theory:

> In the record excerpts [Mays] cites, the prosecutor simply pointed out the inconsistencies in the evidence presented by the defense: [Mays] was calm, friendly, likeable neighbor versus he was a paranoid psychotic. But the prosecutor never suggested or implied that the jury had to unanimously decide which defensive theory, if either, it chose to believe. Any individual juror could

believe or disbelieve either theory; the prosecutor's thrust was that a juror could not simultaneously believe both because they were inconsistent.

*Mays*, 318 S.W. 3d at 395.

Mays restyled the claim in state habeas proceedings, alleging that trial counsel rendered ineffective assistance by not objecting to the lack of instruction. 1 SHCR 22–24. The state habeas court correctly noted that it did not charge the jury pursuant to Texas Code of Criminal Procedure Article 37.071(f)(3) and found that counsel did not object to the omission. 2 SHCR 215. The court further determined that the omission of the instruction had no conceivable impact on the trial's outcome. *Id.* It concluded that Mays failed to demonstrate that counsel performed deficiently or that prejudiced ensued from counsel's alleged shortcoming. *Id.* at 217. The CCA adopted the state habeas court's findings of fact and conclusions of law. *Ex Parte Mays*, No. 75,105-01 (Tex. Crim. App. Mar. 16 2011). Based on the trial court's findings and conclusions and its own review of the record, the CCA denied relief. *Id.*

The CCA reasonably applied *Strickland* in rejecting Claim 4. Regarding *Strickland*'s deficient performance prong, it is significant to the Court's inquiry that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Ross v. Okla.*, 487 U.S. 81, 91 (1988) (quoting with approval *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). The Sixth Amendment guarantees counsel reasonably likely to render and rendering reasonably effective assistance, not errorless counsel. *Green*, 116 F.3d at 1122; *Moreno v. Estelle,* 717 F.2d 171, 176–77 (5th Cir. 1983). To rise to the level of deficient performance, counsel's errors

must be so serious that they undermines the proper adversarial process, such that the trial cannot be relied upon as having produced a just result. *Pinholster*, 131 S. Ct. at 1403. "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 687).

Here, the CCA reasonably concluded that trial counsel was functioning at or above the level that the Sixth Amendment demands, despite his failure to perfect an objection to the lack of the unanimity instruction. On direct appeal, Mays himself argued that one or more of counsel's written objections to the charge should have alerted the trial court to the instruction's omission. *Mays*, 318 S.W.3d at 394 n.104. And Mims testified at the evidentiary hearing that he believed, taken together, his written objections asked the court to instruct the jury that it need not be unanimous regarding what was sufficiently mitigating to warrant a life sentence rather than death. *See* 2 SHRR 37–39. The CCA's contrary conclusion on this point[34] does not mean that counsel failed to make a professionally reasonable, albeit unsuccessful, effort to ensure that the jury received the instruction. *See Strickland*, 466 U.S. at 689–90 (noting that judicial scrutiny of counsel's performance must be highly deferential, with every effort made "to eliminate the distorting effects of hindsight" and to evaluate the conduct from counsel's perspective at the time); *cf. Ward v. Whitley*, 21 F.3d 1355, 1361 (5th

---

[34]      The CCA concluded that counsel's written objections were not sufficiently specific to have alerted the trial court to the omission of the instruction. *Mays*, 318 S.W.3d at 394 n.104.

Cir. 1994) ("We cannot say that trial counsel's strategy, although ultimately unsuccessful, was unsound.").

Further, the CCA reasonably concluded that the absent instruction did not affect the trial's outcome. As the CCA explained when considering the issue on direct appeal,

> In addressing the issue of harm [when deciding the identical issue in *Young*], the Court explained that every single juror had to agree that there were no mitigating facts or circumstances that called for a life sentence rather than a death sentence. Thus, if even one juror believed that there was some mitigating fact—any mitigating fact—that called for a life sentence, that juror could not join in a verdict that there was no mitigating circumstance.

*Mays*, 318 S.W.3d at 395 (internal footnotes omitted). In a footnote, the CCA cited with approval Judge Cochran's concurrence in *Almanza* that

> [I]t would be illogical to speculate that perhaps one or more of those jurors did find a mitigating circumstance but was so confused about the unanimity requirement that he thought that unless every juror agreed upon the same mitigating fact, his vote did not count. So he changed his vote. Such reasoning assumes that jurors would violate their oaths. We must, however, presume that jurors, conscious of the gravity of their tasks, attend closely the particular language of the trial court's instruction in criminal cases and strive to understand, make sense of, and follow the instructions given them.

*Id.* at 395 n.109 (internal quotations omitted). Although counsel did not perfect an objection to the instruction's absence and the CCA therefore evaluated the harm aspect of Mays's claim under *Almanza*'s egregious error standard, Mays has not shown that the CCA would have reached a different result if the CCA had applied a less stringent standard. That is especially true given the CCA's determination that the lack of instruction did not confuse the jury. Further, as the CCA properly determined on direct appeal, the prosecutor's closing argument did not lead the jurors to believe that they must unanimously accept only one theory of

mitigation offered by Mays. *Mays*, 318 S.W.3d at 395 & 395 n.110 (setting forth the prosecution's allegedly improper statements at closing). Under these circumstances, Mays fails to establish either deficient performance or prejudice. It follows that the CCA reasonably rejected his allegation of *Strickland* error. The Court should therefore deny federal habeas relief concerning Claim 4.

**V.    Mays's Unexhausted And Procedurally Defaulted Claim That He Is Mentally Retarded Is Procedurally Barred From Federal Review. Further, The Claim Has No Merit. (Claim 5).**

In Claim 5, Mays asserts that he is mentally retarded, and therefore, the Supreme Court's holding in *Atkins* prohibits his execution. Pet. 35. But as Mays himself admits (and the record shows), although the Supreme Court released *Atkins* five years before Mays even committed his crime, he has never presented the claim to the state courts, either at trial, on direct appeal, or in his state habeas application. *Id.* at 37; *see* Appellant's Br. *passim*; 1 SHCR 1–61 (state habeas application). The claim is therefore unexhausted.

It is well-settled that this Court may not grant federal habeas relief regarding a claim that comes before it in this procedural posture. *See* 28 U.S.C. § 2254(b)(1) (stating that habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State."); *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir. 1998) ("Although AEDPA authorizes a district court to *deny* relief on an unexhausted claim, it does *not* authorize a district court to *grant* relief on an unexhausted claim, 'unless the State, through counsel, expressly waives the requirement.'") (emphasis added).   Moreover, the claim is procedurally defaulted and

procedurally barred from federal merits review because CCA would dismiss as an abuse of the writ a subsequent application raising the challenge. In any event, a grant of relief is not warranted because Mays is not mentally retarded.

To the extent Mays asks the Court to stay these proceedings and hold them in abeyance pursuant to *Rhines* so that he may return to state court to present his meritless *Atkins* claim, Pet. 39, the Court should decline the request. Mays cannot satisfy *Rhines*'s prerequisites. To the extent Mays looks to *Martinez* for relief from his state procedural default, Pet. 38–39, that decision does not assist him in his effort to surmount the procedural bar to federal review.

### A.    Mays is not mentally retarded.

In *Atkins*, the Supreme Court held that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." 536 U.S. at 321. The Court noted that, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317. "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* Accordingly, the Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.*

In response, the CCA adopted the definition of mental retardation as then set out by the American Association on Mental Retardation (AAMR)[35] and the Texas Health and Safety Code. *Ex parte Briseño*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  For Mays to establish that he is mentally retarded under Texas law, he must show (1) significantly subaverage intellectual functioning, (2) significant deficits in adaptive behavior, and (3) onset before age eighteen. *Id.*

Recognizing that adaptive behavior criteria are "exceedingly subjective," the CCA provided seven additional "evidentiary factors" that factfinders might also use in determining whether an individual is mentally retarded. *Id.* at 9. These factors include, for example, whether the people who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—thought he was mentally retarded at that time, and, if so, acted in accordance with that determination, and whether the person has formulated plans and carried them through or whether his conduct impulsive. *Id.* at 8–9. The Fifth Circuit has approved the use of the *Briseño* framework. *See Moreno v. Dretke*, 450 F.3d 158, 163 (5th Cir. 2006); *In re Hearn*, 418 F.3d 444, 446–47 (5th Cir. 2005). It has moreover held that "the application of the *Briseño* factors, even in the absence of specific employment of the AAMR's methodology for determining deficiencies in adaptive behavior," does not run afoul of *Atkins*'s broad holding. *Chester v. Thaler*, 666 F.3d 340, 347 (2011).

---

[35]   The AAMR, as of January 1, 2007, has changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). AAIDD, November 2006, Vol. 6, No. 11, http://www.aaidd.org/content_3558.cfm (Last visited on June 20, 2012).

To establish his claim of mental retardation, Mays relies on Dr. Mayfield's report, obtained by state habeas counsel and included as an exhibit in Mays's state habeas evidentiary hearing, PX-3; high school records from the Kemp Independent School District, PX-5; junior high school records from the Eustace Independent School District, PX-6; a 1983 court order finding Mays mentally ill and civilly committing him to Terrell State Hospital for observation and treatment, PX-7; and treatment records from Terrell State Hospital concerning Mays's 1983 civil commitment and a second admission in 1985, PX-8. Because they are not authenticated, the Court should not consider Exhibits PX 5–6 and 8 (the school and Terrell State Hospital records). But even assuming that these records are what they purport to be, Mays's evidence falls far short of establishing that he is mentally retarded.

### 1.   Mays does not establish "significantly subaverage intellectual functioning."

"Significantly subaverage intellectual functioning" is usually evidenced by an IQ score "of about 70 or below (approximately 2 standards deviations below the mean)." *Briseño*, 135 S.W.3d at 7 n. 24 (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders IV 39 (Text Revision 4th ed. 2000) (DSM-IV-TR), and American Association on Mental Deficiency, Classification in Mental Retardation N 1 (Grossman ed. 1983)) (AAMD). Mays does not make this showing.

Dr. Mayfield stated in her report that she administered a Reynolds Intellectual Assessment Scales (RAIS) test to Mays in October 2009, when Mays was fifty years old and confined at the Polunsky Unit in Livingston, Texas—colloquially known as "Death Row." PX-

3 at 1; 5 SHRR Def.'s Ex. 2. Mays relies exclusively on the results of this testing to establish that he functions at a significantly subaverage intellectual level. Pet. 35–36. But although Dr. Mayfield reported that Mays scored a 63 on the RIAS, there is no evidence that she administered the test under the proper conditions, properly administered the test itself, or properly scored the raw data that she obtained. Neither Dr. Mayfield's testimony at the state habeas evidentiary hearing nor her report addresses these issues, which are central to the test's validity and the reliability of the resulting score. 3 SHRR 5–53; PX-3 *passim*.[36]

Further, the *Atkins* Court recognized the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), not the RIAS, as "the standard in the United States for assessing intellectual functioning." 536 U.S. at 309 n.5; *see Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010) (noting it was undisputed that, when administered under the proper conditions, the WAIS-III is typically considered the "gold standard" for evaluating intellectual functioning); *Thomas v. Quarterman*, 335 Fed. Appx. 386, 391 (5th Cir. 2009) (unpublished) (noting that the petitioner's own expert "acknowledged the WAIS-III is the current 'gold standard' for assessing intellectual abilities."); *United States v. (Joseph) Smith*, 790 F. Supp.2d 482 (E.D. La. 2011) ("[T]he WAIS-III is a gold standard for [intelligence] testing."). In contrast, at least one expert has testified that the RAIS is "a fairly new test and not as comprehensive as the WAIS-III." *Ramirez v. Ryan*, No. CV-97-1331-PHX-JAT, 2010 U.S. Dist. LEXIS 110131, at *39 (Sept. 28, 2010) (unpublished) (recounting expert opinion

---

[36]    The most Dr. Mayfield says on the subject is that she administered the test in a conference room in the visitation area at the Polunsky Unit. PX-3 at 1.

testimony).[37]  Moreover, Mays presents no pre-*Atkins* or pre-trial or pre-age-eighteen score,

which would be inherently more reliable, as Mays now has substantial incentive to minimize

his level of intellectual functioning.[38]

In short, the Court should refuse to endorse Mays's score on the 2009 RIAS as an

accurate estimate of his then-current level of intellectual functioning, much less as a reliable

indicator of Mays's intellectual functioning before the age of eighteen.[39]  Because Mays has

not satisfied *Briseño's* first requirement, the Court could reject his *Atkins* claim without

deciding the two remaining issues (adaptive-deficits and juvenile onset).  Nonetheless, Mays's

evidence also fails to satisfy these remaining prongs.

[37]     A fourth edition of the WAIS, the WAIS-IV, was released in 2008 and is also now in use.

[38]     In this regard, the Court should note Exhibit A, which is an excerpt from Mays's TDCJ classification records.  Those records include various worksheets associated with a disciplinary proceeding held in March 2011, after Dr. Mays's October 2009 testing.  Ex. A at 13–17.  One worksheet indicates that unit personnel appointed a counsel substitute to represent Mays in the proceeding.  *Id.* at 13.  The reasons circled for the appointment of counsel substitute include that Mays had low educational attainment and an IQ below 73.  *Id.*  Yet the record of a February 2009 disciplinary proceeding, which occurred before Dr. Mays conducted her testing, shows that Mays was also assigned counsel substitute.  *Id.* at 26.   But there is no mention of low educational attainment or low IQ.  *Id.*  It is reasonable to infer from the record that, before Dr. Mays's testing, Mays did not manifest any behavior that prompted unit personnel to question his intellectual functioning.  In any event, without a demonstration that any subaverage intellectual functioning had its onset before the age of eighteen, Mays cannot establish that he is mentally retarded.  *Briseño*, 135 S.W.3d at 7.

[39]     Even assuming this score is reliable, Dr. Mayfield herself notably agreed with state habeas counsel that there was no "indication whatsoever that [Mays] had an IQ lower than 70 prior to the age of 18." 3 SHRR 11.  As noted elsewhere, absent a showing that any subaverage intellectual functioning had its onset before the age of eighteen, Mays cannot establish that he is mentally retarded.  *Briseño*, 135 S.W.3d at 7.

## 2.   Mays fails to establish significant, related limitations in adaptive functioning.

"Adaptive behavior" has been referred to as "the collection of conceptual, social, and practical skills that people have learned so they can function in their everyday lives." AAMR 10th ed. 14. Texas law defines "impairments in adaptive behavior" as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." *Briseño*, 135 S.W.3d at 7 n. 25 (quoting AAMD at 11). Such deficits must "be a product of . . . or related to" significantly subaverage intellectual functioning or one cannot make a showing of mental retardation. *Ex parte Blue*, 230 S.W.3d 151, 164 (Tex. Crim. App. 2007). Further, although *Briseño's* definition mentions adaptive limitations without mentioning strengths, courts may nevertheless consider adaptive strengths in evaluating mental retardation claims. *Clark v. Quarterman*, 457 F.3d 441, 447 (5th Cir. 2006).

To satisfy the second part of Texas's mental retardation definition, Mays must demonstrate significant limitations in at least one of three major adaptive-skills domains:

(1)   *conceptual skills*—which include functional academics, money concepts, communication skills, and self-direction;

(2)   *social skills*—interpersonal skills, responsibility, self-esteem, gullibility or naiveté, avoiding victimization, and ability to follow rules and obey laws; and

(3)   *practical skills*—include activities of daily living (*e.g.*, eating, dressing, toileting, getting around, preparing meals, housekeeping, taking

> medications, managing money, and using the telephone), occupational skills, and maintaining a safe environment.

AAMR 10th ed. 42.[40] As in the assessment of IQ, the individual's mental capabilities, education, motivation, cooperation, background, personality characteristics, social and vocational opportunities, and other mental disorders or medical conditions should be factored into the assessment of his adaptive functioning. DSM-IV-TR 42.

Mays relies solely on junior high and high school records reflecting average-to-failing grades and standardized test scores to establish that he suffers from adaptive deficits. Pet. 36; PX 5–6. This evidence is only potentially relevant to the conceptual skills domain. Mays makes no effort to establish that he has adaptive deficits in the social or practical skills domains. *See* Pet. 36. In determining whether Mays has carried his burden concerning adaptive deficits, the Court may therefore limit its inquiry to the conceptual skills domain. But to assist the Court, the Director also addresses the other two adaptive skills domains.

### a.   Conceptual skills domain

To the extent Mays offers his secondary school records to show that he has an adaptive deficit in the conceptual skills domain–presumably in functional academics (reading, writing and simple arithmetic)—his reliance is misplaced. His evidence fails to establish that any such deficits exist or that they are related to significantly subaverage intellectual functioning, which Texas law requires. *Blue*, 230 S.W.3d at 164. One need merely examine the school

---

[40]      Both the AAMR 9th edition and the DSM-IV-TR required significant limitations in at least two of eleven adaptive skills subcategories: communication, self-care, home living, social skills, community use, self-direction, health, safety, functional academics, leisure, and work. AAMR 9th ed. 5; DSM-IV-TR 42.

records themselves; the personal, family, and past history sections from the records of his Terrell State Hospital commitments; and the testimony of Mays's own witnesses to conclude that he cannot make this showing. Myriad plausible reasons exist for Mays's low grades and test scores in junior high and high school, other than mental retardation.

### i.   Functional academics

Mays provides no elementary school records, although it appears that he attended elementary school in Sulphur Springs, east of Dallas, Texas.  PX-6 at 6. Rather, the records he provides begin at 6th grade (the 1971–72 school year), showing that Mays attended Agnew Jr. High in Dallas, Texas. PX-6 at 1. His grades and attendance for that year are not recorded. *Id.*

Mays entered 7th grade (the 1972–73 school year) at Agnew on September 5, 1972. *Id.* at 6. But he withdrew on November 27, 1972, during the second reporting period, to transfer to the Eustace School District (EISD), near Athens, Texas. *Id.* at 6. During the first reporting period at Agnew, Mays made Cs in Math, Science, and English; an F in Social Studies; a B in Arts & Crafts; and an A in Sports. *Id.* at 7. During the second reporting period, Mays's grades stayed the same in all subjects, except that he improved his Social Studies grade from an F to a D and his Arts & Crafts grade from a B to an A. *Id.* His Science teacher commented that Mays talked excessively, disturbing the class. *Id.*

Upon his transfer to EISD, Mays's final grades for the first semester of 7th grade were a C in Language/Grammar; a C- in reading; an A in Spelling; a D+ in Social Studies; a C- in Health Education; a C+ in Arithmetic; an a C- in Elementary Science.  PX-6 at 1. During the

second semester, Mays bettered his grades in some subjects. *Id.* He improved his Language/Grammar grade from a C to a B; his Social Studies grade from a D+ to a C-; and his Health Education grade from a C- to a B-. *Id.* Some grades dropped: Mays made a D in Reading; a B in Spelling; a D in Arithmetic; and a D+ in Elementary Science. *Id.* Mays's final grades for 7th grade were a C- in Language/Grammar; a D+ in Reading; a B+ in Spelling; a C- in Social Studies; a C+ in Health Education; a C- in Arithmetic; and a D+ in Elementary Science. *Id.* Assuming that "GE" stands for "grade equivalent," scores from a standardized test that Mays took during 7th grade show him performing below grade level. *Id.* at 2.

During the 8th grade (the 1973–74 school year), Mays made a B- each semester in Language/Grammar. *Id.* He made a C+ in Reading the first semester, but a D- the second semester, ending the year with a C- average. *Id.* Mays made an A- in Spelling his first semester but only a D in his second semester, ending the year with a C+ average. *Id.* Mays's Social Studies grades remained in the D range all year. *Id.* However, he made As in both semesters of Health Education. Mays made a B- in Arithmetic the first semester, but that grade dropped to a C- in the second, such that his final grade was a C+. *Id.* Mays failed Elementary Science the first semester but received a D the second semester, ending with a D for the year. *Id.* Scores from a standardized test that Mays took during 8th grade show him performing below to slightly-below grade level. *Id.* at 2.

Mays transferred schools again in 9th grade (the 1974–75 school year), moving from a high school in the EISD to one in the Kemp Independent School District. PX-5 at 1. The records moreover show that Mays missed more than fifteen days of school for that school

year. PX-6 at 3. His first semester of 9th grade, Mays made a C in English I and Vocational Agriculture I; a C- in Record Keeping and Physics; a D in Algebra I; and a B in Physical Education. PX-5 at 1. With the exception of his grade in Physical Education, Mays's grades dropped in all courses the following semester. *Id.* He received a D in Record Keeping and Physics and Fs in English I, Vocational Agriculture I, and Algebra I. *Id.* Mays did not receive academic credit for completing English I. *Id.*

Mays's records show that he did not complete 10th grade (the 1975–76 school year). During his first semester, he repeated English I and received a 51. He concurrently took English II and received a 43. He made a 60 in Vocational Agriculture II; a 78 in a class titled "F.O.M. I"—possibly the Fundamentals of Motion, a physics course; a 62 in American History; and an 85 in Physical Education. The second semester, his grades improved somewhat. Mays made a 75 in Vocational Agriculture II; a 48 in English I; and a 68 in American History. No other course work is reflected for the 1975–76 school year, and Mays's academic records end there.

Although Mays's secondary school grades were not stellar, the evidence he presents does not establish that he has a significant deficit in functional academics, or if he does, that it is related to significantly subaverage intellectual functioning. *Blue*, 230 S.W.3d at 164. Initially, Mays's grades were not uniformly in the failing or even D range; he made many Cs and the occasional B and even A. Further, as noted above, Mays provides no evidence concerning his elementary school education. Elementary school provides the foundation in reading, writing, and arithmetic and enables more advanced learning. Mays's elementary

school records may reflect higher levels of achievement, which would suggest that his later grades were due to something other than subaverage intellectual functioning. Drug and alcohol abuse would be one such explanation. As discussed in greater detail below, the record demonstrates that Mays regularly drank alcohol and used drugs from an early age, with his use growing heavier as he grew older. 31 RR 32. If Mays was intoxicated at school or while he was supposed to be studying or preparing assignments, it would clearly have had a negative effect on his grades. Further, the records Mays does provide reflect that he changed schools and presumably moved homes at least twice during his adolescence—a disruption that by itself could easily interfere with learning—and ultimately dropped out in the tenth grade. PX 5–6. The records further suggest that Mays was uninterested or distracted in at least one class during 7th grade. PX 6 at 7.

But even if Mays's elementary school records are also unexemplary, the testimony of his trial witnesses and his Terrell State Hospital records demonstrate that there are many explanations besides mental retardation that plausibly account for Mays's lack of scholastic success, whether in elementary, junior high, or high school. Moreover, the testimony of Mays's clients, his Smith County Jail records, and his TDCJ records establish that he can read, write, and perform arithmetical calculations adequately.

The record is replete with accounts of Mays's unstructured home environment and his drug and alcohol abuse. Mays reported to Dr. Vail that he first began using alcohol when he was seven years old, with "serious use" ("eight beers a day for ten years") beginning at age sixteen. 31 RR 32. Sherry Ross, Mays's older sister, testified that their parents acrimoniously

divorced when he was about five years old. *Id.* at 82. She recounted how their mother fled with the children to California, but their father tracked them down and took the children back with him to Texas. *Id.* at 84. Although their father remarried, he worked days and their stepmother worked nights. *Id.* at 85. Sherry, still a child herself, was nominally left in charge of her siblings. *Id.* But that supervision was minimal at best. The other children stayed out while Sherry remained in the house, cooking and cleaning; she "wasn't aware of a lot that went on with the kids." *Id.* at 86. Sherry testified that when she was a child, her oldest brother, Noble—who was eventually executed by the State of Texas for capital murder—attempted to sexually assault her and was "kind of crazy." *Id.* at 85–86.

Mays did not escape Noble's notice. Linda Ross, Mays's younger sister, testified that Noble mistreated Mays. *Id.* at 111. Linda also testified that when they were young, Mays and his older brother Ray would "huff" gasoline fumes from the tanks of scrapped cars on her family's property. *Id.* at 112–13. Linda confirmed that there was no adult supervision—Sherry, her older sibling, was ostensibly in charge, but the younger children just ran loose. *Id.* at 113.

Dr. Self testified that Mays grew up in an environment that "was not nurturing. It was not protective. As a matter of fact, it was frequently threatening." *Id.* at 157. Dr. Self also testified that Mays was introduced to substance abuse "at a tender young age." *Id.* at 157–58. Mays's mother, Dorothy Hillis, testified that when her ex-husband took the children away from her, it was not by agreement, but because he "found out where [she] was" in California. *Id.* at 161–62. Mays's father then refused to let the children have any relationship with her,

*id.* at 162, and Hillis did not see Mays again until he was ten or twelve years old, *id.* at 164.

The accounts of Mays's personal, family, medical, and psychiatric history found in his Terrell State Hospital records are consistent with and expand upon the testimony recounted above. PX-8 at 2. They detail Ray's violent death in Mays's presence and its negative impact on Mays's psychological health and substance abuse. *Id.*

Further, at Mays's state habeas evidentiary hearing, Dr. Mayfield testified that although Mays tested poorly on the IQ test she administered to him, nothing in his past, including his school records, supported a mental retardation diagnosis:

> The developmental records that I . . . [was] provided and the records from the mom said that his birth and development were normal. There was no indication from the records I've read that he had been in special ed except a resource room. Also, there was no indication of adaptive functioning delay, and that would be necessary for a diagnosis of mental retardation.

3 SHRR 11. Given Mays's normal birth and development, lack of placement in Special Education classes, or adaptive delays, Dr. Mayfield could find nothing that would support the conclusion that Mays is mentally retarded.[41] *Id.* Rather, Dr. Mayfield attributed Mays's performance on the IQ test to his methamphetamine abuse, not innate significantly subaverage intellectual functioning. 3 SHRR 34.

---

[41]     Upon his arrival on Death Row, Mays participated in a mental health intake interview. Ex. E. at 13–25. Mays self-reported that he had been classified as a "slow learner" in fifth grade. *Id.* at 19. But Mays provides no school records to substantiate that assertion. Rather, Mays's school records begin at sixth grade. PX-6 at 1. And even his grades and attendance for sixth grade are not recorded. *Id.*

And notwithstanding Mays's academic performance in secondary school, it is apparent that he adequately reads, writes, and understands arithmetical concepts. Robert Rudkin testified that he hired Mays to refurbish his dock. 31 RR 99. Rudkin related conversations they had about the cost of the projects. *Id.* Sarah Lee Goff, another client, testified that Mays would present her with weekly invoices detailing the cost of materials and labor. *Id.* at 106. A few weeks before Mays's arrest, Goff had deposited roughly a thousand dollars with Mays for work he was doing on her deck. *Id.* at 106–07. From jail, Mays caused his wife to call Goff so that he could return Goff's money. *Id.* Rudkin's and Goff's testimony establish that Mays could complete invoices and perform arithmetic. In addition, Commissary Order Slips that Mays has completed while confined in TDCJ demonstrate his ability to perform arithmetic. Ex. B *passim.*

Mays also completed numerous Inmate Request and Visitation Request forms while incarcerated at the Smith County Jail. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 203–38.[42] The handwriting is legible, which is noteworthy in itself, as Mays apparently wrote them with his nondominant right hand.[43] Moreover, Mays's requests are lucid and often sophisticated—on at least two occasions, Mays requested specific tax forms so that he could

---

[42]    Volumes 5 of the State Habeas Reporter's Record consists of exhibits submitted at Mays's state habeas evidentiary hearing. The pages lack numbers. For the Court's convenience, the Director has copied that volume, numbered the pages in the lower right-hand corner, and submitted it as Exhibit C.

[43]    Mays, who is left handed, was shot in the left arm in the incident that left Deputy Ogburn and Investigator Habelt dead. The injury restricted his range of motion such that as of Dr. Mayfield's testing in 2009, Mays could not perform any motor testing with his left hand and wrote with his right hand. PX-3 at 3–4.

complete his tax return. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 215, 218, 230, 231–35. He also asked for reading glasses and reading material. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 223–24, 226. He asserted that $50 had been deducted in error from his inmate account. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 216–17. Mays's completed Inmate Request forms amply demonstrate his reading comprehension and ability to communicate his needs to jail authorities in writing. The Offender Grievance forms that Mays has completed post-trial while confined at TDCJ similarly demonstrate his ability to read, write, and communicate his needs to jail authorities. Ex. D *passim*.

In short, Mays fails to establish even a tenuous link between his poor academic performance and significantly subaverage intellectual functioning, as he must to establish an adaptive deficit. *Blue*, 230 S.W.3d at 164. Learning disabilities, intoxication, an unstructured home environment, lack of contact with his mother, a lack of parental interest, or a lack of interest or effort on Mays's part are a much more likely explanation for his academic performance. But these causes cannot establish an adaptive deficit in functional academics. *See id.* at 164; *see also Ex parte Smith*, 132 S.W.3d 407, 414 (Tex. Crim. App. 2004) ("A 'slow learner' is not, *ipso facto*, mentally retarded. A person who attends special-education classes does not, by virtue of that fact alone, suffer a severe disability. A person who drops out of school in the ninth grade is not necessarily the victim of a permanent disability. Similarly, one who has a disadvantaged background or a difficult childhood is not

necessarily the victim of a severe and permanent disability.").[44] Further, the record contains overwhelming evidence that Mays suffers no deficits whatsoever in the other areas of the conceptual skills domain: communication skills, money concepts, and self-direction.

### ii.    Communication

Two mental health professionals personally interacted with Mays at the Smith County Jail while he was awaiting trial. Their testimony demonstrates that Mays is perfectly able to communicate. Dr. Vail's testimony, for example, established that she was able to interview Mays. 31 RR 19–21. Although Dr. Vail stated that Mays was depressed and at times manifested delusional thinking and paranoid ideation, she made no assertion that Mays was unable to communicate his thoughts and beliefs to her. *Id.* Diana Gibson, a nurse working under Dr. Vail's supervision, testified that she was assigned to distribute medication to inmates, including Mays. *Id.* at 48. Although Gibson testified that Mays refused the prescribed pain and psychiatric medications she offered him, Gibson made no assertion that Mays could not communicate. Rather, Gibson testified that Mays would thank her for the offered medication but decline it and wish her well. *Id.* at 50. Further, the Inmate Request and Offender Grievance forms that Mays completed at the Smith County Jail and at TDCJ,

---

[44]    *Cf. Ex parte Richard Head Williams*, 2003 WL 1787634, at *3 (Cochran, J., concurring) (though it is a learning disability, "dyslexia is not mental retardation"); *Gregory K.* v. *Longview School Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) ("learning disabilities" such as dyslexia are distinguished from disabilities that are specifically tied to IQ—*e.g.*, mental retardation); *Betts* v. *Rector & Visitors of University of Virginia*, 113 F. Supp. 2d 970, 976 n.4 (W.D. Va. 2000) (noting that the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(26) defines the term "specific learning disability" as including dyslexia but excluding mental retardation).

discussed above, demonstrate his ability to communicate his needs. 5 SHRR Ex. 1 (pages

unnumbered); Ex. C at 203–38.

For tactical reasons, Dr. Self did not personally interview Mays. 31 RR 128–29.

However, Dr. Self watched the videotape of the offense. *Id.* Dr. Self agreed that Mays

conversed with the deputies "clear[ly] and rationally" during the first part of the encounter.

*Id.* at 137. Mays's interaction with the deputies only changed when he concluded that he was

about to be arrested. *Id.* at 151. Dr. Self opined that Mays's methamphetamine-induced brain

damage combined with the stress of the situation triggered a flashback-like phenomena that

exacerbated Mays's paranoid delusions. *Id.* at 137–38. But even if the statements Mays made

to the deputies after they tried to arrest him reflected a level of paranoia, the statements do

not implicate Mays's ability to understand or to communicate. At most, Mays's statements

reflect a distrust of the deputies' intentions.

There is also no evidence that Mays, who worked as a self-employed contractor, had

any difficulty communicating with his clients about business or personal matters. Alain

Rowe, M.D., testified that he owned a house in Henderson County, to which he eventually

retired. *Id.* at 65–66. Mays refurbished Rowe's dock. Based on the quality of the work, Rowe

referred Mays to several other people in the area needing dock and deck repair work done.

*Id.* at 67–69. Rowe recounted several conversations he had with Mays. In one conversation,

Mays explained that he suffered from headaches. *Id.* at 70. In another, Mays declined an

invitation to go sailing on Rowe's daughter's catamaran, saying that he did not believe his

wife would enjoy it. *Id.* Another time, Mays asked Rowe to come over to examine an ulcer on

Mays's wife's leg. *Id.* at 70–71. On another occasion, Mays told Rowe that Mays had bumped his head and was experiencing bad headaches. *Id.* at 71. When Rowe encouraged Mays to have a CAT scan, Mays explained that he could not afford it because he did not have health insurance. *Id.* at 71–72.

Don Kelley testified that a contractor he knew recommended Mays when Kelley needed a 900 square foot deck refurbished. *Id.* at 75. Kelley described Mays as "very competent" and "one of the best people I had working for me." *Id.* at 76. Kelley recalled having general conversations with Mays about Mays's livestock; Mays was concerned with having enough money to keep his cattle fed. *Id.* at 76–77.

As mentioned previously, Robert Rudkin also hired Mays to refurbish his dock. *Id.* at 99. Mays additionally built a steel cradle for Rudkin's boat and did some welding work for Rudkin's home. *Id.* Besides talking about the cost of projects, Rudkin and Mays discussed Mays's goats and his need to separate an aggressive ram from the kids. *Id.* at 99–101, 103. Mays moreover invited Rudkin over to see the home that Mays was building. Mays expressed great pride in the house. *Id.* at 101–02.

As also noted previously, Sarah Lee Goff testified on Mays's behalf. Goff owned a lake home in Henderson County, and two or three different people highly recommended Mays when she needed dock work done. *Id.* at 105. Goff contacted Mays by phone, and he did the initial job so well that Goff continued to hire him, each time communicating the nature of the job to Mays by telephone. *Id.* at 106.   Mays's relatives noted his occasionally odd behavior as an adult, but otherwise reported no communication difficulties. Christina White, Mays's

stepdaughter, testified that Mays and her mother met in 1990 or 1991. *Id.* at 54. White testified that Mays struck her as "a little strange" when she first met him, *id.* at 56, and recounted instances of Mays's sudden unusual behavior, *id.* at 59–60. But nothing in White's testimony suggested that Mays was unable to communicate with others. On the contrary, White told the jury that when she and her children visited, Mays would saddle his horse and lead the children around on rides. *Id.* at 56. White related that on these visits, Mays would provide fish food and invite the children out to the pond to feed the fish. *Id.* He would also tell White that she looked skinny and urge her to eat more. *Id.*

Sherry Ross, Mays's older sister, testified about Mays's drug abuse and commitment to Terrell State Hospital. *Id.* at 87. She related that since Mays had quit using drugs, they could have normal conversations, although sometimes he would suddenly begin to say "crazy stuff" and she would then cut the conversation short. *Id.* at 91–92. Linda Ross, Mays's younger sister, testified that she had seen Mays turn suddenly distrustful, but did not report that he was ever unable to communicate. *Id.* at 119.

The records associated with Mays's two civil commitments for drug abuse treatment also fail to establish any communication difficulties or, if any such deficit exists, that it is related to significantly subaverage intellectual functioning. The records reflect that Mays was first committed in 1983, when he was 22 years old. PX-8. According to his family, Mays had been using drugs since 1976 and had been a drug dealer for the past three years. *Id.* An inability to communicate is patently incompatible with being a drug dealer. Moreover, the 1983 psychiatric reports describes Mays's speech as "spontaneous and coherent." *Id.* at 3. The

record of Mays's 1985 readmission to Terrell reflects that Mays was able to effectively communicate with the interviewer about his relapse from drug abstinence and its effect on him. *Id.* at 4.

### iii.    Self-direction

Self-direction can best be defined as how a person manages his day-to-day life, makes important decisions, and makes changes to correct things that have not gone right or to learn from past mistakes. There is no evidence that Mays suffers deficits in this area. He apparently overcame his addiction to alcohol and drugs. 31 SHRR at 119. He was self-employed as a contractor and welder before his conviction for Deputy Ogburn's capital murder. *Id.* at 98–100. Mays bought and improved his property "from nothing" and built his own home there. 31 RR 93. Mays's stepdaughter described the transformation:

> They took absolutely nothing and made it into what it is today. . . . [T]he first time I went out to the property where they lived . . . there was nothing. It was dirt. It was dirt and a little bitty trailer. . . . And from then on . . . every time I came, there was something new. . . . [T]here was grass growing. There [were] trees planted.

*Id.* at 55–56. To the extent Mays has any deficits in this area, there are a plethora of more plausible reasons for them other than significantly subaverage intellectual functioning.

### iv.    Money concepts

Regarding money concepts, as noted above, Mays worked as a drug dealer before he ceased his substance abuse, which suggests a more than adequate understanding of money and ability to carry out financial transactions. As a welder and contractor, he provided invoices to and received payment from his clients. 31 RR 106. Mays also bought land and

then procured the necessary materials to build a house on the lot and otherwise improve the property. There is no evidence that those materials were donated to him or that he scavenged them, which means that Mays necessarily purchased them.

In sum, Mays has not established that he suffers from any deficits in the conceptual skills domain. Alternatively, to the extent Mays does exhibit any such deficits in this domain, he has not established that significantly subaverage intellectual functioning is the cause.

### b.    Social skills domain

#### i.    Interpersonal skills

The record shows no significant deficit in interpersonal skills. To the contrary, the evidence suggests that Mays's interpersonal skills were more than adequate. Inasmuch as there is any evidence of deficient interpersonal skills, Mays has not established significantly subaverage intellectual functioning as the cause.

Mays had friends in school. PX-8 at 2. He maintained relationships with his family despite having had a serious substance abuse problem as a younger man. Many family members testified on Mays's behalf at the punishment phase concerning his childhood, drug and alcohol abuse, and his life after he ended his drug and alcohol use. 31 RR 51–65 (Christina White), 78–94 (Sherry Ross), 108–21 (Linda Ross), 160–69 (Dorothy Hillis), 170–77 (Lynn Forbus).

The record further shows that Mays maintained romantic relationships. His Terrell State Hospital records from 1983 mention a girlfriend, "Robin," and the punishment phase testimony suggest that he formally married at least once, if not twice. PX-8 at 8; 31 RR 52,

171–72. Mays lost contact with his daughter from his first marriage, Lynn Forbus, but reinitiated contact a few years before the instant offense and worked at reestablishing a relationship, attending her wedding. 31 RR 172–74. Mays had been married to his second wife for fifteen to sixteen years at the time of trial. *Id.* at 52. The testimony of Mays's sisters and stepdaughter suggests that it was a happy marriage. *Id.* at 52, 89, 120. Mays is apparently still married to his second wife, even following his conviction for capital murder.

Mays's stepdaughter, Christine White, moreover testified that he was "great" with her children, buying them toys and providing them with entertainment when they came to visit, and had a good relationship with her. *Id.* at 57–58. White stated, "I don't have words—he was a great grandfather." Mays's mother testified that Mays loved children and was a loving father and uncle. *Id.* at 168.

The testimony of Mays's business clients further demonstrates that he possessed more than adequate social skills. As discussed regarding Mays's communication skills, *supra*, several of his clients testified on his behalf. *Id.* at 65–73 (Alain Rowe, M.D.), 74–77 (Don Kelley), 97–104 (Robert Rudkin), 105–07 (Sarah Lee Goff). Dr. Rowe described Mays as "[j]ust a very gentle, nice person. Very gentle, very honest." *Id.* at 72. Kelley testified that Mays did excellent work and he would hire him again. *Id.* at 76. Kelley further stated that he trusted Mays and that his opinion regarding Mays's honesty was "[c]ompletely, absolute good integrity." *Id.* Rudkin testified that he had grown to consider Mays a friend. *Id.* at 102. He stated that Mays was "very respectful. He called us Mr. and Mrs. Rudkin from day one to this day." *Id.* Rudkin described Mays's personality as "[q]uiet, seemingly very even-tempered. I

don't think I ever saw him get out of control with anything. Deliberate and very effective at what he did." *Id.* Goff testified that Mays is "always very nice." *Id.* at 106. In short, Mays has more than adequate interpersonal skills. To the extent Mays stopped using those skills midway through his fatal encounter with Deputy Ogburn, Mays has not shown that his violent behavior was related to significantly subaverage intellectual functioning.

### ii.     Responsibility

The testimony at Mays's trial indicates that he had no significant deficits in  the area of responsibility; rather, the testimony of his business clients and family shows that he was a responsible business owner, husband, father, grandfather, and livestock owner. To the extent the record reflects any level of irresponsibility, Mays has not shown that significant subaverage intellectual functioning is the cause.

Mays performed work so well for his clients that they referred him to others or testified that they had or would hire him again. 31 RR 67–69, 74–77, 99–102, 105–06. After ceasing his drug and alcohol abuse, Mays sought out his child from an earlier relationship and established a relationship with her. 31 RR 172–74. Mays's stepdaughter, Christina White, testified that Mays took good care of her mother, who had unspecified mental problems. 31 RR 55. Before Mays and her mother met, White expended a great deal of time and energy trying to ensure that her mother was well-cared for. *Id.* White testified that, "[a]fter Randall and my mother got together, I didn't have to worry anymore. . . . [S]he was taken care of." *Id.* at 55–56. Mays tended his livestock and pets. *Id.* at 58, 60–62, 77, 102–03.

### iii.     Self-esteem

The record shows that Mays was very proud of the house he built. 31 RR 101–02.

### iv.    Gullibility or naivete

The clinician who conducted Mays's mental status exam upon his arrival on Death Row circled "Naive" in reference to Mays's social judgment at that time. Ex. E. at 24. But subsequent mental status reports do not remark upon any naivete exhibited by Mays. *Id.* at 2–23. And to the extent Mays exhibits any deficit in this area, he has not shown that it is related to significantly subaverage intellectual functioning or that he exhibited the deficit before the age of eighteen.

### v.    Avoiding victimization

Mays erected fencing on his property. 31 RR 141. He equipped his house with security cameras and motion-sensing lights. *Id.* He was carrying a knife on his person at the time of the offense and pulled it on Deputy Valentine. *Mays*, 318 S.W.3d at 374. He kept at least one firearm on his property, the deer rifle with a scope that he used to kill Deputy Ogburn and Investigator Habelt and severely wound Deputy Harris. *Id.* Mays said he shot the men because he felt he "was being mistreated." *Id.* at 375. The evidence shows that Mays has no difficulty avoiding victimization, whether it be real or perceived.

### vi.    Ability to follow rules and obey laws

Mays has committed capital murder and the record mentions a prior conviction for drug possession. *See* PX-8 at 2. He was also arrested in 1999 for assault on a public servant (Deputy Valentine), although the charge was later dismissed. *Mays*, 318 S.W.3d at 373 n.6.

Mays also apparently supported himself for three years in the early 1980s by dealing drugs. *Id.* But Mays establishes no link between his criminal convictions, unadjudicated bad acts, and his allegedly significant subaverage intellectual functioning. It is apparent that Mays could follow the law when it suited him to do so. Mays was concerned enough with filing a timely income tax return, for example, that he twice requested income tax forms from Smith County Jail officials. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 215, 218, 230, 231–35.

In short, Mays has not established that he suffers from any deficits in the social skills domain. Alternatively, to the extent Mays does exhibit any such deficits in this area, he has not established that significantly subaverage intellectual functioning is the cause.

### c. Practical skills domain

There is no evidence that Mays has any difficulty with the activities of daily living, such as feeding himself, dressing, or using the toilet. To the contrary, the record indicates that at the time of trial, Mays had lived on his own with his wife on their own property for approximately fifteen to sixteen years, after quitting drug and alcohol use. *Id.* at 55–56. Mays built their house himself. *Id.* at 101–02. Robert Rudkin, a client whom Mays invited to see the building in progress, testified that it was "a very nicely done home" and that he was "amazed. For a guy who was a welder, [Mays] did a pretty good job with a hammer." *Id.* at 102. There is no evidence that Mays has any difficulty in getting around; in fact, the trial record shows that Mays drove a pick-up truck to and from his work for clients. 31 RR 76. While there is some evidence that Mays has refused to take medication, *id.* at 50; PX-8 at 4,

6, there is no evidence that his refusal is due to significantly subaverage intellectual functioning.

There is no basis for a finding that Mays otherwise suffers from deficits in self-care or lacks occupational skills, or that if he does, that they are related to significantly subaverage intellectual functioning. The records from his initial commitment to Terrell State Hospital show that he supported himself as a younger man by working as a roughneck, mechanic, and drug dealer. PX-8 at 10. Following his discharge from Terrell State Hospital, Mays returned to live with his family, but decompensated when he failed to follow the treatment team's recommendations and medication regimen and moreover began to abuse alcohol, marijuana, and other illicit drugs again. *Id.* at 4, 6. Mays's stepmother reported that Mays exhibited very poor sleeping and eating habits during this period. *Id.* Such poor habits, however, are easily attributable to causes other than significantly subaverage intellectual functioning, including substance abuse. But several witnesses, including Mays's sister, Linda Ross, testified to Mays's success at beating his addiction to illicit substances, perhaps the ultimate act of self-care. *Id.* at 119.

Further, Alain Rowe, M.D., a client of Mays's and a retired hematologist, testified that Mays sought out medical advice for both himself and his wife. *Id.* at 71–72. And as previously noted, while incarcerated at the Smith County Jail, Mays completed several Inmate Request forms. Among other things, Mays asked to be placed on a low-carbohydrate diet for his stomach. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 211, 214. Mays also asked for a Medical Request Form, an additional example of his ability to seek out medical advice. 5

SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 211. Mays also asked for an opportunity to exercise, evidencing an awareness of and concern for personal health. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 223. He further asked for hair cuts, shaves, and toe nail clippers. 5 SHRR Ex. 1 (pages unnumbered); *see* Ex. C at 205, 210-11, 222. These requests reflect Mays's awareness of and concern for personal hygiene and his ability to seek out the tools and services necessary to promote it. And as discussed regarding the area of communication, nothing from Dr. Vail or Nurse Gibson's testimony suggests that Mays had any trouble communicating with or understanding medical staff.

Regarding safety, Mays worked as a welder and contractor, and there is no evidence that he could not or did not follow safety precautions. Further, outside the well-established fact of his substance abuse problem and behaviors that can be associated with it, Mays apparently did not engage in any risky behaviors. In short, there is no evidence that Mays had any difficulty living on his own except possibly when he was in the throes of his drug and alcohol addiction—a cause other than significantly subaverage intellectual functioning.

In light of this record, the Court should deny Mays's claim because he fails to meet the second element for proving a claim of mental retardation.

### 3. Mays fails to prove onset of any limitations before age eighteen.

Finally, Mays must establish that he exhibited "both significantly subaverage intellectual functioning and concurrent deficits in adaptive behavior" before the age of eighteen. Tex. Health & Safety Code § 591.033(13); *Ex parte Tennard*, 960 S.W.2d 57, 61 (Tex. Crim. App. 1997). Mays provides no records to show that he was ever diagnosed as

mentally retarded or ever placed in special education classes *because of* his alleged retardation. While it might be possible that Mays could have slipped through the cracks for all these years, it is simply not probable.  Additionally, the fact that Mays may not have always made good grades does not establish that he is retarded, but is instead explained by other factors, as discussed above.

For all of these reasons, Mays has not demonstrated that he is, in fact, mentally retarded. Mays is not entitled to federal habeas relief regarding this unexhausted claim because it has no merit.

### B.   Mays is not entitled to a stay pursuant to *Rhines*.

To the extent Mays requests a stay and abeyance of these proceedings pursuant to *Rhines*, Pet. 39, he is not entitled to such relief. In *Rhines*, the Supreme Court delineated the "limited circumstances" in which a federal habeas court possesses discretion to "stay and abate" federal habeas proceedings to allow a petitioner to return to state court. 544 U.S. at 277. *Rhines* held that a federal district court possesses authority to stay a mixed habeas petition and hold it in abeyance so that a petitioner can exhaust claims in state court and then return to federal court for review of his perfected petition, without having AEDPA's one-year statute of limitations expire. *Id.*; *see* 28 U.S.C. § 2244(d). Nonetheless, recognizing that a stay and abeyance—"particularly in capital cases"—has the potential to undermine AEDPA's objectives of reducing delay and of encouraging prisoners to raise all claims in state court before seeking federal relief, the Court cautioned that a "stay and abeyance should be available only in limited circumstances." *Rhines,* 544 U.S. at 276–77.

Specifically, the petitioner must show "good cause" for failing to exhaust his claims first in state court and demonstrate that the claim is not "plainly meritless." *Id.* at 277. Further, "if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all." *Id.* at 278. Moreover, if the district court determines that a stay is warranted, it "should place reasonable time limits on a petitioner's trip to state court and back." *Id.*

Here, Mays cannot make all of *Rhines*'s required showings regarding his unexhausted *Atkins* claim. For these reasons, an order staying the case pursuant to *Rhines* would be not be appropriate.

### 1.   Mays cannot establish good cause for failing to raise his *Atkins* claim in the state courts.

District courts must evaluate whether a petitioner has demonstrated "good cause" for a failure to exhaust in light of *Rhines*'s admonition that courts should only stay mixed petitions in "limited circumstances," lest such orders become routine. *Wooten v. Kirkland*, 540 F.3d 1019, 1023–24 (9th Cir. 2004) (emphasizing that applying too lenient a standard to *Rhines*'s good cause determination would render stay-and-abate orders routine and thus thwart *Rhines*'s instruction that such grants are appropriate only in "limited circumstances."). But Mays cannot demonstrate good cause for failing to raise his *Atkins* claim in state court and therefore is not entitled to a stay and abeyance. *Rhines,* 544 U.S. at 277 ("Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court

determines there was good cause for the petitioner's failure to exhaust his claims first in state court.").

Here, it is clear that Mays may not rely on the legal unavailability of the claim as good cause under *Rhines*. The Supreme Court released *Atkins* on June 20, 2002. 536 U.S. at 304. Mays murdered Deputy Ogburn on May 17, 2007, nearly five years later. Thus, Mays could have raised an *Atkins* challenge as early as his trial. Nor may Mays persuasively argue that the factual basis for his claim was unavailable when his filed his state writ application, when he relies on trial testimony of family members; the testimony of his state habeas expert, Dr. Mayfield; records that were provided to her and his trial experts; and school records that trial counsel's mitigation expert, Gerald Byington, presumably obtained or that were obtainable at the time of trial. Pet. 35–37; *see* 3 SHRR 7–8, 11.

To the extent he contends that state habeas counsel's alleged ineffectiveness represents good cause under *Rhines*, Pet. 37, Mays's argument also fails. Mays argues that state habeas counsel "should have . . . asserted [Mays's present independent claim of mental retardation] as an issue of ineffectiveness of trial counsel in failing to investigate and assert an *Atkins* issue with the trial court." *Id.* But May's argument is both conclusory and disingenuous. Mays faults state habeas counsel because that attorney did not claim that trial counsel was ineffective for failing to assert that Mays is mentally retarded. *Id.* at 37. However, federal habeas counsel has declined to raise the selfsame claim, opting instead to raise a stand-alone *Atkins* allegation. *See id.* at 35.

Mays's criticism of state habeas counsel's representation also lacks merit. It is evident from state habeas counsel's questioning of Dr. Mayfield at the state habeas evidentiary hearing that counsel considered raising such a claim, but rejected the idea after consulting with Dr. Mayfield. 3 SHRR 10–11. Where state habeas counsel relied on Dr. Mayfield's objectively reasonable opinion that Mays was not mentally retarded, he cannot be deemed ineffective. *See Smith*, 311 F.3d at 676–77; *Dowthitt*, 230 F.3d at 748; *see also Easley*, 122 F. App'x at 128–30; *Roane*, 378 F.3d at 409; *Campbell*, 260 F.3d at 555–56; *Pruett*, 996 F.2d at1574.

Lastly, in *Williams v. Thaler*, a pre-*Martinez* case, the Fifth Circuit held that the ineffectiveness of state habeas counsel cannot constitute "good cause" under *Rhines*. *Williams*, 602 F.3d 291, 309 (5th Cir. 2010) ("Williams offers his alleged actual innocence and the conflict under which his state habeas counsel labored as good cause [under *Rhines*] for his failure to exhaust . . . but as discussed above, neither suffices."). In *Martinez*, the Supreme Court established a narrow exception to *Coleman*'s rule that the ineffectiveness of state habeas counsel cannot constitute "cause" under the federal cause-and-prejudice exception for a state procedural default. *Martinez*, 132 S. Ct. at 1315; *Ibarra*, __ F.3d at __, 2012 U.S. App. LEXIS 13777, at *6–7. But as the Fifth Circuit has held that the narrow exception established in *Martinez* does not apply to Texas defendants, *Ibarra* __ F.3d at __, 2012 U.S. App. LEXIS 13777, at *12, nothing in *Martinez* undermines *Williams*'s reasoning.

Because Mays must meet all of *Rhines*'s requirements to obtain a stay and abeyance of these proceedings, the Court need not consider whether Mays satisfies *Rhines*'s other

requirements. But is nonetheless clear that Mays's claim is "plainly meritless" and therefore, that he also cannot satisfy *Rhines*'s second requirement.

### 2. Mays's unexhausted claim that he is mentally retarded is "plainly meritless."

As discussed in Part V(A), Mays's *Atkins* claim is meritless in the most fundamental sense: Mays is not mentally retarded. But the claim is also "plainly meritless" under *Rhines* because the allegation is unexhausted and procedurally defaulted under state law regarding successive applications. *Rhines*'s stay-and-abeyance safety valve is predicated on the availability of state court remedies. *See* 28 U.S.C. § 2254(B)(1). Here, Mays cannot satisfy the relevant statutory exception to Texas's abuse-of-the-writ doctrine, and thus, no such remedies remain. *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005); *Blue*, 230 S.W.3d at 154.

Texas strictly enforces its abuse-of-the-writ doctrine and generally prohibits the filing of successive habeas applications. *Id.* Texas Code of Criminal Procedure Article 11.071, § 5(a), sets forth the "extraordinary circumstances," *Neville*, 423 F.3d at 480, in which the CCA will hear a subsequent state writ application on the merits:

> (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> > (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or

legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury [at the punishment phases].

The CCA has held that applicants such as Mays, who filed his initial state writ application after the Supreme Court released *Atkins* but did not invoke the constitutional prohibition against executing the mentally retarded, must proceed under § 5(a)(3):

A subsequent habeas applicant may proceed with an *Atkins* claim if he is able to demonstrate to this Court that there is evidence that could reasonably show, to a level of confidence by clear and convincing evidence, that no rational finder of fact would fail to find he is mentally retarded.

*Blue*, 230 S.W.3d at 154.

As established in Part V(A), *supra*, Mays's mental retardation claim has no merit. It follows that Mays cannot make the required threshold showing under § 5(a)(3). The CCA will thus dismiss any subsequent application he files raising the claim as an abusive writ, rendering his unexhausted claim "plainly meritless" under *Rhines. Neville*, 423 F.3d at 480.

It bears noting that the dismissal of Mays's subsequent application under § 5(a)(3) would not be an adjudication on the merits and therefore would not implicate the independence and adequacy of the state law grounds for dismissal. In *Blue*, the CCA

explained that its inquiry under § 5(a)(3) is procedural, not merits-based. In *Blue*, the CCA was tasked with deciding whether a subsequent application satisfied § 5(a)(3)'s threshold showing of "clear and convincing evidence" that "no factfinder would fail to find mental retardation." 230 S.W.3d at 163. The CCA explained that in making this determination, it reviews only the adequacy of the pleading and not the merits of the underlying constitutional issue. *Id.* at 162–63.[45] Indeed, if the initial threshold assessment under § 5(a)(3) was merits-based, then there would be no need for the CCA to ever remand a subsequent application for further proceedings because the merits would already be decided. *Id.* at 163.

The Fifth Circuit considers *Blue* to be the CCA's "seminal interpretation" of Texas's abuse-of-the-writ statute. *Rocha v. Thaler*, 626 F.3d 815, 822 (5th Cir. 2010) (*Rocha II*).[46] Federal courts are "obliged to construe and apply § 5(a)(3) as the CCA construes and applies it." *Rocha II*, 626 F.3d at 822 & n.21 (*citing, e.g., Price v. City of San Antonio*, 431 F.3d 890, 892 (5th Cir. 2005) ("To construe a Texas statute, we look to how Texas's highest court would

---

[45]     The CCA's threshold review under Section 5(a)(3) is similar to the gateway inquiry performed by federal courts under 28 U.S.C. § 2244(b)(2). *See In re Morris,* 328 F.3d 739, 741 (5th Cir. 2003) (noting that authorization to file a successive habeas petition is "tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, *without reaching the merits* of the motion") (quoting *Reyes-Requena v. United States,* 243 F.3d 893, 899 (5th Cir. 2001)) (emphasis added). It is also analogous to a federal court's determination on whether to grant a COA under 28 U.S.C. § 2253. *See Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (explaining that, "until a COA has been issued federal courts of appeals *lack jurisdiction to rule on the merits* of appeals from habeas petitioners") (emphasis added). Just as in federal court, the CCA lacks jurisdiction to reach the merits of a claim brought in a subsequent application until an exception is met.

[46]     *Rocha II* clarified and denied panel rehearing regarding its original decision in *Rocha v. Thaler*, 619 F.3d 387 (5th Cir. 2010) (*Rocha I*). *See Adams v. Thaler*, No. 10-70023, 2011 U.S. App. LEXIS 6806, at *20 (5th Cir. 2011) (unreported).

resolve the issue."). Just as the CCA construed and applied § 5(a)(3) in *Blue*, this Court must construe and apply § 5(a)(3) as a threshold evaluation of the adequacy of Mays's application and not the merits of his *Atkins* claim.

### C.   Mays cannot overcome the procedural bar to a federal merits review.

The merits of Mays's claim are closed to federal review as a consequence of his state procedural default. As discussed in Part V(B)(2), *supra*, Section 5(a), would bar Mays from raising his *Atkins* claim in a successive state habeas application.

"Because [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted); *see also Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1998)(explaining that "exhaustion is not required if it would plainly be futile"). The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071, Section 5(a), would foreclose review of those claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997). Mays does not attempt to distinguish his case from *Muniz* and *Nobles*, and indeed he cannot.

Thus, in Mays's case, just as in *Gray*, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless [Mays] can demonstrate cause and prejudice for the default," or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Gray*, 518 U.S. at 162; *Coleman*, 501 U.S. at 750. But Mays makes no attempt to meet either burden, except to argue prospectively[47] that the Supreme Court's decision in *Martinez* may establish a constitutional right to effective assistance of counsel in state habeas proceedings and "could require that his *Atkins* claim be heard," Pet. 38, because it "could . . . require that the [CCA] revisit [*Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002) (finding that competency of prior state habeas counsel is not a cognizable issue on state habeas corpus review and therefore the applicant's allegation that state habeas counsel was ineffective could not fulfill the requirements of Texas Code of Criminal Procedure article 11.071, § 5, for a subsequent writ])," Pet. 39.

Mays's argument is unavailing on its face. The claim before this Court is a freestanding allegation that Mays is mentally retarded and therefore constitutionally ineligible for execution under the Eighth Amendment—not a Sixth Amendment claim alleging that state habeas counsel rendered ineffective assistance. *See* Pet. 35. Further, *Martinez* did not provide the relief that Mays anticipated. *Martinez* did not establish a constitutional right to effective state habeas counsel. Rather, it established only an extremely

---

[47]      *See supra* note 2.

narrow equitable exception to *Coleman v. Thompson*'s[48] rule that the ineffectiveness of state habeas counsel cannot constitute "cause" under the federal cause-and-prejudice exception for a state procedural default. 132 S. Ct. at 1315; *Ibarra*, __ F.3d at __, 2012 U.S. App. LEXIS 13777, *6–7.

The stand-alone *Atkins* claim Mays raises in Claim 5 does not fall within this narrow exception. *Ibarra*, __ F.3d at __, 2012 U.S. App. LEXIS 13777, at *2 (stating that the Court could "readily dismiss" the petitioner's argument that *Martinez* provided a mechanism for overcoming the procedural bar to federal review of a procedurally defaulted *Atkins* claim). *Martinez*, by its terms, applies only to procedurally defaulted claims alleging ineffective assistance of trial counsel. *Id.* at __, 2012 U.S. App. LEXIS 13777, at *2. Moreover, even if Mays were to attempt to recast his independent *Atkins* claim as an ineffective assistance of trial counsel allegation, *Martinez* still would not provide him with means to overcome the procedural bar to federal review. *Id.* at __, 2012 U.S. App. LEXIS 13777, at *12. The Fifth Circuit has held that *Martinez* does not apply to Texas. *Id.* at __, 2012 U.S. App. LEXIS 13777, at *12 (noting that unlike the Arizona procedures at issue in *Martinez*, "Texas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings, and they do not deprive Texas defendants of counsel and court-driven guidance in pursuing ineffectiveness claims."). Therefore, the Court must reject any effort by Mays to argue that state habeas counsel's ineffectiveness constitutes "cause" for his procedural default of Claim 5.

---

[48]     501 U.S. 722, 750 (1991).

Further, because *Martinez* did not establish a constitutional right to effective state habeas counsel, the decision does not require the CCA to revisit its holding in *Graves*. To the extent Mays argues that the Supreme Court's decision in *Martinez* may prompt the CCA to hear a successive petition on equitable grounds, based on an allegation that state habeas counsel was ineffective for failing to raise the claim, the CCA has already rejected such an argument following *Martinez*'s release. *See Ex parte Jesse Joe Hernandez*, No. 62,840-02, slip op. at 2 (Tex. Crim. App. 2012) (Price, J. concurring) ("While [the ruling in *Martinez*] means that a claim such as the one that the applicant presently raises may hereafter be reviewable on the merits in an initial federal habeas corpus proceeding, it hardly avails this applicant in the here and now.").

Lastly, the Court should not excuse Mays's default under a fundamental-miscarriage-of-justice exception. In a capital punishment proceeding, the exception means "actual innocence of the death penalty," and a petitioner must show "by clear and convincing evidence that but for constitutional error, no reasonable juror would have found him eligible for the death penalty under [state] law."*Smith v. Murray*, 477 U.S. 527, 537–38 (1986). Mays never argues that his purported mental retardation qualifies him for this exception. And because the evidence overwhelmingly demonstrates that he is not, in fact, mentally retarded, Mays could not meet this extraordinarily high burden even if he were to attempt it. Accordingly, the Court should hold that Mays's claim is procedurally barred and should deny Mays's requests for funding to further develop the defaulted claim.

VI. **The CCA Reasonably Rejected Mays's Claim That *Atkins*'s Categorical Prohibition Against Executing The Mentally Retarded Also Applies To The Mentally Ill. (Claim 6).**

Mays argues that the Eighth Amendment rationale underlying *Atkins*'s prohibition against executing the mentally retarded applies with equal force to the severely mentally ill. Pet. 40. Because he counts himself among this group, Mays further argues that his death sentence is unconstitutional. *Id.* at 40–42. But Fifth Circuit precedent forecloses relief on this claim. *Shisinday*, 511 F.3d at 521; *Neville,* 440 F.3d at 221. Mays also concedes that to grant relief, this Court would have to create a new rule of constitutional law, which *Teague* nonretroactivity principles preclude in federal habeas proceedings. Pet. 47; *see Teague*, 489 U.S. at 310. Mays states that he raises the issue merely to preserve the claim. Pet. 47. Although Mays acknowledges that *Teague* bars this Court from granting federal habeas relief on his claim, *id.* at 47, for the Court's convenience, the Director shows that his arguments have no merit.

A. **Although Mays presented Dr. Mayfield's report in state habeas proceedings, he did so in support of an entirely different claim.**

Mays asserts that he presented new evidence in his state habeas application—Dr. Mayfield's report—in support of his claim that *Atkins* precludes his execution because he is seriously mentally ill. Pet. 40. His representation is incorrect. To the extent Mays offered new evidence in his writ application, he did so in support of his separate claim that trial counsel was ineffective for failing to seek neuropsychological testing. *See* 1 SHCR 18–19 (referencing Dr. Mayfield's report).

## B.   The CCA did not misapply its own law.

The CCA determined that this claim was procedurally barred in state habeas proceedings because the court had already reached and rejected the claim on the merits on direct appeal. *Ex parte Mays*, slip op. at 2. To the extent Mays argues that the CCA's conclusion contradicted its own holding in *Ex parte Nailor*, 149 S.W.3d 125 (Tex. Crim. App. 2004), it is well settled that federal courts do not function to review a state's interpretation of its own laws and instead will defer to the state courts on such matters. *Weeks v. Scott,* 55 F.3d 1059, 1063 (5th Cir. 1995); *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983). Moreover, Mays's assertion that the CCA's conclusion violates *Nailor* is simply incorrect.

Mays initially raised this claim as his third point of error on direct appeal. Appellant's Br. at 37–39. Mays argued that under the Supreme Court's reasoning in *Atkins* and *Roper v. Simmons*, 543 U.S. 551 (2005), he should be exempt from the death penalty because he is seriously mentally ill. Appellant's Br. at 37–39 ("The holdings in *Atkins* and *Roper* logically compel the conclusion that the Eighth and Fourteenth Amendments to the United States Constitution prohibit the execution of individuals who suffer from serious mental illness."). The CCA rejected his argument. *Mays*, 318 S.W.3d at 379–80.

Mays then raised the identical claim as Issue One of his state habeas application. 1 SHCR 12–13. The entirety of Mays's briefing of his *Atkins-* and *Roper-*based claim in his writ application merely reiterated the claim as he presented it to the CCA on direct appeal:

> During the Trial of Guilt and Innocence and Punishment the Defense presented expert witnesses who testified that in their opinion [Mays] is seriously mentally ill. The Defense presented Dr. Teresa Vail, a Psychiatrist who was on contract

> with the Smith County Jail. Dr. Vail was in effect a State employee, and was not compensated for her time for testifying. Her testimony was followed up by Dr. Kessner and Dr. Self who were appointed by the Trial Court to assist the defense in this cause. All three Doctor[s] testified that in their opinion [Mays] was suffering from mental illness. The State offered no evidence lay or expert which contradicted the opinion of these experts. Rather than rehash this point which was vigorously made[] in [Mays's] brief on direct appeal, [Mays] would incorporate by reference this point which was submitted in [Mays's] brief on direct appeal.

1 SHCR 12–13. In short, in his state habeas application, Mays merely re-offered his original claim that he raised on direct appeal.

The state habeas court nonetheless reached the merits of the claim, concluding that "[n]either the Texas Constitution nor the United States Constitution renders unconstitutional the execution of the mentally ill." 2 SHCR 217. In support, the trial court cited the CCA's opinion regarding Mays's direct appeal "and the cases cited therein." *Id.* The trial court accordingly recommended that the CCA deny Mays relief. *Id.* at 218. After reviewing the record, the CCA unanimously adopted the trial court's factual findings and legal conclusions. *Ex parte Mays*, slip op. at 2. The CCA further held that Mays's claim—that it would be unconstitutional to execute a mentally ill individual—was procedurally barred. *Id.*

The CCA properly applied its own law in concluding the claim was procedurally barred from reconsideration, as it had reached and rejected the identical argument on direct appeal. *Id.* at 2; *see Ex parte Drake,* 883 S.W.2d 213, 215 (Tex. Crim. App. 1994) (holding that previously litigated issues are procedurally barred absent intervening authority). Under Texas law, a claim that is previously raised and rejected on direct appeal, as Mays's instant claim was, is generally not cognizable in a writ of habeas corpus. *Ex parte Acosta*, 672 S.W.2d

470, 472 (Tex. Crim. App. 1984). In *Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997),

however, the CCA recognized a narrow exception to this doctrine for some ineffective

assistance of counsel claims raised on direct appeal. *Nailor*, 149 S.W.3d at 130–31. The CCA

held that "because 'the direct appeal record contained insufficient evidence to evaluate

[Torres's] ineffective assistance issue,'" the appellate court's rejection of Torres's claim on

direct appeal did not bar Torres from relitigating the same ineffective claim in later habeas

corpus proceedings, to the extent he sought to gather and introduce additional evidence not

contained in the direct appeal record. *Id.* (quoting *Torres*, 943 S.W.2d at 475). As the CCA

subsequently explained the exception in *Nailor*,

> [I]f the appellate court rejects a claim of ineffective assistance of counsel because
> the record on direct appeal does not contain sufficient information to adequately
> address and resolve a particular allegation of counsel's deficient performance,
> the defendant may re-urge consideration of that specific act or omission in a
> later habeas corpus proceeding if he provides additional evidence to prove her
> claim.

*Id.* at 131. But the CCA also explained that, where the direct appeal record *is* adequate to

permit adjudication of the appellant's ineffective-assistance claim and the appellate court

rejects the claim on the merits, based on that record, the appellant may not later relitigate

the same claim in state habeas proceedings. *Id.*

Thus, the CCA's holding in *Nailor* applies only to ineffective-assistance claims and to

a very narrow subset of ineffective-assistance claims, at that. Here, Mays did not contend

that he received ineffective assistance of counsel. Rather, Mays  raised a purely legal claim,

i.e., an assertion that the reasoning underpinning the Supreme Court's holdings in *Atkins*

and *Roper* applies equally to the mentally ill. The CCA applied Texas law to this issue and concluded that the claim was procedurally barred. *Ex parte Mays*, slip op. at 2. Because the CCA's determination of state law is binding on this Court, it forecloses Mays's contention that Texas law was violated. But in any case, deficiencies in state habeas proceedings do not constitute a basis for federal habeas corpus relief. *See, e.g., Kinsel v. Cain*, 647 F.3d 265, 273 & 273 n.32 (5th Cir. 2011) (noting the Fifth Circuit's "no state habeas infirmities rule"); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (same).

### C.   Mays's claim has no merit.

If *Teague* did not prevent it from doing so, Mays would have the Court to extend the categorical exemption from capital punishment for mentally retarded and youthful offenders to the mentally ill. Pet. 40, 47. As noted previously, Fifth Circuit precedent forecloses relief. *Shisinday*, 511 F.3d at 521; *Neville*, 440 F.3d at 221. But Mays's claim also fundamentally lacks merit. Mays bases his argument on two faulty premises: First, that mentally ill capital murders are categorically less culpable and less deserving of punishment in the same way as the mentally retarded and juveniles; and second, that Mays himself falls into the category of such mentally ill defendants.

#### 1.   Mays has not demonstrated that he falls within the category of capital defendants that he wishes this Court to exempt from the death penalty.

Turning first to Mays's allegation that he falls within the ranks capital murdered who were severely mentally ill when they committed their crimes, through cross-examination, the

State effectively undermined Mays's claims to mental illness. *See* 29 RR 27–49 (cross-examination testimony of Dr. Kessner); 31 RR 29–38, 42–45, 46 (cross-examination and re-cross-examination testimony of Dr. Vail); 31 RR 144–56, 158–59 (cross-examination and re-cross-examination testimony of Dr. Self). As one of several bases for denying relief on direct appeal, the CCA properly held that Mays had "failed to show that, if he did suffer from some mental impairment at the time of these murders, that impairment was so severe that he is necessarily and categorically less morally culpable than those who are not mentally ill." *Mays*, 318 S.W.3d at 380.

The state habeas likewise reached and rejected this claim when Mays raised it again in state habeas proceedings. 2 SHCR 206, 217. In recommending that the CCA deny relief, the state habeas court implicitly found that Dr. Mayfield's report should not alter the CCA's conclusion regarding the severity of Mays's mentally impairment, if any, at the time of the murders. The state habeas court's implicit finding on this point, which the CCA adopted, is entitled to deference. *Valdez*, 274 F.3d at 948 n.11 (noting that the presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact); *see Anderson*, 470 U.S. at 574 (1985) (stating that a reviewing court should defer to credibility determinations made by the factfinder; this deference also extends to findings based on "physical or documentary evidence or inferences from other facts").

The record supports the state habeas court's implicit finding. State habeas counsel did not offer Dr. Mayfield's report to establish the severity of Mays's mental illness, if any, at the

time of the offense. Indeed, Dr. Mayfield's report had no bearing on that issue. Rather, Dr. Mayfield solely investigated whether Mays suffered from "organic brain dysfunction or cognitive impairment as a result of his past drug history." PX-3 at 1. Dr. Mayfield testified that she did not talk to Mays about the offense. 3 SHRR 49–50. State habeas counsel offered Dr. Mayfield's report to establish that if trial counsel had investigated, trial counsel would have learned and could have presented evidence at punishment that Mays's behavior had an organic cause—brain damage—rather than (or in addition to) a psychological or emotional cause.

Further, the state habeas court found that Dr. Mayfield's report and testimony was otherwise cumulative of the testimony given by Mays's experts at trial on the topic of mental illness, adding "little or no weight." 2 SHCR 206, 212. The CCA expressly adopted these findings, although it alternatively concluded that the claim was procedurally barred. *Ex parte Mays*, slip op. at 2. In short, Dr. Mayfield's report did nothing to disturb the CCA's conclusion on direct appeal regarding the severity of any impairment affecting Mays at the time of the murders. *Mays*, 318 S.W.3d at 380.

> ## 2. The Eighth and Fourteenth Amendments' requirement of proportionality in sentencing does not afford categorical immunity from the death penalty to all mentally ill offenders.

In *Atkins*, the Supreme Court determined that the Eighth Amendment prohibited executing the mentally retarded. 536 U.S. 304. Mays contends that "the nature of certain kinds of mental illness reduce an offender's culpability in the same manner that the *Atkins*

Court held that mental retardation reduced culpability." Pet. at 43. The CCA rejected that

argument on direct appeal, noting that

> there is no authority from the Supreme Court or this Court
> suggesting that mental illness that is a 'contributing factor' in the
> defendant's actions or that caused some impairment or some
> diminished capacity, is enough to render one exempt from execution
> under the Eighth Amendment. Furthermore, [Mays] has not
> demonstrated that there is a trend among state legislatures to
> categorically prohibit the imposition of capital punishment against
> mentally ill offenders. Finally, [Mays] has failed to show that, if he
> did suffer from some mental impairment at the time of these
> murders, that impairment was so severe that he is necessarily and
> categorically less morally culpable than those who are not mentally
> ill.

*Mays,* 318 S.W.3d at 379–80.

The CCA's rejection of the claim as reasonable. *Atkins* was predicated, at least in part,

on evolving standards demonstrated by a definite trend in the legislatures across the nation

enacting prohibitions against the execution of mentally retarded offenders. 536 U.S. at

315–16. Mays has not demonstrated that such a legislative consensus or trend is evident

regarding the execution of murderers who claim mental illness.

In addition, every state judiciary to have examined the issue has rejected the extension

of *Atkins* to the mentally ill. *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (stating that

the Supreme Court "has not yet ruled out the execution of persons who kill under an

irresistible impulse," where Indiana Supreme Court found "[the defendant] may have been

under the influence of extreme mental or emotional disturbance at the time of the murder,

and that this same mental condition may have substantially impaired [his] capacity to

conform his conduct to the requirements of the law."); *Dotch v. State*, 67 So. 3d 936, 1006 (Ala. Crim. App. 2010); *Diaz v. State*, 945 So. 2d 1136, 1152 (Fla. 2006); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (noting also that "unlike a verdict of guilty but mentally retarded, the statute that provides for a verdict of guilty but mentally ill does not preclude a death sentence as the result of such a verdict."); *People v. Runge*, 917 N.E.2d 940, 985–86 (Ill. 2009) (noting that a finding of "guilty but mentally ill" would not preclude imposition of the death penalty.); *Johnson v. Commonwealth*, No. 2006-SC-000548-MR, 2008 WL 4270731 (Ky. 2008)(unreported); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006); *State v. Hancock*, 840 N.E.2d 1032, 1059–60 (Oh. 2006) (rejecting "significant extension of *Atkins*" required to create "a new, ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case."); *Commonwealth v. Baumhammers*, 960 A.2d 59, 62 (Pa. 2008) (finding of substantial mental impairment does not bar a death penalty.); *State v. Irick*, 320 S.W.3d 284, 298 (Tenn. 2010), *cert. denied*, 131 S. Ct. 916 (2011).[49]

Further, Mays's argument notes only that there are similarities between some mental illnesses and mental retardation, but ignores the significant differences.

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning. By contrast, a diagnosis of mental illness does not involve a determination of intelligence. Mental retardation occurs prenatally, at birth, or in early childhood, is caused by an incurable defect in the central

---

[49]     Although Mays cites to opinions advocating *Atkins*'s extension, Pet. 43–44, these do not represent the majority view, but rather concurring and dissenting opinions.

> nervous system, and is a permanent developmental disability. By contrast, the age of onset for schizophrenia, the most serious thought disorder, is in the twenties, and the condition is treatable, even if not curable. Whereas the cognitive impairments associated with mental retardation are permanent, the effects of the major mental illnesses, such as schizophrenia, are intermittent, variable, and fluctuating.

Bruce J. Winick, *The Supreme Court's Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier*, 50 B.C. L. Rev. 785, 789 n.27 (2009) (internal citations and quotations omitted). Mays' attempt to generalize that all individuals diagnosed with severe mental illness possess similar or identical impairments is misplaced.

The law certainly views some types and degrees of mental illness as having legal import. Some mental illnesses may rise to the level of legal insanity, which will insulate a defendant from criminal liability altogether. A juror may find other mental illness to constitute compelling mitigating evidence in a capital case. But some mental illness has no bearing on a defendant's guilt or punishment. What if the mental illness is severe, but unrelated to any legitimate punitive concern (e.g., anorexia or bulimia)? What if the defendant is responsible for his own mental illness, as Mays claims he is due to his prior illegal drug abuse? What if a defendant is curably mentally ill, but refuses to seek treatment because he prefers his mental illness to the inconvenience or side effects of medication or treatment? Because mental illness can vary so widely in its causes, forms and degrees, the categorical exemption that Mays seeks is not appropriate.

*Atkins* recognized that

> the objective evidence [of evolving standards], though of great importance, did not "wholly determine" the controversy, "for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment."

536 U.S. at 313 (internal citation omitted). "Thus, in cases involving a consensus, our own judgment is 'brought to bear' . . . by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators." *Id.* Mays's case provides no such reason.

## VII.   The Charge At Guilt-Innocence Did Not Abrogate The State's Responsibility To Prove A Culpable Mental State. (Claim VII).

During the defense's case-in-chief, the parties and the trial court engaged in a lengthy colloquy regarding the propriety of permitting Drs. Vail and Kessner to testify at the guilt-innocence phase.[50] 28 RR 111–84. At defense counsel's request, the trial court crafted an instruction allowing the jury to consider Drs. Vail's and Kessner's testimony to the extent the defense offered it to negate the *mens rea* element of capital murder. 8 CR 1221. But the trial court gave a companion instruction that limited the jury's ability to consider that evidence to the extent it bore on issues only relevant to punishment:

> Your are instructed that you may consider all relevant facts and circumstances surrounding the killing and any previous relationship existing between [Mays] and Tony Ogburn, if any, together with all relevant facts and circumstances going to show the condition of the mind of [Mays] at the time of the alleged offense.

> You are further instructed that you may consider any mental condition, if any, of [Mays], that he did or did not act intentionally or knowingly in

---

[50]      The trial court ultimately allowed Drs. Vail and Kessner to testify.

> committing the alleged offense, but you cannot consider any mental condition, if any, that [Mays] lacked the capacity to act intentionally or knowingly.

*Id.* At the charge conference, Mays referred to written objections he had filed to the language limiting the jury's consideration of his mental condition evidence, but proposed no curative language. *Id.* at 1204–13; 29 RR 73–76; *see also Mays*, 318 S.W.3d at 380 n.27 ("[A]lthough [Mays] requested a jury instruction on how mental illness may be considered in determining whether he acted intentionally or knowingly, and the trial judge gave such an instruction, [Mays] then complained about the wording of the actual instruction given.").

Mays contends that the instruction removed his mental condition from the jury's consideration and thereby denied him the opportunity to present a complete defense. Pet. 48. He asserts that the instruction therefore  violated his rights under the Sixth and Fourteenth Amendments. Pet. 48. Mays also avers that the instruction impermissibly restricted the jury's consideration of relevant evidence, thereby violating the Eighth Amendment. *Id.* at 49. Finally, Mays argues that the CCA did not reach the federal-law aspects of his claim when he presented the challenge in his direct appeal. *Id.* at 47. For the reasons discussed below, none of Mays's arguments entitle him to federal habeas corpus relief.

## A.    The CCA's rejection of Mays's claim is entitled to AEDPA deference.

On direct appeal, Mays offered a revisionist characterization of his guilt-phase defense. *Mays*, 318 S.W. at 380. Mays argued that his defense at trial had been "'that his

active, serious mental illness prevented him from knowingly or intentionally killing at the moment he pulled the trigger.'" *Id.* But after reviewing the record, the CCA rejected Mays's characterization of his trial defense, finding it inaccurate:

> [T]hat was not his defense at trial. No witness testified that [Mays]—with or without a mental illness—did not knowingly or intentionally shoot Deputy Ogburn with a single shot right between the eyes. Indeed, the evidence showed that immediately after he shot his first victim, [Mays] shouted, "I got one. Where's the other one?" before he shot another deputy in the head. None of Mays's experts testified that he did not intend these actions. Indeed, [Mays's] trial counsel forthrightly admitted during his closing argument at the guilt stage that, "yes, a person can have a paranoid delusion, suffer from paranoia and intentionally and knowingly do what they want to do, in this case, shoot two police officers." At trial, defense counsel stated that he offered the mental-illness testimony as "just an explanation about what went on out there." [Mays's] mental-illness evidence explained his motive for killing the deputies—paranoia, suspicion, and distrust of the officers. It did not rebut the culpable mental state of "intentional and knowing" conduct or raise any legal justification or exoneration for the murders.

*Id.* at 380–81. The CCA also noted that there was no evidence to suggest that Mays suffered from auditory or visual delusions that caused him to see or hear or otherwise believe that he was firing upon someone other than a police officer. *Id.* at 381. The CCA further concluded that Mays offered no evidence to suggest that he did not intend to shoot a person. *Id.* Rather,

> [a]ll of [Mays's] mental-illness evidence showed why he intentionally and knowingly killed the deputies: He was paranoid and thought they has "mistreated" him. But motive is not an element of murder or capital murder. Such mental-illness testimony may be relevant for mitigation purposes during the punishment phase, but expert testimony that does not directly rebut the culpable mental state usually may be excluded at the guilt stage.

*Id.* The CCA concluded that Mays had not been entitled to a jury instruction concerning expert testimony when that testimony did not directly rebut evidence of a culpable *mens rea*. *Id.* at 382. The court further found that Mays had not demonstrated any harm flowing from the legally correct but unnecessary instruction. *Id.*

Mays's assertion that the CCA did not reach the federal-law aspects of his claim is misplaced. *See* Pet. 48. In its direct appeal opinion, the CCA expressly acknowledged that Mays challenged the instruction on both state and federal law grounds. *Mays*, 318 S.W. 3d at 380. Because the jury instruction at issue was a state law creation, the CCA naturally discussed Mays's claim in terms of state law. But the federal constitutional facets of Mays's claim were clearly subsumed within the CCA's analysis of the jury instruction. *See id.* at 380–82. The CCA expressly considered Mays's argument, for example, that the instruction interfered with his right to present a defense. *Id.* Moreover, the fact that the CCA confined its discussion to state law does not deprive that court's decision of AEDPA deference. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (emphasizing that state courts need not expressly cite or even be aware of Supreme Court precedents, as long as their decisions do not contradict the precedents). Thus, AEDPA's deferential standard of review applies to the CCA's adjudication of Mays's claim. *Id.* at 3.

## B.    The CCA reasonably rejected Mays's meritless claim.

Mays contends that the instruction denied him the opportunity to have the jury consider evidence that he did not act intentionally or knowingly when he shot Deputy Ogburn. He further asserts that the instruction precluded the jury from considering

relevant evidence. But his argument has no merit. On federal habeas review the charge, as given, did not constitute a due process or Eighth Amendment violation. In the alternative, error, if any, was harmless.

Improper jury instructions in state criminal trials are not in themselves a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991) (stating that federal habeas courts do not grant relief solely on the basis that a jury charge was erroneous); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The inquiry in habeas proceedings "is not whether there was prejudice to the [petitioner], or whether state law was violated, but whether there was prejudice of constitutional magnitude." *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir.1986); *Galvan*, 293 F.3d at 764. The relevant inquiry is whether the allegedly erroneous instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Cf. Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Galvan*, 293 F.3d at 764–65. Moreover, "there is a strong presumption that errors in jury instructions are subject to harmless-error analysis. Thus, even if the instruction was erroneous, if the error is harmless, habeas corpus relief is not warranted." *Galvan*, 293 F.3d. at 765 (citing *Brecht*, 507 U.S. at 623–24). Under *Brecht*, a court may not grant habeas corpus relief for a constitutional error unless the petitioner demonstrates that it "had [a] substantial and injurious effect or influence in determining the jury's verdict."

507 U.S. at 623–24 (internal quotation marks and citation omitted); *Galvan*, 293 F.3d at 765.

Mays is not entitled to relief. Initially, the instruction at issue was not erroneous. The limiting instruction was a correct statement of Texas law. *Mays*, 318 S.W.3d at 382. To the extent Mays argues that the limiting instruction precluded him from raising a "diminished capacity" defense, he acknowledged on direct appeal that there is no "diminished capacity"defense in Texas. *Id.* at 381. Evidence offered to support a diminished capacity defense would have thus been irrelevant to the jury's consideration. Further, the sentence preceding the limiting instruction expressly allowed the jury to consider the testimony of Mays's mental health experts insofar as Mays offered it to rebut evidence that he acted knowingly and intentionally. Although Mays argues that the two instructions, taken together, had the potential to confuse the jury, his argument is speculative and does not overcome the "crucial" presumption that jurors follow their instructions. *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983); *Parker v. Randolph*, 442 U.S. 62, 73–73 (1979); *Charles v. Thaler*, 629 F.3d 494, 500 (5th Cir. 2011) ("Charles presents no reason to overcome the usual presumption that the jury followed the trial court's instructions.").

Further, no conceivable harm could have resulted. As the CCA correctly noted, Mays's mental health experts did not testify that he lacked the requisite intent when he killed Deputy Ogburn. Dr. Vail testified that she did not discuss the offense with Mays and had not formed any opinion regarding whether he was experiencing psychological

issues when he committed the crime. 28 RR 131.  And although she attempted to evade the question, Dr. Kessner ultimately agreed that Mays fired the rifle intentionally and knowingly. 29 RR 40, 50. In addition, there was no evidence that Mays did not understand that he was firing at a person or that his target was a police officer. Dr. Vail's and Kessner's testimony therefore did nothing to negate the intent element of capital murder. In short, under these circumstances, Mays has not established that a due process violation occurred. Alternatively, he has not demonstrated that prejudice of any kind resulted.

Mays's Eighth Amendment argument also lacks merit. Dr. Vail's and Kessner's testimony was not relevant to any element that the State was required to prove at the guilt phase. Rather, as the CCA concluded, all of the mental health evidence that Mays presented at guilt-innocence phase was geared to show his motive for firing upon the deputies. "But motive is not an element of capital murder." *Mays*, 318 S.W. 3d at 381. Mays has not shown that the jury could not consider his mental health evidence at the punishment phase and indeed, he cannot. The Supreme Court has specifically commended the current Texas capital-sentencing scheme, calling the new statute "[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity". *Penry v. Johnson*, 532 U.S. 782, 802–03 (2001). Furthermore, the Fifth Circuit has repeatedly held that Texas's definition of mitigating evidence "encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F.App'x 270, 277 (5th Cir. 2007)(quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)).

For these reasons, the CCA reasonably denied Mays's claim. AEDPA therefore affords Mays no relief.

## VIII.  Mays Is Not Entitled to Federal Habeas Corpus Relief Concerning His Claim That The Underlying Offense Is Unconstitutionally Vague. (Claim 8).

Pursuant to Texas Penal Code § 19.03(a)(1), the trial court charged the jury that "a person commits the offense of Capital Murder if he intentionally and knowingly causes the death of an individual, knowing that the individual was then and there a peace officer acting in the lawful discharge of an official duty." 9 CR 1220. Mays contends that the CCA's interpretation of the term "lawful" as used in the phrase the "lawful discharge of an official duty" has caused Texas's death penalty statute from performing the narrowing functioning that Supreme Court death penalty jurisprudence requires. Pet. 50–52. But as discussed below, the Court may not consider Mays's claim because the CCA's dismissal rests on independent and adequate state law grounds and is procedurally barred from federal review. Alternatively, the claim lacks merit.

### A.   Mays's claim is procedurally barred from federal review.

Mays raised this claim on direct appeal as his eleventh point of error. *Mays*, 318 S.W. 3d at 388–89. But citing Texas Rule of Appellate Procedure 33.1 (Texas's "contemporaneous objection rule"), the CCA concluded that Mays did not make the argument in the trial court and thus failed to preserved it for appeal. *Id.* at 388 & 388

n.73. The CCA alternatively considered and rejected the merits of Mays's federal claim.[51]

*See Mays*, 318 S.W.3d at 388.

The CCA's determination that Mays failed to comply with Texas's contemporaneous objection rule constitutes an independent and adequate basis for this Court's refusal to address the merits of Mays's claim. *See Rowell v. Dretke*, 398 F.3d 370, 374–75 (5th Cir. 2005) (holding that the procedural default doctrine barred federal review of a claim alleging jury charge error where the CCA determined that the petitioner failed to timely object to the alleged error and thereby violated Texas's contemporaneous objection rule); *Cotton v. Cockrell,* 343 F.3d 746, 754 (5th Cir.2003) (holding that a violation of Texas's contemporaneous objection rule is an adequate and independent barrier to federal habeas review); *Dowthitt*, 230 F.3d at 752 (holding the Texas contemporaneous objection rule is strictly or regularly and evenhandedly applied in the vast majority of cases and, therefore, an adequate state bar).

---

[51]     Mays asserts that the CCA did not reach the federal aspects of his claim when the court conducted its alternative merits analysis. Pet. 50. He is incorrect. The CCA explicitly acknowledged the constitutional nature of Mays's argument and concluded that the challenged language was not unconstitutionally vague. *Mays*, 318 S.W. at 388; *see also Early*, 537 U.S. at 8 (noting that state courts need not expressly cite or even be aware of Supreme Court precedents, as long as the court's decisions do not contradict the precedents). Thus, should the Court conclude that Mays's claim is not procedurally defaulted, then the Court must address his claim under 28 U.S.C. § 2254(d)'s deferential standard. *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007). That is, the Court must determine whether the CCA's implicit adjudication—that the challenged language is not unconstitutionally vague—represents an unreasonable application of clearly established Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(d).

The fact that the CCA alternatively reached the merits of Mays's federal claim,[52] *see Mays*, 318 S.W.3d at 388, does not affect the independence and adequacy of the state procedural bar, *Sawyers v. Collins*, 986 F.2d 1493, 1499 (5th Cir. 1993) ("[W]here a state court finds that a federal claim is procedurally barred, but goes on to reach the merits of that claim in the alternative, the state court's reliance on the procedural default still constitutes an independent and adequate ground which bars federal habeas review."). The CCA's independent and adequate state law ground for dismissal precludes this Court from reviewing the claim's merits unless Mays establishes either (1) cause and prejudice for his state procedural default, or (2) that a miscarriage of justice will result if this Court does not consider the claim's merits. *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

Mays does not even attempt to make the necessary showing. *See* Pet. 50–56. Further, it is clear that Mays cannot meet his burden because as discussed below, the claim has no merit.

### B.    "Lawful discharge of an official duty" is not unconstitutionally vague.

In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court held that Texas's death penalty statute is constitutional. Mays challenges that holding, arguing that the statute no longer performs the narrowing function that the Supreme Court's death penalty jurisprudence requires. Specifically, Mays argues that the term "lawful," as the CCA has defined it in post-*Jurek* opinions, is unconstitutionally vague. Pet. 52–53. But his

---

[52]    *See supra* note 51.

argument lacks merit; Mays fails to demonstrate that Texas sentencing law has changed significantly since *Jurek* was decided.

The capital sentencing decision-making process has two components: "the eligibility decision and the selection decision." *Tuilaepa v. California,* 512 U.S. 967, 972 (1994). "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Id.* Thus, to find a capital defendant death-eligible, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* In the subsequent "selection decision," "the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Id.*

Texas's capital murder statute places the eligibility determination at the guilt-innocence stage by narrowly defining the offense of capital murder and distinguishing that offense from simple murder. Tex. Penal Code Ann. § 19.03 (West 2012); *see Jurek*, 428 U.S. at 270 ("While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty. . . its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose.") ; *see also Lowenfield v. Phelps*, 484 U.S. 231, 243–46 (1988) (discussing the narrowing function performed by Texas's capital murder statute). Accordingly, the jury's determination of guilt ensures that a capital defendant comes within the narrowed class of death-eligible offenders. *Jurek*, 428 U.S. at 270.

The Eighth Amendment requires that an aggravating circumstance elevating murder to a capital offense meets two requirements: "First, the circumstance may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance must not be unconstitutionally vague." *Tuilaepa*, 512 U.S. at 971–72 (internal citation omitted).

> Because "the proper degree of definition" of eligibility and selection factors often "is not susceptible of mathematical precision," *our vagueness review is quite deferential. Walton* [*v. Arizona,* 497 U.S. 639, 655 (1990)]; *see Gregg* [*v. Georgia*, 428 U.S. 153, 193–94 (1976)] (factors "are by necessity somewhat general"). Relying on the basic principle that a factor is not unconstitutional if it has some "common-sense core of meaning . . . that criminal juries should be capable of understanding," *Jurek v. Texas*, [428 U.S. 262, 279 (1976)] (White, J., concurring in judgment), we have found only a few factors vague, and those in fact are quite similar to one another. *See Maynard* [*v. Cartwright*, 486 U.S. 356, 363–64 (1988)], (question whether murder was "especially heinous, atrocious, or cruel"); *Godfrey* [*v. Georgia,* 446 U.S. 420, 427–29 (1980)] (question whether murder was "outrageously or wantonly vile, horrible and inhuman"); *cf. Arave* [*v. Creech*, 507 U.S. 463, 472 (1993)] ("We are not faced with pejorative adjectives . . . that describe a crime as a whole").

*Id.* at 973–74 (emphasis added). The murder of a police officer is unquestionably more restrictive than the unconstitutional death-eligibility factors mentioned in *Tuilaepa*. Further, because most murders are not committed against peace officers, the restriction does not "apply to every defendant convicted of murder." And in fact, Texas restricts capital punishment even further, as the victim must not merely be a peace officer, but must also be acting in the lawful discharge of an official duty.

Under these circumstances, there is no merit to Mays's assertion that the statute is overbroad.

To the extent Mays contends that a jury would not understand what is meant by the term "lawful," his argument similarly lacks merit. In support of his position, Mays cites to the CCA's interpretation of the term in *Montoya v. State*:

> Whether [the officer] was making a lawful arrest is not relevant to determining if [the officer] was acting in the lawful discharge of his duties. A police officer is still acting within the lawful discharge of his official duties when he makes an unlawful arrest, so long as he is acting within his capacity as a peace officer.

744 S.W.2d 15, 29 (Tex. Crim. App. 1987); *see also* Pet.53 (citing *Hughes v. State*, 897 S.W.2d 285, 297–98 (Tex. Crim. App. 1994), and *Guerra v. State*, 771 S.W.2d 453, 460–61 (Tex. Crim. App. 1988)). But as the CCA has recently and persuasively explained:

> As our case law has construed Section 19.03(a)(1), it certainly has a common-sense core of meaning: A police officer is acting within the lawful discharge of his official duties under the statute so long as he is "on duty, in uniform[.]" A jury would have no trouble comprehending this core meaning. Moreover, as so construed, the statute clearly identifies a sub-class of murderers that the Legislature could rationally conclude is deserving of the most severe penalty available. As a matter of public policy, the Legislature may legitimately extend the presumed deterrent effect of capital punishment to discourage citizens from murdering police officers—even those officers who are not necessarily operating within the precise parameters of official departmental policy. Protection of police officers while they are on duty represents a reasonable justification for imposing a more severe penalty than applies to other murderers. Even if [Mays] were right to criticize our past construction of Section 19.03(a)(1)—which we by no means concede—our construction of the statute does not make it indefinite or its imposition arbitrary and capricious. That it narrows the class of murderers susceptible to execution to a sub-class that is broader than [Ruiz] would prefer does not render it intolerably vague for

> Eighth Amendment purposes. For these reasons, we recently (and unanimously) rejected a similar argument that the aggravating element embodied in Section 19.03(a)(1), as we have construed it, is unconstitutionally vague. We likewise reject it here and hold that the evidence was sufficient to support the appellant's conviction for capital murder.

*Ruiz v. State,* No. AP-75,968, 2011 Tex. Crim. App. Unpub. LEXIS, at \*10–11 (Tex. Crim. App. March 2, 2011)(unreported) (internal citations omitted).

In addition, there can be no doubt here that Deputy Ogburn was actually acting in his capacity as a peace officer when Mays murdered him. This was not a case involving the killing of an off-duty or undercover police officer. *See, e.g., Haynes v. Quarterman*, 2007 U.S. Dist LEXIS 5320, at \*57–64 (S.D. Tex. Jan. 25, 2007) (unreported) (considering whether an off-duty police officer was acting in his capacity as a peace officer or a private individual when the petitioner shot and killed him). Rather, the record makes clear that Deputy Ogburn and the other responding officers were functioning squarely in their capacity as peace officers. Witnesses testified that Deputy Ogburn was on duty and responding to a call from dispatch; he arrived at the scene in his marked patrol car and wearing his police uniform and hat. *Mays*, 318 S.W.3d at 373. Further, there was no evidence that Mays did not understand that Deputy Ogburn was a peace officer. *Mays*, 318 S.W. at 380.

In short, Mays has not shown that the word "lawful" used in the aggravating element of his capital murder conviction was unconstitutionally vague. Under such circumstances, Mays cannot establish prejudice, as he must to overcome the procedural bar to federal review. *Gray*, 518 U.S. at 162. Nor has Mays even attempted to meet the extraordinarily high

threshold required under the miscarriage of justice exception to the procedural bar. *Id.* at 162; *Schlup v. Delo*, 513 U.S. 298, 329 (1995). The Court should deny federal habeas corpus relief.

## IX.   Texas's Death Penalty Statute Is Not Unconstitutional For Failing To Place The Burden Of Proof On The State Regarding The Mitigation Special Issue. (Claim 9).

Finally, Mays claims the Texas death penalty statute is unconstitutional because it fails to place the burden of proof on the State regarding the mitigation special issue. Pet. 57. But Mays acknowledges that the Fifth Circuit has held that "'[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation issue be assigned a burden of proof.'" Pet. 61 (quoting *Rowell*, 398 F.3d at 378, and citing *Druery*, 647 F.3d at 546). Based on Mays's acknowledgment that *Rowell* and *Druery* foreclose his argument, the Director understands Mays to invoke the *Apprendi*[53] and *Ring*[54] line of cases as authority for his position. *See Rowell*, 398 F.3d at 378 (rejecting the proposition that either *Apprendi* or *Ring* require the State to prove the absence of mitigating evidence beyond a reasonable doubt); *Druery*, 647 F.3d at 546 (same). However, as discussed below, *Ring* and *Apprendi* do not mandate relief on Mays's claim. Those cases were decided on the narrow grounds that a jury must determine beyond a reasonable doubt whether *aggravating* factors exist that increase a defendant's punishment beyond the range authorized by the jury's verdict. Texas's system clearly complies with this requirement; it mandates that the jury determine beyond a reasonable doubt that statutory aggravating factors exist at both the guilt and punishment

---

[53]     *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

[54]     *Ring v. Arizona*, 536 U.S. 584 (2002).

phases of a capital murder trial. Mays has again failed to demonstrate that the state courts unreasonably applied clearly established federal law in denying him relief.

In *Apprendi*, the Supreme Court reversed a non-capital conviction because the trial court unconstitutionally increased the defendant's sentence beyond the statutory maximum based upon a separate—but unindicted—hate crime statute.  530 U.S. at 470–71. The underlying indicted offense carried a maximum penalty of ten years incarceration only, while the unindicted hate crime offense was punishable by an extended term of imprisonment, between ten and twenty years, "if the trial judge [found], by a preponderance of the evidence, that the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race. . . ." *Id.* at 468–69 (internal quotations omitted). Apprendi was sentenced to twelve years. *Id.* at 471. The Court reasoned that the New Jersey provision at issue violated "basic principles" that mandate that a jury try all facts necessary to constitute a statutory offense, and that these facts be proven beyond a reasonable doubt. *Id.* at 483–84. Consequently, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Because the New Jersey hate crime statute required (1) the trial judge to resolve (2) the fact question of the defendant's state of mind or criminal motive, and (3) the burden of proof was a preponderance of the evidence, the Court declared the statute unconstitutional. *Id.* at 491–93.

In *Ring*, the Supreme Court applied its rationale in *Apprendi* to Arizona's capital sentencing scheme. 536 U.S. at 588–89. A jury convicted Ring of the lesser-included offense of felony murder because the evidence tied him to the proceeds of an armored car robbery, but not the actual murder of the driver. *Id.* at 591–92. Under Arizona law, Ring was not eligible for the death penalty, the statutory maximum for first-degree murder, unless the judge made further findings. *Id.* at 592. During the sentencing proceeding, new evidence led the trial court to conclude that Ring murdered the armored car driver. The trial court sentenced Ring to death. *Id.* at 593–94. The Supreme Court noted that, "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* at 596. The Court further explained that where an increase in punishment is contingent on an additional finding of fact, the Constitution requires a jury to find that fact beyond a reasonable doubt. *Id.* at 602. Thus, to the extent that Arizona's sentencing scheme "[allowed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty," the Supreme Court held it unconstitutional. *Id.* at 609.

To the extent Mays maintains that Texas's death penalty statute is inconsistent with the Sixth and Fourteenth Amendment principles announced in *Apprendi* and *Ring* because the State is not required to prove the mitigation issue beyond a reasonable doubt, he is mistaken. *Apprendi*'s and *Ring*'s Sixth and Fourteenth Amendment rationales do not apply to jury determinations of *mitigating* factors that might *reduce* a defendant's sentence. To the extent Mays attempts to construe the mitigation special issue as an aggravating factor by

suggesting that the *absence* of sufficient mitigation evidence functionally aggravates his sentence from life to death, the Fifth Circuit has rejected similar arguments. *See Woods v. Johnson*, 75 F.3d 1017, 1034 ("*Jurek* held that the Texas punishment phase issues do not function as aggravating circumstances, but rather adequately 'guide and focus the jury's objective consideration of particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.'") (internal citations omitted). Although a Texas capital sentencing jury must specifically answer the disputed issue in the negative to render a death sentence, the actual function of that special issue is plainly meant to benefit the defendant by allowing the jury a way to give effect to mitigating evidence.

It is also relevant to consider that capital punishment jurisprudence has traditionally recognized the distinction between aggravating factors and mitigating circumstances. As discussed previously, in *Tuilaepa*, the Supreme Court explained that there are "two different aspects of the capital decision making process: the eligibility decision and the selection decision." 512 U.S. at 971. To determine that an  individual is eligible for the death penalty, the jury must convict the defendant of murder and find one "aggravating circumstance" at either the guilt or punishment phase of trial. *Id.* at 972. "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)," and may not be a factor applicable to every defendant convicted of murder*. Id.* The selection decision, however, serves an entirely different function. At the selection stage, the jury decides whether a defendant who is eligible for the death penalty should, in fact, receive that sentence. *Id.* "What is important at the selection stage is an *individualized* determination on

the basis of the character of the individual and the circumstance of the crime." *Id.* (citing *Zant v. Stephens*, 461 U.S. 862, 879 (1983)) (original emphasis).

Under Texas law, the mitigation special issue is not an element of the offense of capital murder nor is it an aggravating circumstance as defined by *Tuilaepa*. Rather, it constitutes the vehicle by which the jury may make an individualized determination regarding the offender's moral culpability, as the Supreme Court requires. *Penry*, 532 U.S. at 797; *Eddings v. Oklahoma*, 455 U.S. 104, 111–12 (1982); *Woodson v. North Carolina*, 428 U.S. 280, 303–04 (1976). In making the decision, the jury is instructed to consider all the evidence, including the circumstances of the offense, the defendant's character and background, and the defendant's general moral culpability. Tex. Code Crim. Proc. art. 37.071 § 2 (e) & (f). The jury need not agree on what evidence supports an affirmative answer. Tex. Code Crim. Proc. art. 37.071 § 2 (e) & (f). Clearly, the mitigation issue confers upon the jury a broad ability to show leniency and *reduce* the defendant's sentence to life imprisonment. Thus, this special issue is not functionally equivalent to an aggravating factor.

Moreover, both the *Apprendi* and *Ring* decisions expressly acknowledged the distinction between aggravating factors and mitigating circumstances. In *Ring*, the Court emphasized that the defendant's claim was "tightly delineated" to whether the Sixth Amendment requires a jury finding on the aggravating circumstances asserted against him; the defendant made no assertions regarding mitigating circumstances. *Ring*, 536 U.S. at 597 n.4. The Court's ultimate conclusion was limited accordingly. *Ring*, 536 U.S. at 609 (holding that *Walton*, 497 U.S. 639, was overruled to the extent that it "allows a sentencing, sitting

without a jury to find an *aggravating* circumstance necessary for the imposition of the death penalty," and that "[b]ecause Arizona's enumerated *aggravating factors* operate as the functional equivalent of an elements of a greater offense, the Sixth Amendment required that they be found by a jury") (internal citations and quotations omitted).

The *Apprendi* decision also noted and reaffirmed the distinction between "facts in aggravation of punishment and facts in mitigation." 530 U.S. at 490 n.16. The *Apprendi* Court emphasized that when a judge finds a fact that allows a defendant to "escape the statutory maximum" attached to a jury verdict, the judge's finding "neither expos[es] the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the verdict alone." *Id.* In a concurring opinion joined by Justice Scalia, Justice Thomas also emphasized that facts with the potential to mitigate punishment are not an element of a crime that might increase a sentencing decision. *Id.* at 501 (Thomas, J., concurring, joined by Scalia, J.). Clearly, neither *Ring*'s nor *Apprendi*'s holdings contemplates extending the Sixth Amendment's "reasonable doubt requirement" to a capital jury's finding regarding mitigating evidence.

Equally important here is the portion of *Walton* that the *Ring* majority left untouched, wherein the Supreme Court stated that the Eighth Amendment does not bar a state from imposing a burden of proof *on the defendant* to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 649–51. The Court noted that nothing in its Eighth

Amendment jurisprudence precluded the state from "specifying how mitigating circumstances are to be proved." *Id.* at 649. Indeed, the Court noted that in several other capital cases, it found it constitutional for a state to impose a burden of proof on the defendant to prove issues such as self-defense, insanity, and "the affirmative defense of extreme emotional disturbance." *Id.* at 650 (citations omitted). From these cases, the Court gleaned the following rule:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden to prove mitigating circumstances sufficiently substantial to call for leniency.

*Id.*

Finally, the practical implications of Mays's argument preclude his reading of *Apprendi* and *Ring*. Prosecutors would be in the absurd position of proving a negative (the absence of mitigating evidence) beyond a reasonable doubt. This is impossible under the Texas system, in which  jurors are left to decide what evidence is mitigating and whether that evidence suggests that mercy is appropriate, and where individual jurors need not agree on what evidence is mitigating when voting on this issue. In sum, accepting Mays's assertion would improperly extend *Apprendi* and *Ring* without basis and pervert much of the Supreme Court's Eighth Amendment jurisprudence. It would also be highly impractical. For the foregoing reasons, federal habeas relief is not warranted on this claim.

## CONCLUSION

For all of the foregoing reasons, the Director respectfully requests that the Court deny

Mays relief in all things, including a certificate of appealability regarding any of his claims.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division


* Lead Counsel

\* /s/ Leslie K. Kuykendall
LESLIE K. KUYKENDALL
Assistant Attorney General
Postconviction Litigation Division
State Bar No. 24029673

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Tel:  (512) 936-1400
Fax: (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I certify that on July 31, 2012, I electronically filed the foregoing pleading with the Clerk of the Court for the United States District Court, Eastern District of Texas, Tyler Division, using the Court's electronic case-filing system. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Mr. Scott Smith
State Bar No. 18688900
120 South Crockett Street
P.O. Box 354
Sherman, Texas 75091-0354
email: smithlaw@airmail.net

 /s/ Leslie K. Kuykendall
LESLIE K. KUYKENDALL
Assistant Attorney General